# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BILAL HANKINS,<br><br>                    Plaintiff,<br><br>v.<br><br>KEVIN WHEELER, RAMON PIERRE, and CARL PERILLOUX (in their individual and official capacities), THE ORLEANS LEVEE DISTRICT POLICE, THE HOUSING AUTHORITY OF NEW ORLEANS, THE HURSTVILLE SECURITY AND NEIGHBORHOOD IMPROVEMENT DISTRICT, and DOE INSURANCE COMPANIES 1-6,<br><br>                    Defendants. | Case No.  2:21-cv-01129<br><br>Judge:<br><br>Magistrate Judge:<br><br><br>*Jury Trial Demanded* |

## COMPLAINT

Plaintiff Bilal Hankins ("Bilal" or "Plaintiff"), alleges Defendants—Officer Kevin Wheeler, an Orleans Levee District Police ("OLDP") employee, Officer Ramon Pierre, a Housing Authority of New Orleans ("HANO") employee, and Officer Lieutenant Carl Perilloux, their supervisor and a Hurstville Security and Neighborhood Improvement District ("Hurstville") employee, each individually and in their official capacities, along with their insurers—violated his constitutional rights and the laws of the State of Louisiana, as follows:

### I.  NATURE OF THE ACTION

1.      This is a civil action brought pursuant to, inter alia, 42 USC § 1983 based on violations of Plaintiff's rights under the First and Fourth Amendments of the United States Constitution, and attendant state law claims.

2.      18-year-old Bilal Hankins was looking for a lost dog when Defendants Wheeler and Pierre violated his clearly established rights under the U.S. Constitution and Louisiana law.

3.      Bilal was driving through his neighborhood searching for a missing chihuahua with two friends—a college student and a 12-year-old child. The friends encountered Defendant Wheeler, a uniformed police officer in a marked police car. They stopped and asked him for help before continuing driving down the road in their search.

4.      Instead of providing the requested assistance, Defendant Wheeler called Defendant Pierre, a plainclothes officer in an unmarked vehicle, for backup. Together, Defendants Wheeler and Pierre followed Bilal and his friends and decided to conduct an unlawful traffic stop. The officers turned on their flashing lights, pulled Bilal and his friends over, questioned them at gunpoint, and accused them of lying about the lost dog. After Bilal and his friends proved they were telling the truth, they were finally allowed to leave.

5.      Bilal's terrifying encounter with Defendants Wheeler and Pierre took place against a broader backdrop of racially motivated policing and a disturbing trend of police misconduct across the United States. Just three weeks prior to the incident, George Floyd was murdered by police officer Derek Chauvin and footage of the killing sparked national outrage.[1] The country was forced to reckon with the reality that Black men are more likely than their white counterparts to be stopped by the police[2] and to be subjected to the use of force.[3] Violent police stops can lead to a host of negative consequences, including provoking PTSD-like physical and psychological

---

[1] Associated Press, *Death of George Floyd, trial of Derek Chauvin: Timeline of key events* (April 19, 2021), *available at* https://www.latimes.com/world-nation/story/2021-04-19/timeline-key-events-george-floyd-death-derek-chauvin-trial ("George Floyd's death in police custody in Minneapolis on May 25, 2020, touched off a nationwide reckoning on race and led to the trial of ex-officer Derek Chauvin.").

[2] Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, NATURE HUMAN BEHAVIOR, 736 (July 2020), *available at* https://www.nature.com/articles/s41562-020-0858-1 (finding "that decisions about whom to stop and, subsequently, whom to search are biased against Black and Hispanic drivers").

[3] Phillip Goff, et al., *The Science of Justice: Race, Arrests, and Police Use of Force*, CENTER FOR POLICING EQUITY, 1, 15 (July 2016), *available at* https://policingequity.org/images/pdfs-doc/CPE_SoJ_Race-Arrests-UoF_2016-07-08-1130.pdf (finding that the rate of use of force on Black people was 3.6 times as high as the rate for white people).

responses.[4] When the officers pointed their guns in his direction, Bilal Hankins was reminded that as a Black youth, he is more likely than his white peers to be perceived and treated as a threat *even when he asks the police for help*.

6.     No reasonable suspicion justified the stop of Bilal and his friends—especially given that Bilal and his friends approached voluntarily approached Defendant Wheeler first and asked for help. Nor was it reasonable for Defendants Wheeler and Pierre to draw their weapons and threaten deadly force. The missing dog was found the following day, but Bilal and his friends will suffer trauma from this event for the rest of their lives.

## II. PARTIES

7.     Plaintiff Bilal Hankins is a person of majority and a resident of New Orleans.

8.     Defendant Kevin Wheeler is currently, and was at the time of the events set forth in this Complaint, an officer employed by both the OLDP and Hurstville. He is sued in his individual and official capacities.

9.     Defendant Ramon Pierre is currently, and was at the time of the events set forth in this Complaint, an officer employed by both the HANO police and Hurstville. He is sued in his individual and official capacities.

10.     Defendant Carl Perilloux is currently, and was at the time of the events set forth in this Complaint, an officer employed by both the OLDP Officer Reserve Division and Hurstville. He is sued in his individual and official capacities.

11.     Defendants Wheeler, Pierre, and Perilloux were acting within the scope of their employment and under the color of state law at all times relevant to this Complaint.

12.     Defendants Doe Insurance Companies 1-10 are yet unknown insurance agencies that

---

[4] Amanda Geller PhD, Jeffrey Fagan PhD, Tom Tyler PhD, & Bruce G. Link PhD (2014) "Aggressive Policing and the Mental Health of Young Urban Men." American Journal of Public Health. 104(12): 2321-2327, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232139.

are doing business in the state of Louisiana and that provide or provided insurance to cover the kind of claims contained herein.

