## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BILAL HANKINS,<br><br>    Plaintiff,<br><br>v.<br><br>KEVIN WHEELER, RAMON PIERRE, CARL PERILLOUX, KERRY NAJOLIA, THE HOUSING AUTHORITY OF NEW ORLEANS, THE HURSTVILLE SECURITY AND NEIGHBORHOOD IMPROVEMENT DISTRICT, THE SOUTHEAST LOUISIANA FLOOD PROTECTION AUTHORITY-EAST, LAKEFRONT MANAGEMENT AUTHORITY, MICHAEL BRENCKLE, DARNELL LAURENT, THADDEUS PETIT, JAMEL BROWN, TYRONE MARTIN, DEMETRIUS JACKSON, TOMMY MERCADAL, LEONTINE MULLINS, and DOE INSURANCE COMPANIES 1-6,<br><br>    Defendants. | Case No. 2:21-cv-01129<br><br>Judge: Eldon E. Fallon<br><br>Magistrate Judge: Donna Phillips Currault<br><br><br>*Jury Trial Demanded* |

## FIRST AMENDED COMPLAINT

Plaintiff Bilal Hankins ("Bilal" or "Plaintiff"), alleges Defendants—Officers Kevin Wheeler, Ramon Pierre, Carl Perilloux, and their employers the Hurstville Security and Neighborhood Improvement District ("Hurstville"), the Southeast Louisiana Flood Protection Authority-East ("SLFPA-E"), the Lakefront Management Authority ("LMA"), and/or the Housing Authority of New Orleans ("HANO"), and other employees of these entities—violated his federal constitutional rights and the laws of the State of Louisiana, as follows:

### I.   NATURE OF THE ACTION

1. This is a civil action brought pursuant to, *inter alia*, 42 U.S.C. § 1983 based on violations of Plaintiff's rights under the Fourth and Fourteenth Amendments of the United States Constitution, and attendant state law claims.

2.      18-year-old Bilal Hankins and two of his friends—a college student and a 12-year-old child—were innocently looking for a lost chihuahua when Defendants Wheeler and Pierre violated Bilal's clearly established rights under the U.S. Constitution and Louisiana law.

3.      Bilal and his friends were driving through Bilal's New Orleans neighborhood looking for the dog, when the friends saw Defendant Wheeler, a uniformed police officer in a marked police car. The friends stopped and asked Defendant Wheeler whether he had seen a dog. When he replied no, they asked him for help with their search. They even specifically told him that they were searching for a white chihuahua with brown spots. Excited that Defendant Wheeler had seemingly agreed to help, they continued searching, driving down the road.

4.      Instead of providing the requested assistance, Defendant Wheeler called Defendant Pierre, a plainclothes officer in an unmarked vehicle, for backup. Together, Defendants Wheeler and Pierre followed Bilal and his friends and decided to conduct an unlawful traffic stop. The officers turned on their cars' flashing lights, pulled Bilal and his friends over, questioned them at gunpoint, and accused them of lying about their search for a lost dog. After Bilal and his friends proved they were telling the truth, they were finally allowed to leave.

5.      This encounter with Defendants Wheeler and Pierre terrified Bilal then and continues to terrify him now, more than a year later. It occurred against a broader backdrop of racially motivated policing and a disturbing trend of police misconduct across the United States. Just three weeks before the incident, George Floyd was murdered by police officer Derek Chauvin and footage of the killing sparked national outrage.[1] The country was forced to reckon with the reality

---

[1] Associated Press, *Death of George Floyd, trial of Derek Chauvin: Timeline of key events* (April 19, 2021), *available at* https://www.latimes.com/world-nation/story/2021-04-19/timeline-key-events-george-floyd-death-derek-chauvin-trial ("George Floyd's death in police custody in Minneapolis on May 25, 2020, touched off a nationwide reckoning on race and led to the trial of ex-officer Derek Chauvin.").

that Black men are more likely than their white counterparts to be stopped by the police,[2] and to

be subjected to the use of force.[3] Violent police stops can lead to a host of negative consequences,

including provoking post-traumatic stress disorder-like physical and psychological responses.[4]

Defendant Wheeler's and Pierre's pointing of their guns in his direction starkly reminded Bilal

that, as a Black youth, he is more likely than his white peers to be perceived and treated as a threat

***even when he asks the police for help***.

6. No reasonable suspicion justified Defendants Wheeler's and Pierre's stop of Bilal and

his friends—especially given that Bilal and his friends voluntarily approached Defendant Wheeler

first and requested his help. Nor was it reasonable for Defendants Wheeler and Pierre to draw their

weapons and threaten deadly force. The missing dog was found the following day, but Bilal already

has suffered trauma from this event and will continue to suffer trauma from this event for the rest

of his life.

## II.  PARTIES

7. Plaintiff Bilal Hankins is a person of majority and, at all relevant times, was a resident

of New Orleans, Louisiana.

8. Defendant Kevin Wheeler is currently, and was at the time of the events set forth in

---

[2] Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, NATURE HUMAN BEHAVIOR, 736 (July 2020), *available at* https://www.nature.com/articles/s41562-020-0858-1 (finding "that decisions about whom to stop and, subsequently, whom to search are biased against Black and Hispanic drivers").

[3] Phillip Goff, et al., *The Science of Justice: Race, Arrests, and Police Use of Force*, CENTER FOR POLICING EQUITY, 1, 15 (July 2016), *available at* https://policingequity.org/images/pdfs-doc/CPE_SoJ_Race-Arrests-UoF_2016-07-08-1130.pdf (finding that the rate of use of force on Black people was 3.6 times as high as the rate for white people); *see also* Associated Press, *Beatings And Buried Videos Are A Pattern With The Louisiana State Police* (Sept. 9, 2021), *available at* https://www.npr.org/2021/09/09/1035446605/louisiana-state-police-bodycam-videos-beatings (describing Louisiana state police's "deadly 2019 arrest of Ronald Greene" and observing that the Louisiana state police had found "that 67% of its uses of force in recent years have targeted Black people," which is "double the percentage of the state's Black population").

[4] Amanda Geller et al., *Aggressive Policing and the Mental Health of Young Urban Men*, AMERICAN JOURNAL OF PUBLIC HEALTH, 104(12): 2321-2327 (2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232139.

this Complaint, a police officer employed by both Hurstville and the Orleans Levee District Police Department ("OLD-PD"). Defendant Wheeler is sued in his individual capacity and is directly liable for the actions complained of herein. At all times described herein, Defendant Wheeler was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

9.     Defendant Ramon Pierre is currently, and was at the time of the events set forth in this Complaint, an officer employed by both Hurstville and the HANO police department. He is sued in his individual capacity and is directly liable for the actions complained of herein. At all times described herein, Defendant Pierre was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

10.     Defendant Carl Perilloux is currently, and was at the time of the events set forth in this Complaint, an officer employed by both Hurstville and the OLD-PD Officer Reserve Division. On information and belief, Defendant Perilloux, at all relevant times, was the supervisor and coordinator of Defendant Hurstville's security detail, including of Defendants Wheeler and Pierre. At all times described herein, Defendant Perilloux was in charge of the hiring, training, supervision, discipline, and control of appropriate staff to carry out the functions of the Hurstville security detail. He was also responsible for the supervision, administration, policies, practices, customs, and operations of Hurstville security detail. He was and is a final policymaker for Hurstville. He is sued in his individual and official capacities,[5] and is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Perilloux was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

---

[5] To identify the parties whose conduct has caused Plaintiff harm (especially as certain individual Defendants held employment with multiple entity Defendants), Plaintiff has named as Defendants both certain individual Defendants in their official capacity and also the government entity or entities who employed these individual Defendants.

