1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2

3                          CIVIL ACTION NO.:2:21-cv-001129

4                          JUDGE:ELDON E. FALLON

5                          MAGISTRATE JUDGE:
                           JANIS VAN MEERVELD
6

7  BILAL HANKINS

8  VERSUS

9  KEVIN WHEELER, RAMON PIERRE,
   CARL PERILLOUX, KERRY NAJOLIA,
10 THE HOUSING AUTHORITY OF NEW
   ORLEANS, THE HURSTVILLE
11 SECURITY AND NEIGHBORHOOD
   IMPROVEMENT DISTRICT, THE
12 SOUTHEAST LOUISIANA FLOOD
   PROTECTION AUTHORITY-EAST,
13 LAKEFRONT MANAGEMENT
   AUTHORITY, MICHAEL BRENCKLE,
14 DARNELL LAURENT, THADDEUS
   PETIT, JAMEL BROWN, TYRONE
15 MARTIN, DEMETRIUS JACKSON,
   TOMMY MERCADAL, LEONTINE
16 MULLINS, and DOE INSURANCE
   COMPANIES 1-6

17

18 ****************************************************

19              DEPOSITION OF BILAL HANKINS

20

21      The Deposition of BILAL HANKINS, was taken

22 in the above entitled cause, pursuant to the

23 following stipulation, before Parris A. Amedee,

24 Certified Court Reporter, at ACLU Foundation of

25 Louisiana, 1340 Poydras Street, Suite 2160, New



EXHIBIT
B

1 Orleans, Louisiana on December 16th 2022, beginning

2 at 10:05 a.m.

3

4 Reported by:

5 PARRIS A. AMEDEE, CCR
   Certified Court Reporter
6 Louisiana License #29021

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1        Q.    That's in New Orleans?

2        A.    Yeah.  I don't know the zip code though.

3        Q.    Do you know his phone number?

4        A.    I have it in my phone.  I don't like know

5   it.

6        Q.    Okay.  But you could provide that to us?

7        A.    Yeah.

8        Q.    Okay.  I may come back to that.  All

9   right.  So tell me how you go from playing video

10  games in your apartment with Keith Frederick to the

11  search for the dog, how -- what -- what happened?

12  How did this all -- how did this all transpire?

13       A.    So as I mentioned, before there's two

14  apartments and in the front was my friend Deandra,

15  who the dog belonged to.  The dog, Dutchess, the

16  white Chihuahua with brown spots, belonged to her.

17  And she came in and she had informed us that the

18  dog had gone missing and that they were at -- like

19  they had just came back from trying to initially go

20  and search and find her.  They came back and said

21  it was missing.

22       Q.    What's Deandra's last name?

23       A.    Robins or Robinson, I'm not sure.

24       Q.    Okay.  So she was in the apartment next

25  door?



BILAL HANKINS                                    December 16, 2022
BILAL HANKINS VERSUS KEVIN WHEELER ET AL                    23

1      A.   In the same building, yeah.

2      Q.   Okay.  And so when she informed you of

3  the dog being missing, how did you end up with Tahj

4  Pierre and Latrell Miller?

5      A.   Latrell is her nephew that was visiting

6  for some time.  His mother is Deandra's sister.

7  And Tahj and Deandra were good friends.  They went

8  to Dillard together, but we were all in the same

9  circle at the time because we were all taking

10  classes -- sewing classes and -- at this place

11  called "Material Institute" in the 9th Ward --

12  yeah, 9th Ward.

13      Q.   Okay.  So you were familiar with Tahj and

14  Latrell before that day?

15      A.   Yes.

16      Q.   Okay.  So Deandra came over to your

17  apartment and knocked on the door and told you what

18  was going on or how -- how did --

19      A.   Yeah.  I was --

20      Q.   -- how did the conversation start?

21      A.   -- I was playing video games and she

22  walked in.  She said, Dutchess was missing.