13.     All Defendants are jointly and severally liable for the tortious conduct described herein.

## III.   JURISDICTION AND VENUE

14.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiff's claims of federal civil rights violations arise under the Constitution and laws of the United States, including 28 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue in the Eastern District of Louisiana is proper pursuant to 28 U.S.C. § 1391(b)(2) because the wrongful conduct giving rise to Plaintiff's claims occurred in Orleans Parish, Louisiana, which is located within the Eastern District of Louisiana.

16.     Declaratory relief is authorized by 28 U.S.C. § 2201. A declaration of law is necessary to determine the respective rights and duties of the parties.

## IV.   FACTS

### A.   Private Security Districts, "Paid Details," and Police Misconduct In New Orleans

17.     These events took place within a private policing district in New Orleans—a construct that many citizens do not even know exists. New Orleans has a dozen or so different law enforcement agencies, including the NOPD, Orleans Parish Sheriff's Office, and Louisiana State Police, accompanied by smaller agencies like the Orleans Parish Constable, HANO police, harbor police, levee police, and military police.[5] Yet residents of certain neighborhoods, dissatisfied with the already existing myriad of services provided by these multiple agencies,

---

[5] Ryan Whirty, *Does NOLA have too many law enforcement agencies?*, The Louisiana Weekly (September 3, 2020), http://www.louisianaweekly.com/does-nola-have-too-many-law-enforcement-agencies-2/ (noting that the numerous law enforcement agencies "jockey for funding, hold territorial rivalries with each other, and can at times blur together in the eyes of the public").

have decided to employ their own additional police forces. Louisiana state law allows the residents in these neighborhoods, historically whiter and wealthier than the rest of New Orleans, to self-impose a special tax to fund increased police presence in their area.[6] This creates special security districts such as the Hurstville security district involved in this case.

18.     These semi-public, semi-private districts are governed by a mix of state, city, and local authority. Each district is sanctioned by Louisiana state law and created by a vote of the Louisiana state legislature. The self-imposed taxes are collected through the governing city authority. At the local level, each security district is governed by a board of commissioners who are residents of the neighborhood and are appointed by the mayor, the city council, the relevant Louisiana House of Representatives and Senate members, and other board members.[7]

19.     These neighborhood-specific security districts often employ police officers from other law enforcement agencies in New Orleans for security patrols, also known as "paid details." With so many independent agencies, it has been reported that officers who are fired or forced to resign from one for misconduct can easily find employment at another.[8] Indeed, one of the officers involved in this case was fired from the NOPD with a troubling track record, but readily found employment at the OLDP and at Hurstville.[9]

20.     The fact that each neighborhood-specific security district operates independently

---

[6] Ryan Galvin Wise, *Public Goods for a Few: The Role of Crime Prevention and Security Districts in New Orleans*, 35 (2015), *available at* https://scholarworks.uno.edu/td/1627 (finding that the median income of households in security districts is higher than the median income of the city at large and that residents in the security districts are whiter than residents of the city at large).

[7] *See* **Exhibit A** (HSD Legislation Act 151).

[8] Kimbriell Kelly et al., *Forced out over sex, drugs and other infractions, fired officers find work in other departments*, The Washington Post (December 28, 2017), http://wapo.st/2zgVW3S?tid=ss_mail (finding that 53 officers who were fired or pushed out of the New Orleans Police Department were hired by other police departments).

[9] *See* **Exhibit B** (Wheeler v. Dep't of Police, City of New Orleans Civil Service Commission Dkt. No. 8109 (Nov. 30, 2015), *available at* https://www.nola.gov/getattachment/e30c3d97-406d-41ff-9274-5e2f1520c785/Vara,-J-Wheeler,-K-,-8106-8109); *See* **Exhibit C** (Flood Protection Authority Hiring Letter for Kevin Wheeler (Dec. 23, 2019)).

insulates them from public accountability. Some, like Hurstville, employ off-duty police officers for "paid details," while others employ private security officers.[10] Frequently, off-duty officers on "paid detail" wear publicly-funded police uniforms, drive publicly-funded police cars, and use publicly-funded police resources, as Defendant Wheeler did in this case. Hurstville in particular hires only commissioned law enforcement officers so that the officers can wield public policing powers—such as making stops like the unreasonable one to which Bilal Hankins was subjected. However, the Hurstville officers do not serve the public at large. They serve the more affluent residents of the neighborhood that hired them. Even more dangerous is that they operate with scant policy or accountability, often loosely answering only to the neighborhood board.[11]

21.     In 2011, the United States Department of Justice ("DOJ") issued a consent decree requiring the NOPD to "completely restructure" a similar "paid detail" system.[12] Just like the OLDP and HANO "paid detail" systems at issue in this case, the NOPD's "paid detail" system allowed off-duty officers to work private security patrols for neighborhoods and businesses, among other duties.[13] In its investigation report, the DOJ concluded that "few aspects of NOPD [were] more broadly troubling" than this "paid detail" system.[14] The DOJ also observed that NOPD's system of "privatized officer overtime […] facilitate[d] abuse and corruption" and "contribute[d] to inequitable policing."[15] The consent decree mandated "broad changes in

---

[10] Brendan McCarthy, *N.O. residents increasingly turning to private police patrols*, WWLTV (8:08 AM CDT October 30, 2013), https://www.wwltv.com/article/news/investigations/no-residents-increasingly-turning-to-private-police-patrols/289-319979422.

[11] *Id.*; Wise, *supra* note 3, at 24.

[12] *See* Amended and Restated Consent Decree Regarding the New Orleans Police Department at 85, USA v. City of New Orleans, No. 12-cv-1924 (E.D. La., Oct. 2, 2018), *available at* https://www.laed.uscourts.gov/sites/default/files/nopdconsent/12-1924%20%23565%20Amended%20and%20Restated%20CD.pdf.