11.     Defendant Hurstville is a political entity capable of suing and being sued. Hurstville is the entity having ultimate authority, oversight, responsibility and control over decisions affecting, and funding of, the Hurstville Neighborhood Patrol and its patrol officers, including the individually-named Defendants employed by Hurstville and sued in their personal capacities. Therefore, Hurstville is ultimately responsible for all policies, procedures, practices, decisions and customs employed by its law enforcement officials, supervisors and officers, including appropriate training and supervision of all sworn police officers acting under their authority and the color of law.

12.     Defendant Southeast Louisiana Flood Protection Authority-East ("SLFPA-E") is a political entity capable of suing and being sued. SLFPA-E is a flood protection authority operating across the Jefferson, Orleans, and St. Bernard parishes. The SLFPA-E directly employs a superintendent of police who is responsible for supervising the police security personnel of all levee districts within the SLFPA-E's territorial jurisdiction, including the security personnel of the Orleans Levee District. The authority of the OLD-PD is derived from a grant of the SLFPA-E.

13.     Defendant Lakefront Management Authority ("LMA") is a political subdivision capable of suing and being sued. LMA has authority over and manages the non-flood assets in the Orleans Levee District, including the OLD-PD. The OLD-PD authority is derived from a grant of the LMA.

14.     Defendant HANO is a political entity capable of suing and being sued. HANO is the entity having ultimate authority, oversight, responsibility and control over decisions affecting, and the funding of, the HANO Police Department and its police officers, including the individually-named Defendants employed by HANO and sued in their personal capacities. Therefore, HANO is ultimately responsible for all policies, procedures, practices, decisions and customs employed by its law enforcement officials, supervisors and officers, including appropriate training and supervision of all sworn police officers acting under their authority and the color of law.

15.     Defendant Kerry Najolia is currently, and was at the time of the events set forth in this Complaint, the superintendent of the OLD-PD for the SLFPA-E. At all times described herein, Defendant Najolia was in charge of the hiring, training, supervision, discipline, and control of appropriate staff to carry out the functions of the OLD-PD. He was also responsible for the supervision, administration, policies, practices, customs, and operations of OLD-PD. He was and is a final policymaker. He is sued in his individual and official capacities and is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Najolia was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

16.     Defendant Michael Brenckle is the Captain and commander of the OLD-PD, and is sued in his individual capacity. At all times described herein, Defendant Brenckle was in charge of the hiring, training, supervision, discipline, and control of appropriate staff to carry out the functions of the OLD-PD; this included Officer Wheeler. He was also responsible for the supervision, administration, policies, practices, customs, and operations of OLD-PD. He was and is a final policymaker, and at all pertinent times was acting under color of law. He is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Brenckle was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

17.     Defendant Darnell Laurent is a Lieutenant and internal affairs commander of the OLD-PD and is sued in his individual capacity. On information and belief, Defendant Laurent was and is the B Platoon Commander and POST Firearm Instructor/Training Coordinator for OLD-PD. At all times described herein, Laurent was responsible for the firearms training, supervision, discipline, and control of OLD-PD officers, including Defendant Wheeler. He was also responsible for the firearms supervision, administration, policies, practices, customs, and operations of OLD-PD. He is liable both directly and vicariously for the actions complained of herein. At all times

described herein, Defendant Laurent was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

18. Defendant Thaddeus Petit is a Sergeant of the OLD-PD and is sued in his individual capacity. At all times described herein, Defendant Petit was responsible for the training, supervision, discipline, and control of OLD-PD officers under his command, including Defendant Wheeler. He is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Petit was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

19. Defendant Jamel Brown is a police officer of the OLD-PD and is sued in his individual capacity. At all times described herein, Defendant Brown was responsible for the training, supervision, discipline, and control of OLD-PD officers under his command, including Defendant Wheeler. He is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Brown was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

20. Defendant Tyrone Martin is the Lieutenant/Operations Commander of the HANO Police Department and is sued in his individual and official capacities. At all times described herein, Defendant Martin was responsible for the training, supervision, discipline, and control of HANO officers, including Defendant Pierre. He was also responsible for the supervision, administration, policies, practices, customs, and operations of HANO. He is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Martin was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

21.     Defendant Demetrius Jackson is a Sergeant of the HANO Police Department and is sued in his individual capacity. At all times described herein, Defendant Jackson was responsible for the training, supervision, discipline, and control of HANO officers under his command, including Defendant Pierre. He is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Jackson was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

22.     Defendant Tommy Mercadal is a Sergeant of the HANO Police Department and is sued in his individual capacity. At all times described herein, Defendant Mercadal was responsible for the training, supervision, discipline, and control of HANO officers under his command, including Defendant Pierre. He is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Mercadal was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

23.     Defendant Leontine Mullins is a Sergeant of the HANO Police Department and is sued in his individual capacity. At all times described herein, Defendant Mullins was responsible for the training, supervision, discipline, and control of HANO officers under his command, including Defendant Pierre. He is liable both directly and vicariously for the actions complained of herein. At all times described herein, Defendant Mullins was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law and in the course and scope of his employment.

24.     Defendants Doe Insurance Companies 1-10 are yet unknown insurance agencies that are doing business in the state of Louisiana and that provide or provided insurance to cover the kind of claims contained herein.

25.     All Defendants are jointly and severally liable for the tortious conduct described herein.

## III.   JURISDICTION AND VENUE

**26.**      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiff's claims of federal civil rights violations arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims pursuant to 28 U.S.C. § 1367.

**27.**      Venue in the Eastern District of Louisiana is proper pursuant to 28 U.S.C. § 1391(b)(2) because the wrongful conduct giving rise to Plaintiff's claims occurred in Orleans Parish, Louisiana, which is located within the Eastern District of Louisiana.

**28.**      Declaratory relief is authorized by 28 U.S.C. § 2201. A declaration of law is necessary to determine the respective rights and duties of the parties.

## IV.   FACTS

### A.   Private Security Districts, "Paid Details," and Police Misconduct In New Orleans

**29.**      These events took place within a private policing district in New Orleans—a construct that many citizens do not even know exists. New Orleans has approximately twelve different law enforcement agencies, including the New Orleans Police Department ("NOPD"), Orleans Parish Sheriff's Office, and Louisiana State Police, accompanied by smaller agencies like the Orleans Parish Constable, HANO police, harbor police, levee police, and military police.[6] Yet residents of certain neighborhoods, dissatisfied with the already existing myriad of services provided by these multiple agencies, have decided to employ their own additional police forces. Louisiana state law allows the residents in these neighborhoods, historically whiter and wealthier than the rest of New Orleans, to self-impose a special tax to fund this increased police presence in their area.[7] This

---

[6] Ryan Whirty, *Does NOLA have too many law enforcement agencies?*, THE LOUISIANA WEEKLY (September 3, 2020), http://www.louisianaweekly.com/does-nola-have-too-many-law-enforcement-agencies-2/ (noting that the numerous law enforcement agencies "jockey for funding, hold territorial rivalries with each other, and can at times blur together in the eyes of the public").

[7] RYAN GALVIN WISE, PUBLIC GOODS FOR A FEW: THE ROLE OF CRIME PREVENTION AND SECURITY DISTRICTS IN NEW ORLEANS 35 (2015), *available at* https://scholarworks.uno.edu/td/1627 (finding that the median income of households in security districts is higher than the median income of the city at large and that residents in the security districts are whiter than residents of the city at large).

creates special security districts such as the Hurstville security district involved in this case.