23      Q.   Okay.  So what did y'all do from there?

24      A.   From there, at the time I didn't think

25  anything of it just given the fact that, like, we



1  live in a neighborhood where like our neighbors
2  communicate a lot.  And I just suspected that the
3  neighbor or like somebody had picked up the dog or
4  that they were going to find the dog.  And then
5  some time had passed and I realized they still
6  hadn't found the dog and then I was like, okay, let
7  me put down the video games and go help.
8        Q.   Okay.  So what was the plan?
9             MR. ANDREWS:
10                  Objection.
11  BY MR. HANNA:
12        Q.   You can answer.
13        A.   The plan to find the dog?
14        Q.   Yes.
15        A.   Well, at the time we split up.  Everybody
16  who was in the house at the time split up -- or
17  between the two apartments, not my mom and my
18  grandma, to find the dog.  And I went with Tahj in
19  his car and Latrell soon joined -- like came out
20  and followed us, hopped in the car.  I was in the
21  back
22  -- the back left like passenger side behind the
23  driver seat.  Tahj was driving.  And Latrell was in
24  the passenger seat.
25        Q.   Okay.  So this is the vehicle that was at



 1  got into Tahj's car and started the search?

 2       A.   Yes.

 3       Q.   And what kind of car did Tahj have?

 4       A.   He had a BMW, like a small sports --

 5  sports car and it was a four door though.  And I

 6  know he got it the year he graduated high school.

 7  So could be like a 2016, 2017, 2015, like that

 8  range.

 9       Q.   Do you know whether it was like a 300

10  Series, 500 Series?

11       A.   I'm not that good with cars.

12       Q.   Okay.

13       A.   No.

14       Q.   But it was a four door?

15       A.   Yeah, it was a four-door BMW sports car.

16       Q.   And what color was it?

17       A.   It was black.

18       Q.   Okay.  And where was everyone seated in

19  the car?

20       A.   Like I said, I was behind Tahj, who was

21  the driver, in the back left side.  And Latrell was

22  sitting on the passenger, in the front right.

23       Q.   Okay.  And Latrell is -- was a relatively

24  young individual at the time, he was like -- how

25  old was Latrell?



```
 1        A.   To my knowledge, no.

 2        Q.   Okay.  Would you agree that during your

 3   search and up to the time you first encountered the

 4   first police officer, you all were driving slowly?

 5        A.   I suppose, but also cars do drive slow on

 6   Camp Street given all the potholes.  Like I don't

 7   think we were driving abnormally slowly but, yeah.

 8        Q.   But you wanted to proceed slowly, in

 9   order -- in order to see if you could find a small

10   Chihuahua walking around at night, correct?

11             MR. ANDREWS:

12                  Objection.

13   BY MR. HANNA:

14        A.   We were just trying to find the dog.

15        Q.   Okay.  But you wanted to drive with some

16   degree of speed such that you could find the dog

17   and driving at a fast speed would make it more

18   difficult, would -- wouldn't you agree?

19             MR. ANDREWS:

20                  Objection.

21   BY MR. HANNA:

22        A.   I suppose, yes.

23        Q.   Do you know what the speed was of the

24   vehicle, approximately, as you were driving on Camp

25   Street?
```



1        A.    Yeah.

2        Q.    Was it flashing at this point or was it

3   just still solid?

4        A.    No, it was still a solid blue light.

5        Q.    Okay.  So siren activated?

6        A.    No siren.

7        Q.    Okay.  So you -- then you cross Jefferson

8   Hi -- Jefferson Avenue?

9        A.    Yes.

10       Q.    Still heading further Uptown?

11       A.    Yes.

12       Q.    Okay.  And as I understand it you got to

13  Joseph Street where Camp runs into Joseph, right?

14       A.    I was unsure at the time but now I

15  believe it was Octavia, but between Camp and

16  Octavia -- or between Joseph and Octavia was around

17  where we turned but I'm pretty sure it was Octavia.

18       Q.    Okay.

19       A.    -- because there was a yellow dumpster

20  parked on the corner and they were doing

21  construction work on the school, Benjamin Franklin

22  Elementary, in that neighborhood.

23       Q.    Okay.  So I've seen a number of

24  references to you all driving down Camp Street to

25  Joseph.  You don't recall driving to the



1  intersection of Camp and Joseph?

2      A.   What I'm saying is --

3      Q.   Because Octavia would be a block before

4  that.

5      A.   Yeah, but what I'm saying is we drove to

6  there but where we were stopped, I believe was

7  Octavia.

8      Q.   Okay.  But I'm going to -- I'm going to

9  get to that in a minute, but do you recall driving

10  down Camp to the intersection of Camp and Joseph?

11      A.   Um, --

12      Q.   Do you all recall -- I mean, do you

13  recall that being your path?