[13] *The Consent Decree*, Consent Decree Monitor, New Orleans, Louisiana, *available at* http://consentdecreemonitor.com/the-consent-decree (last accessed Jun. 4, 2021).

[14] United States Department of Justice, *Investigation of the New Orleans Police Department* at xv, 100 (2011), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf.

[15] *Id.*

policies and practices" to ensure "NOPD employees' off-duty secondary employment does not compromise or interfere with the integrity and effectiveness of [the] NOPD."[16] Notwithstanding the DOJ's clear and unequivocal censure of the NOPD's "paid detail" system, other law enforcement agencies not subject to the consent decree—including HANO and the OLDP—continue to endorse "paid detail" work and take part in the "paid detail" system.

22.     It is against the backdrop of the broad, unregulated powers yielded by these scattered and de-centralized policing constructs that the following events took place.

**B.   The Unlawful Stop**

23.     On Saturday, June 13, 2020, at around 11:30 PM, Bilal Hankins went out looking for a lost dog.

24.     Bilal's family has lived in the same neighborhood in Uptown New Orleans for more than 60 years. At the time the events giving rise to this Complaint took place, Bilal was 18 years old. He had just recently graduated from high school. Bilal was still living in his family home on Camp Street, helping his mother Lona Hankins ("Lona") care for his grandmother.

25.     At the front of the family home is a small apartment, which Lona was renting out to a tenant, Diondra Robbins ("Diondra"). Diondra was taking care of her 12-year-old nephew, L.M. ("LM"), for the summer. Diondra owned a white chihuahua with brown spots named Duchess.

26.     On the evening of June 13, Bilal invited his friend Tahj Pierre ("Tahj") over for dinner. Tahj was a few years ahead of Bilal in school and was visiting from college. Bilal, Tahj, Diondra, and LM were socializing after dinner when they realized Duchess had escaped. Duchess had an underlying condition for which she needed medication, so it was important to find her quickly.

27.     Tahj, Bilal, and LM hopped into Tahj's black BMW to drive through the

---

[16] *See* Amended and Restated Consent Decree Regarding the New Orleans Police Department, *supra* n.12 at 85.

neighborhood and search. The BMW was a high school graduation present to Tahj from his mother. Tahj was in the driver's seat; Bilal was in the back left side passenger seat (behind the driver's seat); and LM was in the front right side passenger seat. They drove slowly down Camp Street heading west, calling and whistling for Duchess.

28.     After driving a few blocks, the group observed a white police officer wearing an OLDP uniform, parked in an OLDP police car at the intersection of Camp Street and Valmont Street.

29.     The three youths—a college student, a high schooler, and a twelve-year-old child—were hesitant to approach the police officer. They were aware of recent racial violence across the nation, and stories of police mistreating Black men and boys especially. But they were hopeful the officer could help them search. They decided to ask the officer for assistance.

30.     Unfortunately, the events that followed would confirm Bilal and his friends' worst fears. As Bilal would later learn, that officer in the OLDP car was Defendant Wheeler, a former NOPD officer who had been fired twice, including once for dishonesty after tasing an unarmed suspect and lying about it. Defendant Wheeler's "day job" was working with the OLDP. But that evening, he was off-duty, working a private paid security detail for the neighborhood adjoining Bilal's own—the Hurstville security district.

31.     As Tahj drove up alongside Defendant Wheeler's car, Bilal waved to Defendant Wheeler and asked if he had seen a dog. When Defendant Wheeler replied in the negative, Bilal explained they were searching for a white chihuahua with brown spots. He gave Defendant Wheeler the address of his family home and asked if Defendant Wheeler could help search.

32.     In their complaints and interviews regarding that evening, Bilal, Tahj, and LM all consistently describe voluntarily and proactively approaching Defendant Wheeler and asking for help finding the lost dog. Importantly, Defendant Wheeler and Pierre's *own* reports of the incident on June 13 *confirm* that Bilal and his friends approached Defendant Wheeler first and

asked for help finding their lost dog. Specifically, Defendant Wheeler reported that Bilal and his friends approached the OLDP vehicle and asked him for help finding a lost dog. Defendant Pierre's report describes how Defendant Wheeler radioed Defendant Pierre, reported encountering Bilal and his friends, and again noted the request to help find the lost dog.

33.     After asking Defendant Wheeler for help, Bilal and his friends continued their search. After driving for a few blocks, they noticed Defendant Wheeler and another unmarked vehicle following behind them. That unmarked vehicle belonged to the second officer, Defendant Pierre. Defendant Pierre was in plain clothes, driving his personal vehicle.

34.     Defendant Pierre's primary employer is the HANO police department. But at the time, Defendant Pierre, like Defendant Wheeler, was off-duty, and working as private patrol for the Hurstville neighborhood.

35.     Defendant Wheeler had called Defendant Pierre in for backup. Defendant Wheeler informed Defendant Pierre of his encounter with Bilal and Bilal's request to help find a lost dog, but expressed suspicion based on his observation of three back males in a nice car in a nice neighborhood—classic racial profiling.[17] Defendant Wheeler claimed to be suspicious because Bilal and his friends were driving slowly, and it was common for "certain people" to drive slowly down the street in search of potential targets for burglary or carjacking, leaning out the windows and pulling on car door handles to see if they were unlocked.[18]

36.     On information and belief, by "certain people," Defendant Wheeler means Black people.

37.     On information and belief, Defendant Wheeler did not believe it was a common tactic for would-be car burglars or carjackers to approach police and draw attention to their presence prior to committing a crime.

---

[17] *See* **Exhibit D** (*Statement Concerning a complaint made against Officer Pierre while working the Hurstville Detail*, HANO (June 25, 2020)).
[18] *See* **Exhibit E** at 5 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).

**38.**     On information and belief, Defendant Wheeler ran a license plate check on Tahj's BMW, which did not report Tahj's BMW as stolen.