30.     These semi-public, semi-private districts are governed by a mix of state, city, and local authority. Each district is sanctioned by Louisiana state law and created by a vote of the Louisiana state legislature. The self-imposed taxes are collected through the governing city authority. At the local level, each security district is governed by a board of commissioners who are residents of the neighborhood and are appointed by the mayor, the city council, the relevant Louisiana House of Representatives and Senate members, and other board members.[8]

31.     These neighborhood-specific security districts often employ police officers from other law enforcement agencies in New Orleans for security patrols, also known as "paid details." With so many independent agencies, it has been reported that officers who are fired or forced to resign from one for misconduct can easily find employment at another.[9] Indeed, Defendant Wheeler is one such example. The NOPD fired him for misconduct, giving him a troubling track record. But he readily found employment at Hurstville and the OLD-PD.[10]

32.     Each neighborhood-specific security district operates independently and this insulates each district from public accountability. Some districts, like Hurstville, employ off-duty police officers for "paid details," while others employ private security officers.[11] Frequently, off-duty officers on "paid detail" wear publicly-funded police uniforms, drive publicly-funded police cars, and use publicly-funded police resources—as Defendant Wheeler did in this case. Hurstville in

---

[8] *See* **Exhibit 1** (HSD Legislation Act 151).

[9] Kimbriell Kelly et al., *Forced out over sex, drugs and other infractions, fired officers find work in other departments*, The Washington Post (December 28, 2017), http://wapo.st/2zgVW3S?tid=ss_mail (finding that 53 officers who were fired or pushed out of the New Orleans Police Department were hired by other police departments).

[10] *See* **Exhibit 2** (Wheeler v. Dep't of Police, City of New Orleans Civil Service Commission Dkt. No. 8109 (Nov. 30, 2015), *available at* https://www.nola.gov/getattachment/e30c3d97-406d-41ff-9274-5e2f1520c785/Vara,-J-Wheeler,-K-,-8106-8109); *see* **Exhibit 3** (Flood Protection Authority Hiring Letter for Kevin Wheeler (Dec. 23, 2019)).

[11] Brendan McCarthy, *N.O. residents increasingly turning to private police patrols*, WWLTV (8:08 AM CDT October 30, 2013), https://www.wwltv.com/article/news/investigations/no-residents-increasingly-turning-to-private-police-patrols/289-319979422.

particular hires only commissioned law enforcement officers so that the officers can wield public policing powers—such as making stops like the unreasonable one Defendants Wheeler and Pierre conducted on Bilal. However, the Hurstville officers do not serve the public at large. They serve the more affluent residents of the neighborhood that hired them. Even more dangerous is that they operate with scant policy or accountability, often loosely answering only to the neighborhood board.[12]

33.     In 2011, the United States Department of Justice ("DOJ") issued a consent decree requiring the NOPD to "completely restructure" a similar "paid detail" system.[13] Just like the OLD-PD and HANO "paid detail" systems at issue in this case, the NOPD's "paid detail" system allowed off-duty officers to work private security patrols for neighborhoods and businesses, among other duties.[14] In its investigation report, the DOJ concluded that "few aspects of NOPD [were] more broadly troubling" than this "paid detail" system.[15] The DOJ also observed that NOPD's system of "privatized officer overtime […] facilitate[d] abuse and corruption" and "contribute[d] to inequitable policing."[16] The consent decree mandated "broad changes in policies and practices" to ensure "NOPD employees' off-duty secondary employment does not compromise or interfere with the integrity and effectiveness of [the] NOPD."[17] Notwithstanding the DOJ's clear and unequivocal censure of the NOPD's "paid detail" system, other law enforcement agencies not subject to the consent decree—including HANO and the OLD-PD—continue to endorse "paid

---

[12] *Id.*; Wise, *supra* note 7, at 24.

[13] *See* Amended and Restated Consent Decree Regarding the New Orleans Police Department at 85, *USA v. City of New Orleans*, No. 12-cv-1924 (E.D. La., Oct. 2, 2018), *available at* https://www.laed.uscourts.gov/sites/default/files/nopdconsent/12-1924%20%23565%20Amended%20and%20Restated%20CD.pdf.

[14] *The Consent Decree*, Consent Decree Monitor, New Orleans, Louisiana, *available at* http://consentdecreemonitor.com/the-consent-decree (last accessed Sept. 30, 2021).

[15] United States Department of Justice, *Investigation of the New Orleans Police Department* at xv, 100 (2011), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf.

[16] *Id.*

[17] *See* Amended and Restated Consent Decree Regarding the New Orleans Police Department, *supra* note 13 at 85.

detail" work and take part in the "paid detail" system.

34.    It is against the backdrop of the broad, unregulated powers yielded by these scattered and de-centralized policing constructs that Defendants Wheeler and Pierre unlawfully stopped and used excessive force on Bilal.

**B.   The Unlawful Stop**

35.    Bilal's family has lived for more than sixty years in the same neighborhood in Uptown New Orleans. In June 2020, at the time the events giving rise to this Complaint took place, Bilal was only 18 years old and he had just graduated from high school. Bilal was living in his family home on Camp Street, helping his mother Lona Hankins ("Lona") care for his grandmother.

36.    At the front of the family home is a small apartment, which Lona was renting out to a tenant, Diondra Robbins ("Diondra"). Diondra was taking care of her 12-year-old nephew, L.M. ("L.M."), for the summer. Diondra owned a white chihuahua with brown spots, affectionately named Duchess.

37.    On Saturday, June 13, 2020, Bilal invited his friend Tahj Pierre ("Tahj") over for dinner. Tahj was a few grades ahead of Bilal in school and was visiting from college. Bilal, Tahj, Diondra, and L.M. were socializing after dinner when they realized Duchess had escaped. Duchess had an underlying condition for which she needed medication, so it was important to find her quickly.

38.    At around 11:30 PM that night, to search for Dutchess, Bilal, Tahj, and L.M. hopped into Tahj's black BMW—a high school graduation present to Tahj from his mother. Tahj drove; Bilal sat in the back, directly behind the driver's seat; and L.M. sat in the front passenger seat. They drove slowly down Camp Street heading west, calling and whistling for Duchess.

39.    After driving a few blocks, the group observed a white police officer wearing an OLD-PD uniform, parked in an OLD-PD police car at the intersection of Camp Street and Valmont Street.

40.     The three youths—a college student, a recent high school graduate, and a twelve-year-old child—were hesitant to approach the police officer. They were aware of recent racial violence across the nation, and accounts of police mistreating Black men and boys especially. But hopeful the officer could help them with their search, they decided to ask the officer for assistance.

41.     Unfortunately, the events that followed would confirm Bilal's and his friends' worst fears. As Bilal would later learn, that officer in the OLD-PD car was Defendant Wheeler, a former NOPD officer who had been fired twice, including once for dishonesty after tasing an unarmed suspect and lying about it. Defendant Wheeler's "day job" was working with the OLD-PD. But that evening, he was off-duty, working a private paid security detail for the neighborhood adjoining Bilal's own—the Hurstville Security District.

42.     As Tahj drove up alongside Defendant Wheeler's car, Bilal waved to Defendant Wheeler and asked if he had seen a dog. When Defendant Wheeler said no, Bilal explained that they were searching for a white chihuahua with brown spots. Bilal gave Defendant Wheeler his home address and asked for Defendant Wheeler's help with the search.

43.     In their complaints and interviews regarding what had transpired that evening, Bilal, Tahj, and L.M. all consistently describe voluntarily and proactively approaching Defendant Wheeler and asking for his help finding the lost dog. Importantly, Defendant Wheeler's and Pierre's *own* reports of the incident on June 13 *confirm* that Bilal and his friends approached Defendant Wheeler first and asked for help finding their lost dog. Defendant Wheeler reported that Bilal and his friends approached the OLD-PD vehicle and asked him for help finding a lost dog. Defendant Pierre's report describes how Defendant Wheeler radioed Defendant Pierre, reported encountering Bilal and his friends, and again noted the request to help find the lost dog.

44.     After asking Defendant Wheeler for help, Bilal and his friends continued their search. After driving for a few blocks, they noticed Defendant Wheeler and another unmarked vehicle following behind them. That unmarked vehicle belonged to the second officer at the scene,

Defendant Pierre. Defendant Pierre was in plain clothes, driving his personal vehicle.