14      A.   I feel like I did -- like I said, at the

15  time I thought it was Joseph but now after --

16  especially after me moving back here and driving in

17  that neighborhood, I'm pretty sure it was Octavia.

18      Q.   Okay.  So your recollection is you didn't

19  go any further past -- on Camp past Octavia Street?

20      A.   That's not necessarily what I'm saying.

21  What I'm saying is in the moment when I gave --

22  when I was speaking to the officers and probably

23  even in my statement, I might have referred to it

24  as Joseph because like I said I went to Lusher and

25  like I know Joseph Street.  So like Jefferson,



1  Joseph that's like what clicked in my head.  But

2  after going back and after looking at Google maps

3  where the yellow dumpster was, that is where we

4  were stopped.

5       Q.  Okay.  And I know that's ultimately where

6  you stopped, but I'm still talking about the path

7  that you took as you were driving up river, on Camp

8  Street, did you get as far as Joseph Street --

9           MS. CASEY:

10               Objection.

11  BY MR. HANNA:

12       A.   Yeah, --

13       Q.  -- that night?

14       A.   -- I'm unsure because it --

15       Q.  Okay.

16       A.   -- was dark.

17       Q.  Okay.

18           THE REPORTER:

19               You said, "it was dark," I'm sorry.

20           THE WITNESS:

21               Yes, because it was dark.

22  BY MR. HANNA:

23       Q.  So if you got to the intersection of

24  Joseph and Camp Street, could you say which way you

25  all turned if you -- if, in fact, that was your



 1  path?

 2       A.   We turned right.

 3       Q.   Okay.  If there's multiple references and

 4  statements -- recorded statements and other

 5  documentation that says that you turned left at the

 6  corner of Joseph and Camp Street, would you agree

 7  that those references may be correct?

 8       A.   No.

 9       Q.   Okay.

10       A.   Because at the -- if you turn left on

11  Joseph and Camp Street that's a one-way coming from

12  Magazine.

13       Q.   Okay.  What do you recall -- do recall

14  Tahj taking a left there and then making a U-turn?

15       A.   I don't recall that.  I don't even think

16  there's --

17       Q.   Okay.

18       A.   -- enough space to make a U-turn.

19       Q.   And Tahj didn't live Uptown so he was not

20  that familiar with the streets in Uptown, correct?

21       A.   No.

22       Q.   Am I correct?

23       A.   Yeah, you're -- you're right, he lived in

24  the East.

25       Q.   Okay.  And you agree that this car was



1  registered to a female owner with an address in New

2  Orleans East?

3      A.   Yes, it --

4      Q.   Now --

5      A.   -- was to Tahj's mother.

6      Q.   Tahj's mother.  Do you know where Tahj

7  lived at the time of this incident?

8      A.   Um, I don't -- I've only been to Tahj's

9  house once.  I don't know if it was before or after

10 this incident.  I didn't know his address.

11     Q.   Okay.  But you -- you do agree that Tahj

12 lived in New Orleans East and the car was

13 registered to his mother who lived at the same

14 address in New Orleans East?

15     A.   Yes.

16     Q.   Okay.

17     A.   And I knew that -- all I knew about Tahj

18 before going to his house is that his house is in a

19 wealthy subdivision in the East because his mom is

20 a nurse and his father is also a -- well off.

21     Q.   Okay.  So as you all were proceeding from

22 -- on Camp Street were you all stopped with your

23 vehicle pointed further Uptown or had you all

24 turned around and you were pointed towards Downtown

25 when you were stopped?



1        Q.   Okay.  Do you know if Latrell put hands
2   out?

3        A.   When we were immediately stopped?

4        Q.   Yes.

5        A.   Latrell did look out of the passenger
6   side to see what was going on because like I said
7   we were -- it was just an unmarked gray car behind
8   us initially and at that point that's when I looked
9   through the back window and I saw who I now know as
10  Officer Pierre, but I didn't know at the time.  I
11  just saw a man with some -- a man with a gray shirt
12  putting on body armor in his car.  Then he gets out
13  of his car and he has his gun drawn, raised above
14  his shoulders like this (demonstrating) and is
15  pointed like directly through the car like to like
16  me -- like the car and Latrell, like --.

17       Q.   Okay.  So you say that the officer you --
18  I have identified as Officer Pierre got out.  He --
19  you saw him physically put on body armor?