**39.**     On information and belief, Defendants Wheeler and Pierre followed Bilal and his friends for approximately another few blocks. At the time they began following Bilal and his friends, both officers were aware that there was a reasonable explanation for the behavior of Bilal and his friends—leaning out of windows, driving slowly—namely that they were looking for a lost dog.

**40.**     On information and belief, in the entire time they followed and observed the BMW, neither Defendant reported any behavior by Bilal or his friends that was inconsistent with their given explanation that they were looking for a lost dog. Neither Defendant reported seeing Bilal, Tahj, or LM reaching towards car door handles, pulling on car door handles, or otherwise touching or attempting to engage with cars parked on the street as they were driving by. Neither Defendant ever reported that Bilal or his friends appeared nervous, unfriendly, or threatening, or that they attempted to evade the police.

**41.**     In spite of having full knowledge of Bilal's request for help, Defendants Wheeler and Pierre decided together to conduct an illegal traffic stop, pulling Bilal and his friends over without valid reasonable suspicion.

**42.**     Bilal and his friends were confused why Defendants Wheeler and Pierre were following them, because they thought it would make sense to split up and cover more ground in their search. But they trusted Defendant Wheeler knew what he was doing.

**43.**     After a few more blocks of slow driving, Bilal and his friends observed Defendants Wheeler and Pierre turn on their flashing lights. Bilal and his friends kept driving at the same slow pace. At first, they didn't believe the flashing lights were for them—they had just asked for help. Bilal and his friends thought the police must have been called to some other emergency, and they were flashing their lights to signal that they needed to pass. So they turned down a side

street to allow Defendants Wheeler and Pierre to continue along the narrow main road.

44.    Bilal and his friends were surprised when both officers turned down the same side street, and even more surprised when Defendant Wheeler began shouting over the intercom for the driver to get out of the car and put his hands up. Bilal and his friends were confused, thinking perhaps the officers were trying to signal they had found the dog. Confusion and disbelief turned into realization that they were being pulled over, despite having done nothing wrong.

45.    Once that realization hit, the driver Tahj quickly complied, pulling over near the neighborhood elementary school and exiting the car with his hands up. Bilal put his hands out the car window to show he was unarmed, and LM put his head out the window to see what was happening. Even though Bilal, Tahj, and LM's actions were entirely peaceful and compliant, and even though both officers recognized that they were youths (Defendant Wheeler later referred to all three as "kids")[19], both officers were brandishing their guns at the stopped BMW.

46.    This stop and display of deadly force were objectively unreasonable. At the time the stop was conducted and the threat of force was used, Defendants Wheeler and Pierre knew—and a reasonable officer would have known—that these actions were objectively unreasonable.

47.    The OLDP manual, for example, states that "[c]itizens are free to walk and drive our streets, highways, and other public places without police interference so long as they obey the law," and that "racial and ethnic profiling are totally unacceptable patrol tactics."[20]

48.    The OLDP manual further instructs that "[t]he use of a firearm is in all probability the most serious act in which a law enforcement officer will engage," and that "the use of deadly force is not justified merely to protect property interests."[21] OLDP guidelines caution against "[u]nnecessarily or prematurely drawing or exhibiting a firearm," noting that it "creates

---

[19] **Exhibit E** at 6–7 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).
[20] *See* **Exhibit F** (Orleans Levee District Police Operations Manual, TRAFFIC, PEDESTRIAN STOPS AND FIELD INTERVIEWS, Section 6.1 (Dated Aug. 1, 2001, revised Sept. 29, 2010)).
[21] *See* **Exhibit G** (Orleans Levee District Police Operations Manual, USE OF FORCE, Section 9.0 (Dated Sep. 26, 1997, revised Oct. 13, 2009)).

unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm," and instructing officers to "not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that it may be necessary to use the firearm."[22] The manual explains that "reasonable" force must be "necessary" (meaning that "if another alternative, such as verbal persuasion, would reasonably be expected to be effective under the particular circumstances, and this alternative was not attempted, the use of force is not legal") and reasonable in "degree" (meaning that "[t]he officer may only use enough force to overcome the amount of resistance or aggression met," and "[w]hen such resistance or aggression is reduced, the officer must correspondingly and immediately reduce the degree of force he is supplying, or the use of force is not legal").[23]

49.     Terrified, but attempting to remain calm, Bilal asked the reason for the stop. Defendant Wheeler declared accusingly that he had run a license plate check, and that the car came back registered to a woman in New Orleans East (a historically black neighborhood in a different part of the city), so there was no way Bilal and his friends were really looking for a dog. He demanded to know what they were doing.

50.     Bilal explained that he was a resident of the neighborhood, Tahj was visiting, and the car was registered to Tahj's mother, who lived in New Orleans East. Bilal suggested Defendant Wheeler check the address on Tahj's driver's license, which would match the address on the car registration. Defendant Wheeler took Tahj's license and went back to his vehicle, while Defendant Pierre kept his weapon up, providing cover.

51.     When Defendant Wheeler returned from his vehicle, his whole demeanor had changed. He brought a notepad, and he asked for Bilal to repeat the details about the lost dog and provide his address. He said, "I thought you guys were yanking my chain," and tried to joke with

---

[22] *Id.*
[23] *Id.*

them, saying, "you know, three young men, in a nice car, in this neighborhood." Realizing they had acted illegally, Defendants Wheeler and Pierre finally allowed Bilal and his friends to leave.

## C. The Attempted Coverup

52.     Following the stop, Defendants Wheeler and Pierre coordinated efforts to hide their misdeeds and stage excuses for their unlawful behavior. Specifically, Defendant Wheeler submitted false narratives in his official records, making material misstatements of fact. Defendant Pierre's report omitted material facts to create the misleading impression that Defendant Wheeler's version of the facts is correct, and also made material misstatements of fact in interviews. Defendants thereby intentionally corrupted the official written record—for Defendant Wheeler, at least, not for the first time.