45.     Defendant Pierre's primary employer is the HANO police department. But at the time, Defendant Pierre, like Defendant Wheeler, was off-duty, and working as private patrol for Hurstville.

46.     Defendant Wheeler had called Defendant Pierre in for backup. Defendant Wheeler informed Defendant Pierre of his encounter with Bilal and Bilal's request to help find a lost dog. Defendant Wheeler expressed skepticism that Bilal was truly searching for a dog, based on his observation of three Black males in a nice car in a nice neighborhood—classic racial profiling.[18] Defendant Wheeler claimed to be skeptical because Bilal and his friends were driving slowly, and it was common for "certain people" to drive slowly down the street in search of potential targets for burglary or carjacking, leaning out the windows and pulling on car door handles to see if they were unlocked.[19]

47.     On information and belief, by "certain people," Defendant Wheeler means Black people.

48.     On information and belief, Defendant Wheeler did not believe that it was a common tactic for would-be car burglars or carjackers to approach police and draw attention to their presence prior to committing a crime.

49.     On information and belief, Defendant Wheeler ran a license plate check on Tahj's BMW, which did not report Tahj's BMW as stolen.

50.     On information and belief, Defendants Wheeler and Pierre followed Bilal and his friends for approximately another few blocks. At the time they began following Bilal and his friends, both officers were aware that there was a reasonable explanation for Bilal's and his friends' behavior—leaning out of windows, driving slowly—namely that they were looking for a lost dog.

_____

[18] *See* **Exhibit 4** (*Statement Concerning a complaint made against Officer Pierre while working the Hurstville Detail*, HANO (June 25, 2020)).
[19] *See* **Exhibit 5** at 5 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).

**51.** On information and belief, in the entire time they followed and observed the BMW, neither Defendant Wheeler nor Pierre reported any behavior by Bilal or his friends that was inconsistent with their given explanation that they were looking for a lost dog. Neither Defendant reported seeing Bilal, Tahj, or L.M. reaching towards car door handles, pulling on car door handles, or otherwise touching or attempting to engage with cars parked on the street as they were driving by. Neither Defendant ever reported that Bilal or his friends appeared nervous, unfriendly, or threatening, or that they attempted to evade the police.

**52.** In spite of having full knowledge of Bilal's request for help, Defendants Wheeler and Pierre decided together to conduct an illegal traffic stop, pulling Bilal and his friends over without reasonable suspicion.

**53.** Bilal and his friends were confused as to why Defendants Wheeler and Pierre were following them. They thought it would make more sense to split up and cover more ground in their search. But they trusted Defendant Wheeler knew what he was doing.

**54.** After a few more blocks of slow driving, Bilal and his friends observed Defendants Wheeler and Pierre turning on their cars' flashing lights. Bilal and his friends kept driving at the same slow pace. At first, they didn't believe the flashing lights were for them—they had just asked for help. Bilal and his friends thought that the police must have been called to some other emergency, and that they were flashing their car lights to signal the need to pass. So Bilal and his friends turned down a side street to allow Defendants Wheeler and Pierre to continue along the narrow main road.

**55.** Bilal and his friends were surprised when both Defendants Wheeler and Pierre turned down the same side street, and even more surprised when Defendant Wheeler began shouting over the intercom for the driver to exit the car, with his hands up. Bilal and his friends remained confused, thinking that perhaps Defendants Wheeler and Pierre were trying to signal that they had found the dog. Confusion and disbelief turned into the realization that they were being pulled over,

despite having just asked Defendant Wheeler for help and having done nothing wrong.

56.     Once that realization hit, the driver Tahj quickly complied, pulling over near the neighborhood elementary school and exiting the car with his hands up. Bilal put his hands out the car window to show he was unarmed, and L.M. put his head out the window to see what was happening.

57.     What Bilal and his friends saw was both Defendants Wheeler and Pierre brandishing guns at them. Defendants Wheeler and Pierre brandished their guns, even though Bilal's, Tahj's, and L.M.'s actions were entirely peaceful and compliant, and even though both Defendants Wheeler and Pierre recognized that Bilal and his friends were youths (Defendant Wheeler later referred to all three as "kids").[20]

58.     This stop and display of deadly force were objectively unreasonable. When Defendants Wheeler and Pierre conducted the stop and threatened deadly force by brandishing their guns, they knew or should have known—as a reasonable officer would have known—that their actions were objectively unreasonable.

59.     The OLD-PD manual, for example, states that "[c]itizens are free to walk and drive our streets, highways, and other public places without police interference so long as they obey the law," and that "racial and ethnic profiling are totally unacceptable patrol tactics."[21]

60.     The OLD-PD manual further instructs that "[t]he use of a firearm is in all probability the most serious act in which a law enforcement officer will engage," and that "the use of deadly force is not justified merely to protect property interests."[22] OLD-PD guidelines caution against "[u]nnecessarily or prematurely drawing or exhibiting a firearm," noting that it "creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental

---

[20] **Exhibit 5** at 6–7 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).
[21] *See* **Exhibit 6** (Orleans Levee District Police Operations Manual, TRAFFIC, PEDESTRIAN STOPS AND FIELD INTERVIEWS, Section 6.1 (Dated Aug. 1, 2001, revised Sept. 29, 2010)).
[22] *See* **Exhibit 7** (Orleans Levee District Police Operations Manual, USE OF FORCE, Section 9.0 (Dated Sep. 26, 1997, revised Oct. 13, 2009)).

discharge of the firearm," and instructing officers to "not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that it may be necessary to use the firearm."[23] The manual explains that "reasonable" force must be "necessary" (meaning that "if another alternative, such as verbal persuasion, would reasonably be expected to be effective under the particular circumstances, and this alternative was not attempted, the use of force is not legal") and reasonable in "degree" (meaning that "[t]he officer may only use enough force to overcome the amount of resistance or aggression met," and "[w]hen such resistance or aggression is reduced, the officer must correspondingly and immediately reduce the degree of force he is supplying, or the use of force is not legal").[24]

61.     Terrified, but attempting to remain calm, Bilal asked the reason for the stop. Defendant Wheeler declared accusingly that he had run a license plate check, which showed the car was registered to a woman in New Orleans East (a historically Black neighborhood in a different part of the city). Thus, there was no way Bilal and his friends were really looking for a dog. Defendant Wheeler then demanded to know what Bilal and his friends were doing in this neighborhood.

62.     Bilal explained that he resided in the neighborhood, that Tahj was visiting him, and that the car was registered to Tahj's mother, who lived in New Orleans East. Bilal suggested that Defendant Wheeler check the address on Tahj's driver's license, which Bilal said would match the address on the car registration. Tahj then provided his license to Defendant Wheeler. Defendant Wheeler took Tahj's license and returned to his vehicle, while Defendant Pierre kept his weapon up, providing cover.

63.     When Defendant Wheeler returned from his vehicle, his whole demeanor had changed. He brought a notepad, and he asked Bilal to repeat the details about the lost dog and to provide his address. He said, "I thought you guys were yanking my chain," and tried to joke with them, saying, "you know, three young men, in a nice car, in this neighborhood." Realizing that their behavior

---

[23] *Id.*
[24] *Id.*

was unlawful, Defendants Wheeler and Pierre finally allowed Bilal and his friends to leave.

## C.   The Attempted Coverup

**64.**   Following the stop, Defendants Wheeler and Pierre conspired to hide their misdeeds and stage excuses for their unlawful behavior. Specifically, Defendant Wheeler submitted false narratives in his official records, making material misstatements of fact. Defendant Pierre's report omitted material facts to create the misleading impression that Defendant Wheeler's version of the facts was correct. Defendant Pierre also made material misstatements of fact in interviews. Defendants Wheeler and Pierre thereby intentionally corrupted the official written record—for Defendant Wheeler, at least, not for the first time.