20       A.   He put on body armor before he stepped
21  out of the vehicle, --

22       Q.   Okay.  Well, how can you --

23       A.   -- which makes me --

24       Q.   -- see all this if the high beams blinded
25  you to begin with earlier?



1       Q.   All right.  The only -- the only person

2  that got out of the car was Tahj Pierre, correct?

3       A.   Correct.

4       Q.   You stayed in the car the whole time?

5       A.   Correct.

6       Q.   Okay.  How long did Officer Pierre have

7  his gun drawn?

8       A.   I couldn't say.

9       Q.   Did Officer Wheeler ever draw his gun?

10      A.   I believe so, yes.

11      Q.   What makes you believe that?

12      A.   That's how I remember it.

13      Q.   Okay.  Well, "I believe so" sounds like

14  you're not certain.  Is -- is it --

15           MR. ANDREWS:

16                Objection.

17  BY MR. HANNA:

18      Q.   -- correct that you're not entirely

19  certain whether Wheeler drew -- drew a gun?

20      A.   When Officer Wheeler got out of his car

21  he in a similar fashion as Officer Pierre had his

22  arms raised like this (demonstrating).  I don't

23  know if it was a gun or a taser, but it was a

24  weapon pointed directly at the car and everybody in

25  it.



1      Q.   Okay.  And when you're doing this

2  motioning you're holding your hands up, almost

3  parallel with your shoulders as though somebody

4  would be in a shooting position, correct?

5      A.   Yes.

6      Q.   Okay.  But you don't know for certain

7  what Officer Wheeler had in his hands?

8           MR. ANDREWS:

9                Objection.

10 BY MR. HANNA:

11     A.   I can say I felt in danger with whatever

12 was in his hands --

13     Q.   Okay.

14     A.   -- pointed at my direction.

15     Q.   You don't know for sure what Officer

16 Pierre had in his hands either?

17     A.   I know for sure he had a gun.

18     Q.   Okay.  Did you all do anything to cause

19 the officers to pull weapons out of fear for their

20 own safety?

21           MR. ANDREWS:

22                Objection.

23 BY  MR. HANNA:

24     A.   What could be something that we --

25     Q.   I'm just asking a question if -- if you



1  recall doing anything that would cause them to want

2  to pull weapons?

3            MR. ANDREWS:

4                 Objection.

5  BY MR. HANNA:

6       A.   No, we previously just asked this officer

7  for help finding a lost dog three blocks ago.

8       Q.   Were any commands made while you say

9  these weapons were drawn?

10      A.   Officer Wheeler asked for Tahj's

11 identification -- license.

12      Q.   Okay.  So that was the command that was

13 given?

14      A.   Yeah, a command that was given.  Yes.

15      Q.   Okay.  And did he ask Off -- Tahj Pierre

16 to get out of the vehicle?

17      A.   Yes.

18      Q.   Did Tahj Pierre comply?

19      A.   Yes.  And he complied in giving his

20 license.

21      Q.   When Tahj Pierre got out of the vehicle,

22 are you saying that anybody had a weapon drawn on

23 Tahj Pierre at that time?

24      A.   Um, yes, the officers still had their

25 guns up.



1      Q.   And they were pointed at Tahj Pierre as

2   he got out of the vehicle?

3      A.   Yes, because during this moment I even

4   like made clear to Officer Wheeler that like you

5   just look at his license.  Like if, he's going to

6   give you his license you can run it and see that

7   this is the car we're in.

8      Q.   Where was Tahj Pierre positioned?  Did he

9   walk back towards the police vehicle or police

10  vehicles?  Did he stay stationary next to the BMW?

11  Where was Tahj positioned?

12     A.   We were parked on the right side of the

13  road and Tahj had got out and officers were in the

14  street.  Officer Wheeler specifically was in the

15  street and Tahj was -- moved -- walked into the

16  street with his hands up of course.  And that's

17  when Officer Wheeler asked for his license.  They

18  exchanged it in the street.

19     Q.   Did you see Tahj hand him the license?

20     A.   Yes.

21     Q.   And what was -- what happened with

22  whatever was in Officer Wheeler's hands at that

23  time?