53.     The fabrications that Defendant Wheeler placed in his reports and stated in interviews include, but are not limited to, the following. These statements are false, and Defendant Wheeler knew they were false at the time he made these statements:

   a.  Officers Defendant and Pierre decided jointly to conduct the stop based on their shared suspicion that Bilal and his friends were engaged or about to engage in car burglary or carjacking. In fact, Bilal approached Defendant Wheeler, drawing attention to their presence, and asked for help finding a lost dog. Defendant Pierre was made aware of this encounter by Defendant Wheeler. These facts are incompatible with any claimed suspicion of criminal activity.

   b.  Bilal did not leave or try to leave any contact information with Defendant Wheeler when he asked for help finding Duchess.[24] In fact, Bilal provided the address of his family home to Defendant Wheeler, as confirmed by Bilal's initial

---

[24] *See* **Exhibit H** at 1 (Orleans Levee District Police Department White Paper Report Regarding June 13, 2020); **Exhibit E** at 5, 19–20 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).

complaint to and subsequent interview with the OLDP.[25]

c.  Bilal and his friends conducted traffic violations, including failing to wear seatbelts and driving the wrong way on a one way street.[26] In fact, neither Defendant Wheeler nor Pierre reported any traffic violation at the time the incident occurred. No ticket or citation was ever issued for any traffic violation. Defendant Wheeler only reported these alleged traffic violations as a post-hoc justification after Bilal filed a complaint and the OLDP began its investigation.

d.  Defendant Wheeler did not use his intercom or PA system to command the BMW to stop, only a "firm, but polite tone of voice."[27] In fact, the statements of Bilal, Tahj, and LM all consistently recount Defendant Wheeler commanding the vehicle to stop over his intercom,[28] which is further confirmed by the report of Defendant Pierre.[29]

e.  Neither officer drew his weapon at any point, and no force or threat of force was used during the stop.[30] In fact, the statements of Bilal, Tahj, and LM consistently recount Defendants Wheeler and Pierre brandishing their weapons and using the threat of deadly force to conduct thee unlawful traffic stop.[31]

---

[25] *See* **Exhibit I** (East Jefferson/Orleans Levee District Citizen Complaint Form of Bilal Jules Hankins); **Exhibit J** at 5 (Transcript of Phone Interview of Bilal Hankins (July 10, 2020)).
[26] *See* **Exhibit H** at 2.
[27] *See id.*
[28] *See, e.g.*, **Exhibit I**; **Exhibit K** at 3 (June 23, 2020 Email from Tam Pierre Re: New Orleans Incident).
[29] *See* **Exhibit D** (*Statement Concerning a complaint made against Officer Pierre while working the Hurstville Detail*, HANO (June 25, 2020)).
[30] *See* **Exhibit H** at 2 (Orleans Levee District Police Department White Paper Report Regarding June 13, 2020); **Exhibit E** at 12, 24 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).
[31] *See, e.g.*, **Exhibit I** (East Jefferson/Orleans Levee District Citizen Complaint Form of Bilal Jules Hankins); **Exhibit K** at 3 (June 23, 2020 Email from Tam Pierre Re: New Orleans Incident); **Exhibit L** (June 21, 2020 Email from Lona Hankins RE: Guns Drawn on Youth by Security Detail).

54.     Defendant Pierre omitted multiple material facts from his report, including key details that would contradict Defendant Wheeler's version of events. For example, Defendant Pierre's report did not mention:

   a.  Details of the discussion in which Defendants Pierre and Wheeler agreed to conduct the unlawful traffic stop;

   b.  The length of time the officers followed Bilal and his friends before conducting the unlawful traffic stop;

   c.  Whether he observed any traffic violations prior to conducting the traffic stop;

   d.  The exact location and positioning of the traffic stop;

   e.  Whether he put on body armor;

   f.  Whether he or Defendant Wheeler at any point drew their weapons; or

   g.  Details of Defendant Wheeler's discussions with Bilal and Tahj during the unlawful traffic stop.

55.     In a subsequent interview, Defendant Pierre was asked "did you or any other officer remove their firearm and point it at [Bilal or his companions]"? Defendant Pierre responded, "No."[32] This statement was false, and Defendant Pierre knew it was false at the time he made this statement.

56.     These intentional, material omissions and misstatements were designed to create the misleading impression that Defendant Wheeler's version of the facts is correct.

**D.  Harm To Bilal**

57.     Bilal was deeply traumatized by the events of that night. At first, he did not want to tell his parents what happened. Eventually, Bilal got up the courage to tell his mother Lona about what happened. Lona was upset and worried, but concern was quickly replaced with questions—

---

[32] *See* **Exhibit M** (July 25, 2020 HANO Memorandum Re: Misconduct Complaint – Ramon Pierre).

who were these officers? What was an OLDP officer (whose responsibility is to patrol the lake front) doing uptown? What authority did they have to conduct a traffic stop? Defendant Wheeler appeared to be associated with the OLDP, but Bilal and Lona had no way of identifying the second plainclothes officer in the unmarked car, and the OLDP didn't know his identity. The investigation that followed revealed even more troubling findings.