**65.**   Defendant Wheeler's fabrications in his reports and interviews include, but are not limited to, the following. These statements are false, and Defendant Wheeler knew they were false at the time he made these statements:

> a.   Defendants Wheeler and Pierre decided jointly to conduct the stop based on their shared suspicion that Bilal and his friends were engaged or about to engage in a car burglary or carjacking. In fact, Bilal approached Defendant Wheeler, drawing attention to his and his friends' presence, and asked for help finding a lost dog. Defendant Pierre was made aware of this encounter by Defendant Wheeler. These facts are incompatible with any claimed suspicion of criminal activity.

> b.   Bilal did not leave or try to leave any contact information with Defendant Wheeler when he asked for help finding Duchess.[25] In fact, Bilal provided the address of his family home to Defendant Wheeler, as confirmed by Bilal's initial complaint to and subsequent interview with the OLD-PD.[26]

---

[25] *See* **Exhibit 8** at 1 (Orleans Levee District Police Department White Paper Report Regarding June 13, 2020); **Exhibit 5** at 5, 19–20 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).

[26] *See* **Exhibit 9** (East Jefferson/Orleans Levee District Citizen Complaint Form of Bilal Jules Hankins); **Exhibit 10** at 5 (Transcript of Phone Interview of Bilal Hankins (July 10, 2020)).

c. Bilal and his friends violated traffic laws, including failing to wear a seatbelt or driving the wrong way on a one-way street.[27] In fact, neither Defendant Wheeler nor Defendant Pierre reported any traffic violation at the time the incident occurred. No ticket or citation was ever issued for any traffic violation. Defendant Wheeler only reported these alleged traffic violations as a post-hoc justification after Bilal filed a complaint and the OLD-PD began its investigation.

d. Defendant Wheeler did not use his intercom or PA system to command the BMW to stop, only a "firm, but polite tone of voice."[28] In fact, the statements of Bilal, Tahj, and L.M. all consistently recount Defendant Wheeler commanding the vehicle to stop over his intercom,[29] which is further confirmed by the report of Defendant Pierre.[30]

e. Neither officer drew his weapon at any point, and no force or threat of force was used during the stop.[31] In fact, the statements of Bilal, Tahj, and L.M. consistently recount Defendants Wheeler and Pierre brandishing their weapons and using the threat of deadly force to conduct the unlawful traffic stop.[32]

**66.** Defendant Pierre omitted multiple material facts from his report, including key details that would contradict Defendant Wheeler's version of events. For example, Defendant Pierre's report did not mention:

---

[27] *See* **Exhibit 8** at 2.

[28] *See id.*

[29] *See, e.g.*, **Exhibit 9**; **Exhibit 11** at 3 (June 23, 2020 Email from Tam Pierre Re: New Orleans Incident).

[30] *See* **Exhibit 4** (*Statement Concerning a complaint made against Officer Pierre while working the Hurstville Detail*, HANO (June 25, 2020)).

[31] *See* **Exhibit 8** at 2 (Orleans Levee District Police Department White Paper Report Regarding June 13, 2020); **Exhibit 5** at 12, 24 (Transcript of Phone Interview of Kevin Wheeler (July 10, 2020)).

[32] *See, e.g.*, **Exhibit 9** (East Jefferson/Orleans Levee District Citizen Complaint Form of Bilal Jules Hankins); **Exhibit 11** at 3 (June 23, 2020 Email from Tam Pierre Re: New Orleans Incident); **Exhibit 12** (June 21, 2020 Email from Lona Hankins RE: Guns Drawn on Youth by Security Detail).

    a.   Details of the discussion in which Defendants Pierre and Wheeler agreed to conduct the unlawful traffic stop;

    b.   The length of time that the officers followed Bilal and his friends before conducting the unlawful traffic stop;

    c.   Whether he observed any traffic violations prior to conducting the traffic stop;

    d.   The exact location and positioning of the traffic stop;

    e.   Whether he put on body armor;

    f.   Whether he or Defendant Wheeler at any point drew their weapons; or

    g.   Details of Defendant Wheeler's discussions with Bilal and Tahj during the unlawful traffic stop.

**67.** In a subsequent interview, Defendant Pierre was asked "did you or any other officer remove their firearm and point it at [Bilal or his companions]"? Defendant Pierre responded, "No."[33] This statement was false, and Defendant Pierre knew it was false at the time he made this statement.

**68.** These intentional, material omissions and misstatements were designed to create the misleading impression that Defendant Wheeler's version of the facts is correct.

**D.  Harm To Bilal**

**69.** Bilal was and remains deeply traumatized by the events of that night. At first, he did not want to tell his parents what had happened. Eventually, Bilal mustered the courage to tell his mother Lona about what happened. Lona was upset and worried, but questions quickly replaced any concerns. Lona wondered: Who were these officers? What was an OLD-PD officer (whose responsibility it is to patrol the lake front) doing uptown? What authority did this officer have to conduct a traffic stop? Defendant Wheeler appeared to be associated with the OLD-PD, but Bilal and Lona had no way of identifying the second plainclothes officer in the unmarked car, and the

---

[33] *See* **Exhibit 13** (July 25, 2020 HANO Memorandum Re: Misconduct Complaint – Ramon Pierre).

OLD-PD did not know his identity. The investigation that followed revealed even more troubling findings.

70.     It took Lona multiple phone calls to various contacts and agencies before she could determine that Defendants Wheeler and Pierre were, in fact, working for Hurstville the night of June 13, 2020. But Hurstville did not publish its rules or policies, and there was no way to file a complaint through the Hurstville website. When Lona was finally able to find contact information for Defendant Perilloux, the Hurstville patrol supervisor, he claimed to have no written or verbal report of the incident.[34]

71.     Subsequent inquiries revealed that Hurstville provides no training whatsoever to its officers on any aspects of their job, including their use of force and their execution of investigatory stops. Hurstville conceded, in response to a public records request, that it has no written documents or policies regarding training or supervising its patrol officers, or regarding tracking its officers' use of force during investigatory stops.[35] When asked to provide all policies relating to officer conduct, traffic stops, racial profiling, and use of force, Hurstville produced a single page of instructions given to patrol officers. Nowhere in these instructions is there any mention of training. These instructions merely state that Hurstville patrol officers should "conduct themselves in accordance with all their Agencies Rules and Regulations at all times."[36] A December 2020 email among the Hurstville's board of commissioners further indicates that Hurstville does not train its officers on use of force, investigatory stops, or any other aspects of their official duties.[37] In that email, a member of Hurstville's board acknowledged that Hurstville's board is heavily reliant on Defendant Perilloux with respect to "managing the patrol-related aspects of" Hurstville's police

---

[34] *See* **Exhibit 12** (June 21, 2020 Email from Lona Hankins RE: Guns Drawn on Youth by Security Detail).
[35] *See* **Exhibit 14** at 2–3 (April 23, 2021 Hurstville Response to Public Records Request).
[36] *See* **Exhibit 15** (Hurstville Neighborhood Security Patrol Instructions).
[37] *See* **Exhibit 16** (December 5, 2020 Email from Marshall Page regarding Hurstville patrol officers).

force, in part because Hurstville board members "don't have that kind of expertise."[38]

72.     Hurstville and Defendant Perilloux failed to provide Defendants Wheeler and Pierre with any training whatsoever regarding use of force or investigatory stops, although it was substantially certain that Defendants Wheeler and Pierre would face the prospect of using force or conducting investigatory stops. Hurstville patrol officers' primary responsibility for Hurstville is to serve as Hurstville's police force. Hurstville instructs officers to "monitor the NOPD radio and respond to all calls for service within the Hurstville Security District Boundaries" and to "patrol each street within the Hurstville Security District Boundaries several times during their shift."[39] Hurstville also advises residents to call its patrol officers "to report a crime in action or after the fact" or "to report any suspicious activity."[40] Hurstville also represents that it has hired patrol officers, including Defendants Wheeler and Pierre, "to provide enhanced security services in the neighborhood, monitor the activity in the area and direct the necessary security resources to keep criminal activity to a minimum."[41]