24     A.   He put his weapons down.  Took the

25  license and went back to his vehicle.  At the time



1  Officer Pierre was still outside of his vehicle.

2  And once Officer Wheeler brought the license back

3  to his vehicle, he said that he ran the plates

4  again and saw that the address matched up from --

5  his reasoning for the stop was that the car was

6  registered to a New Orleans East address and we

7  were Uptown.

8        Q.   Are you certain that Tahj handed Officer

9  Wheeler a driver's license?

10             MR. ANDREWS:

11                  Objection.

12  BY MR. HANNA:

13        A.   Like a driver's license or --

14        Q.   Are you sure --

15        A.   -- identification?  He handed --

16        Q.   -- are you sure that he gave any sort of

17  identification or driver's license to Officer

18  Wheeler?

19        A.   Oh, for sure.

20        Q.   Okay.  What about Officer Pierre, did he

21  at some point holster his weapon?

22             MR. ANDREWS:

23                  Objection.

24  BY MR. HANNA:

25        A.   Um, after the incident was over.



```
 1              MR. ANDREWS:
 2                    Objection.
 3   BY MR. HANNA:
 4        Q.   Go ahead.
 5        A.   And this is after -- at what point are we
 6   talking about?  Are we talking about --
 7        Q.   When Tahj got out of the vehicle, I'd
 8   like to know everything that you heard communicated
 9   between the officers and Tahj Pierre, --
10        A.   Well --
11        Q.   -- to the best of your recollection.
12        A.   -- like I said to the best of my
13   recollection, I told you Tahj handed his license or
14   identification to Officer Wheeler.  And Officer
15   Wheeler walks back to his car in which, like I
16   said, he runs the plates again and sees it matches
17   to the address on the identification.  And I even
18   -- at this point -- or before he walked back to his
19   car, I even said like his mom lives like -- he
20   lives in New Orleans East.  And this female that he
21   said that the car is registered to is most likely
22   his mom.  And so he went back to his car and saw
23   everything checked out, and then he came back with
24   his weapon holstered.
25                    And this is when he brings out his
```



1  notepad to take notes about the dog and he asks us,

2  "If it was a white Chihuahua with brown spots?"

3  And I said, "Yes."  And I also remember him saying,

4  "Well, you know three young men in a nice car in

5  this neighborhood is the reasoning for the stop."

6       Q.   Okay.

7       A.   To which I said, "I don't know what

8  you're talking about because I've lived in this

9  neighborhood my whole life."  And it was -- seemed

10 to me it felt like he was insinuating the color of

11 our skin.

12      Q.   So Officer Wheeler described Dutchess?

13      A.   He asked what type of dog it was again.

14 As in --

15      Q.   Okay.

16      A.   -- to me that showed that he didn't take

17 in any information from the first time we stopped

18 and previously described this dog and my address.

19      Q.   At no time were any commands made for

20 everyone to get out of the car, correct?

21      A.   Correct.

22      Q.   At not time were any commands made for

23 everybody to get out of the car and lay on the

24 ground, correct?

25           MR. ANDREWS:



1                        Objection.

2    BY MR. HANNA:

3         A.    Correct.

4         Q.    At no time were any commands made to get

5    out of the car and show hands on the hood or the

6    back of the vehicle at any time, correct?

7         A.    Correct.

8         Q.    The only one who got out of the car at

9    any time that night was Tahj Pierre, got out of the

10   BMW, correct?

11              MR. ANDREWS:

12                   Objection.

13   BY MR. HANNA:

14        A.    Yes, during the incident.

15        Q.    Okay.

16        A.    During the stop.

17        Q.    Now, how long did this stop take before

18   you all were allowed to leave?

19        A.    I don't remember.

20        Q.    Okay.

21        A.    I do remember after the event.  I don't

22   remember how long -- like I remember saying that to

23   Tahj.

24        Q.    Have you seen the Internal Affairs

25   Investigative Report that was produced in this case



1  that, that GPS data is unreliable?

2              MR. ANDREWS:

3                    Objection.

4  BY MR. HANNA:

5      A.   Unreliable I -- I don't know, especially

6  I'm a software engineer I'd like to believe that

7  technology is reliable.

8      Q.   Okay.  And if, in fact, the stop was less

9  than 5 minutes you would agree that that's far less

10 than 20 or 30 minutes?

11             MR. ANDREWS:

12                   Objection.

13 BY MR. HANNA:

14     A.   I remember saying it felt like 20 or 30

15 minutes.