58.     It took Lona multiple phone calls to various contacts and agencies before she could determine that Defendants Wheeler and Pierre were, in fact, working for Hurstville the night of June 13, 2020. But Hurstville did not publish its rules or polices, and there was no way to file a complaint through the Hurstville website. When Lona was finally able to find the contact information for Defendant Carl Perilloux, the Hurstville patrol supervisor, he claimed to have no written or verbal report of the incident.[33] Subsequent inquiries revealed that Hurstville has no written documents or policies regarding qualifications for hiring, firing, conducting background checks on, training, or supervising its patrol officers, or regarding tracking uses of force during investigatory stops.[34] When asked to provide all policies relating to officer conduct, traffic stops, racial profiling, and use of force, Hurstville produced a single page of instructions given to patrol officers, which states simply that officers should "conduct themselves in accordance with all their Agencies Rules and Regulations at all times."[35] In an email, a Hurstville representative admitted that, even though they employ a police force, they "don't have the knowledge or resources … for that part of what we do."[36]

59.     Hurstville's lack of appropriate oversight became even more apparent when Lona began researching the backgrounds of Defendant Wheeler and Pierre. Multiple news reports

---

[33] See **Exhibit L** (June 21, 2020 Email from Lona Hankins RE: Guns Drawn on Youth by Security Detail).
[34] See **Exhibit N** at 2–3 (April 23, 2021 Hurstville Response to Public Records Request).
[35] See **Exhibit O** (Hurstville Neighborhood Security Patrol Instructions).
[36] See **Exhibit P** at 2 (December 5, 2020 Email from Marshall Page re: Hurstville Security District).

confirmed that Defendant Wheeler had been fired in 2012 from his job at the NOPD for tasing an unarmed suspect and lying about it, colluding with his partner to falsely report that the man was armed and dangerous.[37] Prior to his firing, Defendant Wheeler had other "moral conduct" complaints filed against him in 2009 and 2010 for "unauthorized force," "false or inaccurate reports," and "adherence to law" violations, but these were not sustained.[38] In 2012, however, Defendant Wheeler was caught after a video recording from his Taser "clearly contradict[ed]" his reports and the statements he made to investigators, and his dismissal for dishonesty was upheld by the State of Louisiana Fourth Circuit Court of Appeal.[39] These facts are concerningly similar to the facts of Bilal's case.

60.    Nor did Defendant Perilloux or Hurstville conduct their own investigation into their officers' misconduct. Hurstville relied on the investigative capacity of OLDP and HANO, which found no wrongdoing after a perfunctory inquiry. Defendant Perilloux noted that the agencies conducted their investigations without statements from Bilal, Tahj, or LM, and even when those statements were provided it "did not change the final result of [either] agency's investigation."[40]

61.    Defendants Wheeler and Pierre were suspended briefly from Hurstville, but neither officer was otherwise "restricted from their normal patrol duties or restricted from working outside details."[41] Even while the investigations were still underway, the officers' innocence appears to have been a foregone conclusion; a representative for Hurstville emailed HANO

---

[37] See *3 officers dismissed, 1 suspended from NOPD for truthfulness violations*, WDSU (Nov. 28, 2012), *available at* https://www.wdsu.com/article/3-officers-dismissed-1-suspended-from-nopd-for-truthfulness-violatons/3359919;  Brendan McCarthy, *NOPD dismisses three officers for lying*, WWLTV (Dec. 12, 2012), *available at* https://www.wwltv.com/article/news/local/investigations/nopd-dismisses-three-officers-for-lying/289-346600818;  *Vara & Wheeler v. Dep't of Police*, No. 2016-CA-0036 (La .Ct. App. Jun. 29, 2016).

[38] See **Exhibit Q** (Kevin Wheeler - Officer Complaint History).

[39]*Vara & Wheeler v. Dep't of Police*, No. 2016-CA-0036 (La .Ct. App. Jun. 29, 2016).

[40] See **Exhibit R** at 1 (July 28, 2020 Email from Carl  Perilloux re: Update – Officer's Wheeler and Pierre's Internal Investigation).

[41] See id.

stating they were "eager to get Officer Pierre back to work with Hurstville as soon as the investigation is concluded and he has been cleared."[42]

62.     In short, both Defendants Pierre and Wheeler emerged from this incident with little or no consequences, entirely unscathed. For Bilal, on the other hand, the harm this incident caused has continued to manifest over the past year. Bilal has developed repeated nightmares and a deep distrust of the police. Bilal even disabled his social media accounts, unable to view reports and stories of others encountering police violence without experiencing flashbacks to his own harrowing experience.

63.     Bilal is one of innumerable Black youth who have been unjustly traumatized by law enforcement. Bilal, Tahj, L.M., and their families are all painfully aware that they could have become the next George Floyd or Trayvon Martin. Without accountability, law enforcement will continue to violate the rights of Black youth and shatter their sense of trust and security. Officers, and the organizations that enable them, must be held accountable for such misconduct. By bringing this case, Bilal seeks to hold Defendants Wheeler and Pierre, their supervisor Defendant Perilloux, and their employers accountable for their violations of citizens' rights under the U.S. Constitution, the Louisiana Constitution, and Louisiana state common and statutory laws.

**COUNT I**
**Violation of 42 U.S.C. § 1983 Excessive Force**
**Fourth and Fourteenth Amendments**
(All Defendants)

64.     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

65.     Defendants Wheeler and Pierre's actions, including pulling over the car in which Bilal was a passenger and brandishing their weapons—despite, *inter alia*, Bilal and his friends' request that Defendants Wheeler and Pierre assist them in locating the white chihuahua—as fully

---

[42] *See* **Exhibit S** at (August 10, 2020 Email from Marshall Page re: Ramon Pierre).

described herein, was malicious and constituted reckless, callous, and deliberate indifference to Bilal's clearly established and federally protected rights.

66.     Defendants Wheeler and Pierre, as complained of herein, deployed objectively unreasonable force against Bilal.

67.     Defendants Wheeler and Pierre, at all relevant times, were acting under the color of state law in their capacity as an OLDP and HANO officers, respectively. Their actions were taken within the scope of their employment with OLDP, HANO, and Hurstville.

68.     Bilal, at the time of the complained of events, had clearly established constitutional rights under the Fourth and Fourteenth Amendments to be secure in his person from unreasonable seizure through excessive force.

69.     At the time when Defendants Wheeler and Pierre used this force on Bilal, there were no factual circumstances that would have led a reasonable person to believe that Bilal posed a threat to Defendants Wheeler and Pierre.