73.     Moreover, these exact the same responsibilities make it imperative that Hurstville implement proper practices for hiring, firing, or conducting background checks on its patrol officers. Hurstville, however, has not a single document or written policy regarding its qualifications for hiring, firing, or conducting background checks on its patrol officers. Hurstville claimed that it had no documents in its possession responsive to a public records request for documents regarding Hurstville's qualifications for, hiring and firing of, and background checks for Hurstville patrol officers. And the same Hurstville board member who acknowledged that Hurstville was incredibly reliant on Defendant Perilloux for managing patrol officers also admitted that Hurstville is similarly dependent on Defendant Perilloux for "identifying and vetting

---

[38] *See id.*
[39] *See* **Exhibit 15** (Hurstville Neighborhood Security Patrol Instructions).
[40] *See* Neighborhood Patrol, Hurstville, available at https://hurstvillesecurity.com/neighborhood-patrol/
[41] *See id.*

officers."[42] Tellingly, this Hurstville board member conceded that Hurstville officials "don't have the knowledge or resources … for that part of what we do," i.e., training, supervising, and other aspects related to Hurstville's employment of a police force.[43] This statement is troubling, as Hurstville employs nearly twenty patrol officers and has patrol officers on duty around the clock.[44]

74.     Hurstville's lack of appropriate oversight, and obvious need for appropriate hiring practices, became even more apparent when Lona began researching the backgrounds of Defendants Wheeler and Pierre. Multiple news reports confirmed that the NOPD fired Defendant Wheeler in 2012 for tasing an unarmed suspect and lying about it, colluding with his partner to falsely report that the man was armed and dangerous.[45] In 2012, however, Defendant Wheeler was caught after a video recording from his Taser "clearly contradict[ed]" his reports and the statements he made to investigators; his dismissal for dishonesty was upheld by the State of Louisiana Fourth Circuit Court of Appeal.[46] These facts are concerningly similar to the facts of Bilal's case. Additionally, even before he was fired, Defendant Wheeler had numerous "moral conduct" complaints filed against him in 2009 and 2010 for "unauthorized force," "false or inaccurate reports," and "adherence to law" violations—although these complaints were not sustained.[47]

75.     Nor did Defendant Perilloux or Hurstville conduct their own investigation into their officers' misconduct. Hurstville relied on the investigative capacity of OLD-PD and HANO, which

---

[42] *See* **Exhibit 16** (December 5, 2020 Email from Marshall Page regarding Hurstville patrol officers).

[43] *See id.*

[44] *See* Patrol Officer Bios, Hurstville, available at *https://hurstvillesecurity.com/neighborhood-patrol/patrol-officer-bios/*; *see also* Neighborhood Patrol, Hurstville, available at https://hurstvillesecurity.com/neighborhood-patrol/.

[45] *See 3 officers dismissed, 1 suspended from NOPD for truthfulness violations*, WDSU (Nov. 28, 2012), *available at* https://www.wdsu.com/article/3-officers-dismissed-1-suspended-from-nopd-for-truthfulness-violatons/3359919; Brendan McCarthy, *NOPD dismisses three officers for lying*, WWLTV (Dec. 12, 2012), *available at* https://www.wwltv.com/article/news/local/investigations/nopd-dismisses-three-officers-for-lying/289-346600818; *Vara & Wheeler v. Dep't of Police*, No. 2016-CA-0036 (La .Ct. App. Jun. 29, 2016).

[46] *Vara & Wheeler v. Dep't of Police*, No. 2016-CA-0036 (La .Ct. App. Jun. 29, 2016).

[47] *See* **Exhibit 17** (Kevin Wheeler - Officer Complaint History).

found no wrongdoing after a perfunctory inquiry. Defendant Perilloux noted that the agencies conducted their investigations without statements from Bilal, Tahj, or L.M., and even when those statements were provided it "did not change the final result of [either] agency's investigation."[48]

76.     Defendants Wheeler and Pierre were suspended briefly from Hurstville, but neither Defendant Wheeler nor Defendant Pierre was otherwise "restricted from their normal patrol duties or restricted from working outside details."[49] Even while the investigations were pending, Defendants Wheeler's and Pierre's innocence appears to have been a foregone conclusion; a representative for Hurstville emailed HANO stating they were "eager to get Officer Pierre back to work with Hurstville as soon as the investigation is concluded and he has been cleared."[50]

77.     In short, both Defendants Pierre and Wheeler emerged from this incident with little or no consequences, essentially entirely unscathed. For Bilal, on the other hand, Defendants Wheeler's and Pierre's unlawful conduct continues to cause him harm—harm that has continued to manifest over the past year. Bilal has developed repeated nightmares and a deep distrust of the police. Bilal even disabled his social media accounts, unable to view reports and stories of others encountering police violence without experiencing flashbacks to his own harrowing experience. Bilal also has experienced anxiety and distress when just seeing an OLD-PD vehicle similar to that which Defendant Wheeler was driving during the incident.

78.     Bilal is one of innumerable Black youth who have been unjustly traumatized by law enforcement. Bilal, Tahj, L.M., and their families are all painfully aware that they could have become the next George Floyd or Trayvon Martin. Without accountability, law enforcement will continue to violate the rights of Black youth and shatter their sense of trust and security. Officers, and the organizations that enable them, must be held accountable for such misconduct. By bringing this case, Bilal seeks to hold Defendants Wheeler and Pierre, their supervisors, including

---

[48] *See* **Exhibit 18** at 1 (July 28, 2020 Email from Carl Perilloux re: Update – Officer's Wheeler and Pierre's Internal Investigation).
[49] *See id.*
[50] *See* **Exhibit 19** at 2. (August 10, 2020 Email from Marshall Page re: Ramon Pierre).

Defendant Perilloux, and their employers accountable for their violations of his rights under the U.S. Constitution and Louisiana state common and statutory laws.

## COUNT I
### Violation of 42 U.S.C. § 1983 Excessive Force
### Fourth and Fourteenth Amendments
(Against Defendants Wheeler and Pierre)

**79.**    Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

**80.**    Defendants Wheeler's and Pierre's actions, including pulling over the car in which Bilal was a passenger and brandishing their weapons—despite, inter alia, Bilal's and his friends' request that Defendants Wheeler and Pierre assist them in locating the white chihuahua—as fully described herein, was malicious and constituted reckless, callous, and deliberate indifference to Bilal's clearly established and federally protected rights.

**81.**    Defendants Wheeler and Pierre, as complained of herein, deployed objectively unreasonable force against Bilal.

**82.**    Defendants Wheeler and Pierre, at all relevant times, were acting under the color of state law in their capacity as an OLD-PD and HANO officers, respectively. Their actions were within the course and scope of their employment with OLD-PD, HANO, and Hurstville.

**83.**    Bilal, at the time of the complained of events, had clearly established constitutional rights under the Fourth and Fourteenth Amendments to be secure in his person from unreasonable seizure through excessive force.

**84.**    At the time when Defendants Wheeler and Pierre used this force on Bilal, there were no factual circumstances that would have led a reasonable person to believe that Bilal posed a threat to Defendants Wheeler and Pierre.

**85.**    Defendants Wheeler and Pierre are not entitled to qualified immunity, because their conduct violated Bilal's constitutional rights and was objectively unreasonable.

**86.**    Defendants Wheeler's and Pierre's actions further were a result of Hurstville's and

Defendant Perilloux's failure to implement proper policies and procedures and provide any training whatsoever for use of force, and Hurstville's practice of dispatching inadequately trained or screened officers and failing to adequately supervise officer encounters involving use of force.