16     Q.   Okay.  You would agree that 5 minutes is

17 far less than 20 or 30 minutes, right?

18     A.   Yeah, but I would also say that 5 minutes

19 can feel like 20 or 30 minutes, especially in a

20 situation like this.

21     Q.   Understood.  Ultimately you -- ultimately

22 you all were allowed to leave without further

23 incident, correct?

24             MR. ANDREWS:

25                   Objection.



1  BY  MR. HANNA:

2       A.   "Further incident," like without speaking

3  to them again that night?

4       Q.   The -- the -- no requirements were placed

5  on you.  No tickets were issued.  No citations were

6  issued.  You all were allowed to go on about your

7  way?

8       A.   Yes, because we didn't do anything wrong.

9  We asked for help finding a dog.  We -- this was

10  the last thing that we thought were going to happen

11  when we stopped and asked this police officer for

12  help.

13       Q.   You never had any physical contact with

14  Officers Wheeler or Pierre, correct?

15            MR. ANDREWS:

16                 Objection.

17  BY MR. HANNA:

18       A.   Um, I don't remember -- like handshakes

19  or something like --?

20       Q.   They never layed hands on you at any time

21  that night did they?

22       A.   No, I maybe shook his hand or something

23  maybe when he left.

24       Q.   Okay.  But you never got out of the BMW

25  did you?



```
 1                    MR. ANDREWS:
 2                         Objection.
 3    BY MR. HANNA:
 4         A.   After -- during the stop?
 5         Q.   During the stop you never got out of the
 6    BMW, right?
 7         A.   No.
 8         Q.   Okay.  And so they never reached in and
 9    layed hands on you at any time that night, did
10    they?
11                    MR. ANDREWS:
12                         Objection.
13    BY MR. HANNA:
14         A.   I don't remember.
15         Q.   Okay.  You never mentioned anything about
16    being touched or having hands layed on you in your
17    recorded phone interview, did you?
18         A.   I don't remember any hands being put on
19    me, no.
20         Q.   Okay.  All right.  And you were never
21    arrested that night were you?
22         A.   No.  But like I said that was not what we
23    were thinking could happen after asking him for
24    help.
25         Q.   Okay.  No physical force was ever applied
```



1  to you that night, correct?

2            MR. ANDREWS:

3                 Objection.

4  BY MR. HANNA:

5       A.   I don't know what qualifies as "physical

6  force."

7       Q.   The officers never got you out of the

8  vehicle and handcuffed you or did anything to you

9  physically, --

10           MR. ANDREWS:

11                Object --

12 BY MR. HANNA:

13      Q.   -- right?

14           MR. ANDREWS:

15                -- objection.

16 BY MR. HANNA:

17      A.   I was not put in handcuffs, no.

18      Q.   Okay.  Latrell never got out of the car

19 that night or was commanded to get out of the car

20 that evening, correct?

21      A.   I don't know if he was commanded to get

22 out, but no he did not get out?

23      Q.   Okay.  I'm going to show you the

24 statement that you --

25           MR. HANNA:



1  said, "Driver get out of the car, multiple times."

2  That's what you wrote the commands were over the PA

3  system?

4       A.   Yes.

5       Q.   Okay.  And then it says, "Tahj pulls over

6  behind a yellow dumpster?"

7       A.   "Pulled on Octavia near Ben Franklin

8  Elementary School."

9       Q.   "And gets out with his" --

10      A.   "Hands up."

11      Q.   "His hands up," okay.  "The Levee

12 District Officer got out of his car and immediately

13 had his firearm aimed at Tahj's head."  So would

14 that be Wheeler?

15      A.   Yes.  At this point we still didn't know

16 any names.

17      Q.   "At that point my" -- does it say,

18 "roommate's" --

19      A.   Yeah, "my roommate's 12 year old" --

20      Q.   -- "12 year old nephew" --

21      A.   -- "nephew."

22      Q.   -- "sticks his head out of the window"

23 and then what does it say there?

24      A.   "The person in the unmarked car gets out

25 and points his weapon at my nephew, yelling, hands



1        A.   "The officer says that we look

2   suspicious."

3        Q.   Okay.  "The officer says that we look

4   suspicious riding around Uptown and then he ran

5   Tahj's plate and it came back to an address in the

6   East and" --

7        A.   "Registered to a female."

8        Q.   Okay.  So are you recounting that's what

9   you concluded or are you recounting that, that's

10  what the officer told you?