70.     Defendants Wheeler and Pierre are not entitled to qualified immunity, because their conduct violated Bilal's constitutional rights and was objectively unreasonable.

71.     Defendants Wheeler's and Pierre's actions further were a result of Hurstville and Defendant Perilloux's failure to implement appropriate policies and procedures for use of force, and Hurstville's practice of dispatching inadequately trained or screened officers and failing to adequately supervise officer encounters involving use of force.

72.     Therefore, Bilal is entitled to compensatory damages, costs, and attorney's fees under 42 U.S.C. §§ 1983 and 1988, jointly and severally, because Defendants Wheeler and Pierre violated Bilal's clearly established rights.

### COUNT II
### Violation of 42 U.S.C. § 1983 Unreasonable Seizure
### Fourth and Fourteenth Amendments
(All Defendants)

73.     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the

Complaint by reference or incorporation as if fully set forth herein.

74.     Defendants Wheeler and Pierre seized Bilal, using force and words a reasonable person would be afraid to ignore by, *inter alia*, pulling over the car in which Bilal was a passenger, using their sirens and flashing lights, and then by pulling their firearms on Bilal.

75.     At the time Defendants Wheeler and Pierre seized Bilal, Bilal had clearly established rights under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure.

76.     Defendants Wheeler and Pierre's seizure of Bilal was objectively unreasonable, because of the facts and circumstances complained of herein, including, among other things, that Bilal and his friends had only shortly before requested Defendant Wheeler's assistance in locating the lost chihuahua.

77.     As a direct and proximate consequence of Defendants Wheeler and Pierre's acts and omissions, including the use of force, Bilal has suffered, and continues to suffer, damages including through emotional injury.

78.     Defendants Wheeler and Pierre, at all relevant times, were acting under the color of state law in their capacity as an OLDP and HANO officers, respectively. Their actions were taken within the scope of their employment with OLDP, HANO, and Hurstville.

79.     Defendants Wheeler and Pierre are not entitled to qualified immunity, because their conduct violated Bilal's constitutional rights and was objectively unreasonable.

80.     Defendants Wheeler's and Pierre's actions further were a result of Hurstville and Defendant Perilloux's failure to implement appropriate policies and procedures regarding traffic stops and racial profiling, and Hurstville's practice of dispatching inadequately trained or screened officers and failing to adequately supervise officer encounters involving traffic stops or racial profiling.

81.     Because of Defendants Wheeler and Pierre's acts and omissions, Bilal seeks and is entitled to compensatory damages, costs, and attorney's fees as provided for under 42 U.S.C.

§§ 1983 and 1988 for Defendants Wheeler and Pierre's violation of Bilal's clearly established rights to be free of unreasonable search and seizure.

82.     Moreover, the facts and circumstances complained of herein demonstrate that Defendants Wheeler and Pierre engaged in this conduct willfully, intentionally, and with reckless disregard for Bilal's constitutionally protected rights. Accordingly, Defendants Wheeler and Pierre are liable to Bilal for punitive damages for their unreasonable seizure of Bilal.

**COUNT III**
**42 U.S.C. §§ 1983 and 1985 - Conspiracy**
**Fourth and Fourteenth Amendments**
(Defendants Wheeler and Pierre)

83.     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

84.     Defendants Wheeler and Pierre knowingly, willfully, and intentionally conspired to deprive Bilal of his clearly established constitutionally protected rights.

85.     Defendants Wheeler and Pierre committed numerous acts and omissions in furtherance of the conspiracy by, *inter alia*, pulling over the car in which Bilal was a passenger and pointing their guns at Bilal as complained of herein.

86.     As complained of herein, Defendants Wheeler and Pierre knowingly, willfully, and intentionally committed these acts because they racially profiled Bilal on the basis that he was in a luxury vehicle with two other Black youth, in an affluent neighborhood.

87.     Defendants Wheeler and Pierre, at all relevant times, were acting under the color of state law in their capacity as an OLDP and HANO officers, respectively. Their actions were taken within the scope of their employment with OLDP, HANO, and Hurstville.

88.     Defendants Wheeler and Pierre are not entitled to qualified immunity, because their conduct violated Bilal's constitutional rights and was objectively unreasonable.

89.     As a direct and proximate consequence of Defendants' acts and omissions, Bilal has suffered, and continues to suffer, damages including through emotional injury.

90.     Therefore, Bilal is entitled to damages in an amount to be proven at trial.

**COUNT IV**
**Aggravated Assault**
(Defendants Wheeler and Pierre)

91.     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

92.     This is a claim for aggravated assault against Defendants Wheeler and Pierre.

93.     Defendants Wheeler and Pierre threatened to cause physical injury to Bilal with the use of a firearm, which is a dangerous weapon.

94.     Defendants Wheeler and Pierre knowingly, willfully, intentionally, and directly, and/or by being present and encouraging such behavior, assaulted Bilal by detaining him at gunpoint.

95.     Defendants Wheeler and Pierre were aware that they detained Bilal at gunpoint and, as a result of such conduct, put Bilal in reasonable fear of harmful or offensive contact constituting an imminent threat of battery.

96.     Defendant Wheeler was acting within the scope of his employment with the OLDP, and Defendant Ramon Pierre was acting within the scope of his employment with the HANO, and both Defendants were acting within the scope of their employment with Hurstville. Defendants were at all times relevant hereto acting under the color of state law.

97.     Defendants Wheeler and Pierre lacked any legal justification or excuse for their conduct.

98.     Defendants Wheeler and Pierre's actions were the legal and proximate cause of Bilal's damages as complained of herein, including Bilal's continued suffering of emotional injury and psychiatric distress. Bilal continues to suffer from severe distress, shock, anguish, humiliation, and loss of enjoyment of life.