87.     Therefore, Bilal is entitled to compensatory damages, costs, and attorney's fees under 42 U.S.C. §§ 1983 and 1988, jointly and severally, because Defendants Wheeler and Pierre violated Bilal's clearly established rights.

**COUNT II**
**Violation of 42 U.S.C. § 1983 Unreasonable Seizure**
**Fourth and Fourteenth Amendments**
(Against Defendants Wheeler and Pierre)

88.     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

89.     Defendants Wheeler and Pierre seized Bilal, using force and words a reasonable person would be afraid to ignore by, inter alia, pulling over the car in which Bilal was a passenger, using their sirens and flashing lights, and then by pulling their firearms on Bilal.

90.     At the time Defendants Wheeler and Pierre seized Bilal, Bilal had clearly established rights under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure.

91.     Defendants Wheeler's and Pierre's seizure of Bilal was objectively unreasonable, because of the facts and circumstances complained of herein, including, among other things, that Bilal and his friends had only shortly before requested Defendant Wheeler's assistance in locating the lost chihuahua.

92.     As a direct and proximate consequence of Defendants Wheeler and Pierre's acts and omissions, including the use of force, Bilal has suffered, and continues to suffer, damages including through emotional injury.

93.     Defendants Wheeler and Pierre, at all relevant times, were acting under the color of state law in their capacity as an OLD-PD and HANO officers, respectively. Their actions were

taken within the course and scope of their employment with OLD-PD, HANO, and Hurstville.

94.     Defendants Wheeler and Pierre are not entitled to qualified immunity, because their conduct violated Bilal's constitutional rights and was objectively unreasonable.

95.     Defendants Wheeler's and Pierre's actions further were a result of Hurstville's and Defendant Perilloux's failure to implement proper policies and procedures and to provide any training whatsoever regarding traffic stops and racial profiling, and Hurstville's practice of dispatching inadequately trained or screened officers and failing to adequately supervise officer encounters involving traffic stops or racial profiling.

96.     Because of Defendants Wheeler's and Pierre's acts and omissions, Bilal seeks and is entitled to compensatory damages, costs, and attorney's fees as provided for under 42 U.S.C. §§ 1983 and 1988 for Defendants Wheeler's and Pierre's violation of Bilal's clearly established rights to be free of unreasonable search and seizure.

97.     Moreover, the facts and circumstances complained of herein demonstrate that Defendants Wheeler and Pierre engaged in this conduct willfully, intentionally, and with reckless disregard for Bilal's constitutionally protected rights. Accordingly, Defendants Wheeler and Pierre are liable to Bilal for punitive damages for their unreasonable seizure of Bilal.

## COUNT III
### 42 U.S.C. §§ 1983 and 1985 - Conspiracy
### Fourth and Fourteenth Amendments
(Against Defendants Wheeler and Pierre)

98.     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

99.     Defendants Wheeler and Pierre knowingly, willfully, and intentionally conspired to deprive Bilal of his clearly established constitutionally protected rights.

100.    Defendants Wheeler and Pierre committed numerous acts and omissions in furtherance of the conspiracy by, inter alia, pulling over the car in which Bilal was a passenger and pointing their guns at Bilal as complained of herein.

101.   As complained of herein, Defendants Wheeler and Pierre knowingly, willfully, and intentionally committed these acts because they racially profiled Bilal on the basis that he was in a luxury vehicle with two other Black youth, in an affluent neighborhood.

102.   Defendants Wheeler and Pierre, at all relevant times, were acting under the color of state law in their capacity as an OLD-PD and HANO officers, respectively. Their actions were within the course and scope of their employment with OLD-PD, HANO, and Hurstville.

103.   Defendants Wheeler and Pierre are not entitled to qualified immunity, because their conduct violated Bilal's constitutional rights and was objectively unreasonable.

104.   As a direct and proximate consequence of Defendant Wheeler's and Pierre's acts and omissions, Bilal has suffered, and continues to suffer, damages including through emotional injury.

105.   Therefore, Bilal is entitled to damages in an amount to be proven at trial.

**COUNT IV**
**Failure to Train, Supervise, and Discipline Officers Wheeler & Pierre**
**Pursuant to 42 U.S.C. § 1983**
(Against Defendants Hurstville, HANO, SLFPA-E, LMA, Najolia, Brenckle, Laurent, Petit, Brown, Perilloux, Martin, Jackson, Mercadal, Mullins)

106.   Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

107.   Defendants named in this Count, acting individually and together, under color of law, violated Bilal's rights to due process of law and to be free from excessive force and unreasonable searches protected under the Fourth and Fourteenth Amendments.

108.   Defendants HANO, Hurstville, SLFPA-E, and LMA, and Defendants Najolia, Perilloux, and Martin in their individual and official capacities, and Defendants Brenckle, Laurent, Petit, Brown, Jackson, Mercadal, and Mullins in their individual capacities, failed to train and/or supervise their subordinate, namely Defendants Wheeler and/or Pierre, to ensure that this subordinate did not violate members of the public's rights protected under the Fourth and Fourteenth Amendments. This failure to train and/or supervise was a moving force behind

Defendants Wheeler's and Pierre's use of excessive force against Bilal. At all pertinent times herein, Defendants HANO, Hurstville, SLFPA-E, LMA, Najolia, Brenckle, Laurent, Petit, Brown, Perilloux, Martin, Jackson, Mercadal, and Mullins were aware of the need to supervise, train, investigate, and discipline their subordinates in order to ensure that they did not violate the rights of members of the public. These Defendants ignored that need and acted unreasonably and with deliberate indifference and disregard for Bilal's constitutional rights as described above.

109.    At all pertinent times, Defendants named in this Count, individually and collectively, were acting under color of law and in the course and scope of their employment. Defendants named in this Count acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Bilal by failing to prevent the misconduct of officers under their command.

### COUNT V
**_Monell_ Violation of Bilal's Civil Rights Based on Policies, Patterns, or Practices**
**That Subjected Bilal to Excessive Use of Force and an Unreasonable Search**
**Pursuant to 42 U.S.C. § 1983**
(Against Defendants Hurstville, HANO, SFLPA-E, and LMA)

110.    Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

111.    Defendants named in this Count, HANO, Hurstville, the SLFPA-E and LMA, acting individually and together, under color of law, violated Bilal's right to be free from excessive use of force and unreasonable searches, and his right to due process and equal protection of the laws as protected by the Fourth and Fourteenth Amendments of the United States Constitution.

112.    They did so by establishing and maintaining insufficient policies, patterns, customs, trainings, or practices that they knew would fail to prevent excessive uses of force against members of the public. On information and belief, there was a policy, pattern, and/or practice of HANO, Hurstville, and OLD-PD officers engaging in unjustified, unreasonable, and excessive uses of force and unreasonable searches. Further, on information and belief, there was a pattern and/or

practice of failing to adequately, promptly, and properly investigate misconduct and discipline officers for infractions of policy and constitutional rights. Finally, on information and belief, there was a pattern and/or practice of failing to establish adequate policies and/or of maintaining inadequate policies. All of these patterns and/or practices resulted in known deficiencies in training, supervision, and policy, which resulted in acts of unconstitutional policing.

113.   Bilal was individually harmed by these policies, patterns, and/or practices because they resulted in the unreasonable stop and excessive use of force by Defendants Wheeler and Pierre.

114.   At all pertinent times, Defendants named in this Count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Bilal by establishing the above-described policies, patterns, or practices.

115.   The above-named Defendants are therefore liable to Bilal for the violation of constitutional rights described above pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

### COUNT VI
**Aggravated Assault**
(Against Defendants Wheeler and Pierre)

116.   Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

117.   This is a claim for aggravated assault against Defendants Wheeler and Pierre.

118.   Defendants Wheeler and Pierre threatened to cause physical injury to Bilal with the use of a firearm, which is a dangerous weapon.