11       A.   This is what the officer told us.

12       Q.   And which officer told you this?

13       A.   Officer Wheeler.

14       Q.   Okay.

15       A.   I did not speak to Officer Pierre during

16  the stop --

17       Q.   At any time?

18       A.   -- other than -- other than him like

19  directing or commands.

20       Q.   Okay.  Then you say, "I calmly told the

21  officer that I am a resident of the neighborhood.

22  The officer then asked what the car was doing

23  Uptown?  I told him Tahj had drove over for dinner

24  and that he lives in the" --

25       A.   "East" --



1        A.    Yes.

2        Q.    So as far as you know, isn't it correct

3  that Sergeant Demetrius Jackson of the Housing

4  Authority of New Orleans was not present during the

5  stop that took place on June 13th 2020?

6        A.    No.  He was not present.

7        Q.    How about Sergeant Tommy Mercadal?

8        A.    No.

9        Q.    He was not present?

10        A.    No, not present.

11        Q.    How about Lieutenant Tyrone Martin?

12        A.    Not present.

13        Q.    How about Sergeant Leontine Mullins?

14        A.    Not present.

15        Q.    Thank you.  Do you know of anything that

16  Lieutenant Tyrone Martin, of the Housing Authority

17  of New Orleans, did that caused the conduct of

18  Ramon Pierre during the stop on the night of June

19  13th 2020?

20              MR. ANDREWS:

21                    Objection.

22  BY MS. WISDOM:

23        A.    Um, as far as I know he's his supervisor

24  and is responsible for like training Officer

25  Pierre.  And we also -- like it was not clear to us



1  -- not necessarily the investigation.  But like in

2  the days after when my mom was trying to figure

3  out, you know, who pulled the guns out on her son,

4  we didn't know who to contact.  Because when we

5  contacted Hurstville they told us this was a HANO

6  and OLDP issue.  And when we were on the phone with

7  HANO and OLDP we got conflicting answers.

8       Q.   Okay.  So what is it that you claim that

9  Lieutenant Martin did wrong in training Officer

10 Ramon Pierre regarding investor -- investigatory

11 stops?

12            MR. ANDREWS:

13                 Objection.

14 BY MS. WISDOM:

15       A.   Um, I -- I don't know what goes into the

16 training.

17       Q.   In fact, you don't know what training

18 Ramon Pierre received regarding his policing

19 activities, do you?

20       A.   Nor at the --

21            MR. ANDREWS:

22                 Objection.

23 BY MS. WISDOM:

24       A.    -- nor at the time did I know that he was

25 even involved with police.



1       Q.   So your answer to that question is, no?

2       A.   No.

3       Q.   Okay.  Thank you.  Are you aware of any

4  complaints, other than yours, made against Ramon

5  Pierre regarding his conduct as a police officer?

6            MR. ANDREWS:

7                  Objection.

8  BY MS. WISDOM:

9       A.   Um, I'm unsure.

10      Q.   Are --

11      A.   No.

12      Q.   Okay.  Do you have any reason to contest

13 that with the exception of your complaint, Ramon

14 Pierre has never been accused of excessive force?

15           MR. ANDREWS:

16                 Objection.

17 BY MS. WISDOM:

18      A.   Like I said, I don't.

19      Q.   Do you have any reason to contest that

20 with the exception of your complaint Ramon Pierre

21 has never been accused of improperly brandishing a

22 weapon?