99.     Defendants Wheeler and Pierre engaged in extreme and outrageous acts and omissions with the specific intent to cause Bilal harm. Accordingly, Bilal is entitled to damages

in an amount to be proven at trial.

## COUNT V
### Assault
(Defendants Wheeler and Pierre)

**100.**    Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

**101.**    This is a claim for assault against Defendants Wheeler and Pierre.

**102.**    Defendants Wheeler and Pierre knowingly, willfully, intentionally, and directly, and/or by being present and encouraging such behavior, assaulted Bilal by detaining him at gunpoint.

**103.**    Defendants Wheeler and Pierre were aware that they detained Bilal at gunpoint and, as a result of such conduct, put Bilal in reasonable fear of harmful or offensive contact constituting an imminent threat of battery.

**104.**    Defendant Wheeler was acting within the scope of his employment with the OLDP, and Defendant Ramon Pierre was acting within the scope of his employment with the HANO, and both Defendants were acting within the scope of their employment with Hurstville. Defendants were at all times relevant hereto acting under the color of state law.

**105.**    Defendants Wheeler and Pierre lacked any legal justification or excuse for their conduct.

**106.**    Defendants Wheeler and Pierre's actions were the legal and proximate cause of Bilal's damages as complained of herein, including Bilal's continued suffering of emotional injury and psychiatric distress. Bilal continues to suffer from severe distress, shock, anguish, humiliation, and loss of enjoyment of life.

**107.**    Defendants Wheeler and Pierre engaged in extreme and outrageous acts and omissions with the specific intent to cause Bilal harm. Accordingly, Bilal is entitled to damages in an amount to be proven at trial.

### COUNT VI
**Intentional Infliction of Emotional Distress**
(Defendants Wheeler and Pierre)

**108.**    Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

**109.**    Bilal asserts that Defendants Wheeler and Pierre violated Louisiana law by committing intentional torts, while acting within the scope of their employment at OLDP and HANO, respectively.

**110.**    As a direct and proximate cause of the intentional torts that Defendants Wheeler and Pierre committed as complained of herein, Bilal continues to suffer emotional injury and psychiatric distress. Bilal further continues to suffer from severe distress, shock, anguish, humiliation, and loss of enjoyment of life.

**111.**    Defendants Wheeler and Pierre's intentional and reckless acts are the sole cause of the aforementioned injuries that Bilal has suffered.

**112.**    Defendants Wheeler and Pierre's conduct was extreme and outrageous. They acted maliciously with specific intent to cause Bilal harm, and with reckless disregard for the consequences of their actions. Accordingly, Bilal is entitled to damages in an amount to be proven at trial.

### COUNT VII
**Negligent Infliction of Emotional Distress**
(Defendants Wheeler and Pierre)

**113.**    Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

**114.**    Bilal asserts that Defendants Wheeler and Pierre violated Louisiana law by committing negligent torts, while acting within the scope of their employment at OLDP and HANO, respectively.

**115.**    Defendants Wheeler and Pierre owed Bilal a duty of care and breached that duty of care causing Bilal harm within the scope of protection of the duty they owed him. Because of

Defendants Wheeler's and Pierre's negligent acts and omissions, Bilal continues to suffer emotional injury and psychiatric distress. Bilal further continues to suffer from severe distress, shock, anguish, humiliation, and loss of enjoyment of life.

116.    Defendant Wheeler's and Defendant Pierre's negligent acts are the sole cause of the aforementioned injuries that Bilal has suffered.

117.    Defendants Wheeler and Pierre acted with reckless disregard for the consequences of their actions and omissions. Therefore, Bilal is entitled to damages in an amount to be proven at trial.

**COUNT VIII**
**Negligent Hiring/Supervision**
(against Defendant Perilloux)

118.    Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

119.    Bilal asserts that Defendant Perilloux violated Louisiana law because of his negligence in hiring Defendants Wheeler and Pierre.

120.    Defendant Perilloux was, at all relevant times, employed by the OLDP and by Hurstville.

121.    Defendant Perilloux was responsible for supervising and training Hurstville patrol officers, including Defendants Wheeler and Pierre.

122.    Defendant Perilloux failed to implement any policies and procedures regarding the use of excessive force, racial profiling, or any other policing matters.

123.    Because of Defendant Perilloux's failure to implement policies and procedures and to train Hurstville patrol officers, Bilal suffered injury.

124.    Defendant Perilloux's failure to implement policies and procedures and failure to train amounts to deliberate indifference, because he was or reasonably should have been aware these failures would result in a constitutional violation.

125.    As a direct proximate cause of Defendant Perilloux's failure to implement policies

and procedures and failure to train, Bilal has suffered damages, including through emotional injury.

126. Therefore, Bilal is entitled to damages in an amount to be proven at trial.

## V. DEMAND FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

1. Compensatory damages;

2. Punitive damages;

3. Special damages;

4. Reasonable attorneys' fees and costs;

5. Prejudgment interest; and

6. Such other relief as this Court may deem just and proper.


Respectfully submitted,

Dated: June 10, 2021

*/s/Stephanie Willis*
Stephanie Willis
LA Bar No. 31834
swillis@laaclu.org
Nora Ahmed
*(pro hac vice application forthcoming)*
Nahmed@laaclu.org
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St., Suite 2160
New Orleans, Louisiana 70112
Telephone: (504) 444-6046

*and*

Patrick E. Gibbs
*(pro hac vice application forthcoming)*
pgibbs@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000

Christopher M. Andrews
*(pro hac vice application forthcoming)*
candrews@cooley.com
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6862

Rose M. Kautz
*(pro hac vice application forthcoming)*
rkautz@cooley.com
Amara S. Lopez
*(pro hac vice application forthcoming)*
alopez@cooley.com
COOLEY LLP
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Telephone: (310) 883-6422

*Counsel for Plaintiff Bilal Hankins*