119.   Defendants Wheeler and Pierre knowingly, willfully, intentionally, and directly, and/or by being present and encouraging such behavior, assaulted Bilal by detaining him at gunpoint.

120.   Defendants Wheeler and Pierre were aware that they detained Bilal at gunpoint and, as a result of such conduct, put Bilal in reasonable fear of harmful or offensive contact constituting an imminent threat of battery.

121.   Defendant Wheeler was acting within the course and scope of his employment with the

OLD-PD, and Defendant Ramon Pierre was acting within the course and scope of his employment with the HANO, and both Defendants were acting within the course and scope of their employment with Hurstville. Defendants were at all times relevant hereto acting under the color of state law.

**122.**     Defendants Wheeler and Pierre lacked any legal justification or excuse for their conduct.

**123.**     Defendants Wheeler and Pierre's actions were the legal and proximate cause of Bilal's damages as complained of herein, including Bilal's continued suffering of emotional injury and psychiatric distress. Bilal continues to suffer from severe distress, shock, anguish, humiliation, and loss of enjoyment of life.

**124.**     Defendants Wheeler and Pierre engaged in extreme and outrageous acts and omissions with the specific intent to cause Bilal harm. Accordingly, Bilal is entitled to damages in an amount to be proven at trial.

**COUNT VII**
**Assault**
(Defendants Wheeler and Pierre)

**125.**     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

**126.**     This is a claim for assault against Defendants Wheeler and Pierre.

**127.**     Defendants Wheeler and Pierre knowingly, willfully, intentionally, and directly, and/or by being present and encouraging such behavior, assaulted Bilal by detaining him at gunpoint.

**128.**     Defendants Wheeler and Pierre were aware that they detained Bilal at gunpoint and, as a result of such conduct, put Bilal in reasonable fear of harmful or offensive contact constituting an imminent threat of battery.

**129.**     Defendant Wheeler was acting within the course and scope of his employment with the OLD-PD, and Defendant Ramon Pierre was acting within the course and scope of his employment with HANO, and both Defendants were acting within the course and scope of their employment with Hurstville. Defendants were at all times relevant hereto acting under the color of state law.

**130.**     Defendants Wheeler and Pierre lacked any legal justification or excuse for their

conduct.

**131.**     Defendants Wheeler's and Pierre's actions were the legal and proximate cause of

Bilal's damages as complained of herein, including Bilal's continued suffering of emotional injury

and psychiatric distress. Bilal continues to suffer from severe distress, shock, anguish, humiliation,

and loss of enjoyment of life.

**132.**     Defendants Wheeler and Pierre engaged in extreme and outrageous acts and omissions

with the specific intent to cause Bilal harm. Accordingly, Bilal is entitled to damages in an amount

to be proven at trial.

**COUNT VIII**
**Intentional Infliction of Emotional Distress**
(Against Defendants Wheeler and Pierre)

**133.**     Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the

Complaint by reference or incorporation as if fully set forth herein.

**134.**     Bilal asserts that Defendants Wheeler and Pierre violated Louisiana law by committing

intentional torts, while acting within the course and scope of their employment at OLD-PD and

HANO, respectively.

**135.**     As a direct and proximate cause of the intentional torts that Defendants Wheeler and

Pierre committed as complained of herein, Bilal continues to suffer emotional injury and

psychiatric distress. Bilal further continues to suffer from severe distress, shock, anguish,

humiliation, and loss of enjoyment of life.

**136.**     Defendants Wheeler's and Pierre's intentional and reckless acts are the sole cause of

the aforementioned injuries that Bilal has suffered.

**137.**     Defendants Wheeler's and Pierre's conduct was extreme and outrageous. They acted

maliciously with specific intent to cause Bilal harm, and with reckless disregard for the

consequences of their actions. Accordingly, Bilal is entitled to damages in an amount to be proven

at trial.

**COUNT IX**
**Negligent Infliction of Emotional Distress**
(Against Defendants Wheeler and Pierre)

**138.** Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

**139.** Bilal asserts that Defendants Wheeler and Pierre violated Louisiana law by committing negligent torts, while acting within the course and scope of their employment at OLD-PD and HANO, respectively.

**140.** Defendants Wheeler and Pierre owed Bilal a duty of care and breached that duty of care causing Bilal harm within the scope of protection of the duty they owed him. Because of Defendants Wheeler's and Pierre's negligent acts and omissions, Bilal continues to suffer emotional injury and psychiatric distress. Bilal further continues to suffer from severe distress, shock, anguish, humiliation, and loss of enjoyment of life.

**141.** Defendant Wheeler's and Defendant Pierre's negligent acts are the sole cause of the aforementioned injuries that Bilal has suffered.

**142.** Defendants Wheeler and Pierre acted with reckless disregard for the consequences of their actions and omissions. Therefore, Bilal is entitled to damages in an amount to be proven at trial.

**COUNT X**
**Negligent Hiring/Supervision**
(Against Hurstville, Defendant Perilloux, SFLPA-E, and LMA)

**143.** Bilal repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

**144.** Bilal asserts that Defendants Hurstville, Perilloux, SFLPA-E, and LMA violated Louisiana law because of their negligence in hiring Defendant Wheeler. Bilal asserts that these Defendants violated Louisiana law because of their negligence in failing to supervise both Defendants Wheeler and Pierre.

**145.** Defendant Perilloux was, at all relevant times, employed by the OLD-PD and by

33

Hurstville.

**146.** Defendant Perilloux was directly responsible for hiring, supervising, and training Hurstville patrol officers, including Defendants Wheeler and Pierre. Defendant Hurstville authorized Defendant Perilloux to hire, supervise, and train Defendants Wheeler and Pierre.

**147.** The Defendants named in this Count failed to exercise reasonable care in the selection of Defendant Wheeler as an employee. As alleged herein, Defendant Wheeler's employment with the NOPD was terminated, because of his use of excessive force and dishonesty regarding the events involving his use of excessive force. As also alleged herein, Defendant Wheeler was the subject of numerous other complaints regarding his use of excessive force.

**148.** The Defendants named in this Count failed to exercise reasonable care regarding the hiring, firing, and supervision of Defendants Wheeler and Pierre, and regarding the use of excessive force, racial profiling, or any other policing matters. Because of their failure, Bilal suffered injury.

**149.** The Defendants named in this Count knew or reasonably should have known these failures would result in harm to Bilal.

**150.** As a direct proximate cause of these Defendants' conduct, Bilal has suffered damages, including through emotional injury.

**151.** Therefore, Bilal is entitled to damages in an amount to be proven at trial.

## V.  DEMAND FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

1. Compensatory damages;

2. Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

3. Special damages in an amount to be determined at trial;

4. Reasonable attorneys' fees and costs;

5. Pre and post-judgment interest; and

6.  Such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated: October 5, 2021

*/s/ Stephanie Willis*
Stephanie Willis
LA Bar No. 31834
swillis@laaclu.org

Nora Ahmed (*pro hac vice*)
Nahmed@laaclu.org
ACLU Foundation of Louisiana
1340 Poydras Street, Suite 2160
New Orleans, LA 70112
Telephone: (504) 522-0628

*and*

Patrick E. Gibbs (*pro hac vice*)
pgibbs@cooley.com
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304
Telephone: (650) 843-5000

Christopher M. Andrews (*pro hac vice*)
candrews@cooley.com
Cooley LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6862

Amara Lopez (*pro hac vice*)
Crystal Caldera (*pro hac vice forthcoming*)
alopez@cooley.com
ccaldera@cooley.com
Cooley LLP
1333 2nd Street, Suite 400
Santa Monica, CA 90401
Telephone: 310-883-6581

*Counsel for Plaintiff Bilal Hankins*