23           MR. ANDREWS:

24                 Objection.

25 BY MS. WISDOM:



```
 1  BY MS. WISDOM:
 2       A.   Like I said previously, this was my first
 3  time filling out a form like this and I just
 4  thought it was assumed that if he's pointing the
 5  car -- or pointing the gun and my nephew's in the
 6  car across from me, that would be assumed.
 7       Q.   Isn't it correct though that, that night
 8  what you saw was this pers -- this unidentified
 9  person, according to your report, pointing the gun
10  at Latrell Miller?
11            MR. ANDREWS:
12                 Objection.
13  BY MS. WISDOM:
14       A.   Um --
15       Q.   That's what you saw, right?
16       A.   -- in the direction.  Yes, in the
17  direction of Latrell Miller but that direction also
18  involved me in the line of fire.  So if any shots
19  were to ring off I felt threatened as if I would be
20  hit.
21       Q.   Okay.  Other than seeing this person now
22  known to be Officer Ramon Pierre pointing the gun
23  at Latrell Miller, did you see him point his gun at
24  anyone else?
25            MR. ANDREWS:
```



```
 1                  Objection.
 2  BY MS. WISDOM:
 3       A.   Um, he still had his weapon out pointing
 4  at the car for the duration of the stop.
 5       Q.   Okay.  Where was it pointed at the car?
 6  What part of the car was it pointed at?
 7       A.   Um, I couldn't tell you but I can tell
 8  you that I still saw him in the same position of
 9  holding his weapon above his shoulder in a shooter
10  -- in a shooting position until after Officer
11  Wheeler put his gun down.  And -- like after
12  Officer Wheeler had already gotten the license from
13  Tahj, he put his gun down.
14       Q.   So if I -- if I hear what you just told
15  me correctly, that after Officer -- who you now
16  understand to be Officer Ramon Pierre, pointed his
17  gun at Latrell Miller; after that you're not sure
18  where he was pointing the gun?
19             MR. ANDREWS:
20                  Objection.
21  BY MS. WISDOM:
22       A.   No.  I told you he was still pointed in
23  the direction of the vehicle, but Latrell had put
24  his hands up.  And like I said, he stuck his head
25  out his window and then after he was commanded to
```



1  put his hands up, he put his head back in the

2  window and he still had his hands up.

3       Q.   Okay.  So the gun, after he put his hands

4  up, was just pointed at -- in the direction of the

5  vehicle?

6       A.   Yes.

7       Q.   And you don't know where on the vehicle

8  it was pointed?

9            MR. ANDREWS:

10                Objection.

11  BY MS. WISDOM:

12       A.   Um, I still felt threatened wherever it

13  was pointed at the vehicle for reasons like I --

14       Q.   Right.

15       A.   -- just said because he was -- wherever

16  he pointed at the vehicle I was going to be at --

17       Q.   Okay.

18       A.   -- hit first because I was in the back

19  left.

20       Q.   I understand what you -- that you're

21  telling me what you may have felt.  But what I

22  would like to know is if you are aware of where on

23  the car the vehicle -- the gun was pointed?

24       A.   I don't know.  Like it didn't have a

25  laser beam to where it was pointed.  I don't know



1  just by me talking to Officer Wheeler.

2       Q.   So you saw him standing up with his arms

3  up, is that correct?  You said, "the same

4  position."

5       A.   Yes, with the same weapon, like -- like

6  you said, you asked me if I could see the barrel

7  and I said, yes.

8       Q.   Throughout the entire stop you could see

9  the barrel of the gun?

10          MR. ANDREWS:

11             Objection.

12  BY MS. WISDOM:

13       A.   Um, I mean, I'm not going to say the

14  entire stop but I can tell you when I looked the

15  first time and got out of the car, he had his gun

16  out in the same position.  And all the times that I

17  saw him throughout that stop he was in the same

18  position until Officer Wheeler put down his gun and

19  his weapon first.  To which Officer Pierre followed

20  and put his weapon down.

21       Q.   Okay.  And it's your testimony that

22  Officer Wheeler put his gun down after he received

23  Tahj Pierre's license?

24       A.   Um, yes.

25       Q.   So it was at that point that Officer



1   Ramon Pierre put his gun down and -- according to

2   you?

3          A.    After Officer Wheeler.

4          Q.    And Officer Wheeler did it after he got

5   the driver's license from Tahj Pierre, correct?

6               MR. ANDREWS:

7                    Objection.

8   BY MS. WISDOM:

9          A.    Um, yeah, I -- after he had the license.

10         Q.    So Ramon Pierre, immediately following --

11  well, Officer Wheeler putting his gun down it's

12  your testimony that Officer Ramon Pierre put his

13  gun down as well?

14         A.    After Officer Wheeler did.

15         Q.    Okay.  During the stop did Officer Ramon

16  Pierre say anything?

17         A.    Um, I'm pretty sure I remember recalling

18  and in my statement that he told Latrell to put his

19  hands up when he saw Latrell put his head out of

20  the window.

21         Q.    Okay.  Other than telling Latrell Miller

22  to put his hands up, did he say anything else

23  throughout the entire stop?

24         A.    No.  I don't -- I don't remember anything

25  very vocal after that.

