## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BILAL HANKINS, | Case No. 2:21-cv-01129 |
| Plaintiff, | Judge: Eldon E. Fallon |
| v. | Magistrate Judge: Janis van Meerveld |
| KEVIN WHEELER, RAMON PIERRE, and CARL PERILLOUX (in their individual and official capacities), THE ORLEANS LEVEE DISTRICT POLICE, THE HOUSING AUTHORITY OF NEW ORLEANS, THE HURSTVILLE SECURITY AND NEIGHBORHOOD IMPROVEMENT DISTRICT, and DOE INSURANCE COMPANIES 1-6, | *Jury Trial Demanded* |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO HANO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS .................................................................................... 2

LEGAL STANDARD ........................................................................................... 7

ARGUMENT ........................................................................................................ 7

    I.       PIERRE VIOLATED BILAL'S CONSTITUTIONAL RIGHTS. ....................... 7

           A.    Pierre Has Not Shown That His Conduct was Within the Scope of His Discretionary Authority .......................................................... 7

           B.    Bilal's Unreasonable Seizure Claim is Supported by Robust Evidence ........................................................................................ 8

           C.    Bilal's Excessive Use of Force Claim is Supported by Robust Evidence ...................................................................................... 13

    II.     The HANO Supervisors are not entitled to qualified immunity on Bilal's Section 1983 claims for failure to supervise, discipline, or train ........................ 16

           A.    The HANO Supervisors' Failure to Supervise Amounts to Deliberate Indifference and Caused the Violation of Bilal's Constitutional Rights. ............................................................... 17

                  1.    Each of the HANO Supervisors' failures to supervise Pierre amounted to deliberate indifference ............................................ 18

                        a.    Martin utterly failed to supervise Pierre. ........................ 18

                        b.    Defendant Jackson utterly failed to supervise Pierre. ....... 19

                          c.    Mullins utterly failed to supervise Pierre. ........................ 20

                          d.    Mercadal utterly failed to supervise Pierre. .................... 20

                          e.    All the HANO Supervisors failed to supervise Pierre with knowledge of his history of violating HANO policies ................................................................ 20

                  2.    Case law supports that the HANO Supervisors' failure to supervise amounts to deliberate indifference ............................... 21

                  3.    Qualified immunity does not apply at all because it is contrary to the Notwithstanding Clause of the original text of Section 1983. ................................................................ 22

           B.    The HANO Supervisors' Failure to Train Pierre Amounts to Deliberate Indifference and Caused Pierre's Violation of Bilal's Constitutional Rights. ............................................................... 23

**TABLE OF CONTENTS**
(continued)

**Page**

C.  The HANO Supervisors' Failure to Discipline Pierre Amounts to
Deliberate Indifference and Caused Pierre's Violation of Bilal's
Constitutional Rights. ............................................................................. 23

CONCLUSION.............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. City of Round Rock*,
  854 F.3d 298 (5th Cir. 2017) ............................................................11

*Ball v. LeBlanc*,
  792 F.3d 584 (5th Cir. 2015) ............................................................22

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
  520 U.S. 397 (1997)..........................................................................17

*Brown v. Texas*,
  443 U.S. 47 (1979)............................................................................11

*Burge v. St. Tammany Par.*,
  336 F.3d 363 (5th Cir. 2003) ............................................................17

*Camilo-Robles v. Zapata*,
  175 F.3d 41 (1st Cir. 1999)...............................................................17

*Cherry Knoll, LLC v. Jones*,
  922 F.3d 309 (5th Cir. 2019) ..............................................................8

*City of Canton v. Harris*,
  489 U.S. 378 (1989)..........................................................................17

*Cooper v. Brown*,
  844 F.3d 517 (5th Cir. 2016) ............................................................15

*Courson v. McMillian*,
  939 F.2d 1479 (11th Cir. 1991) ........................................................12

*Cox v. Wal-Mart Stores E., L.P.*,
  755 F.3d 231 (5th Cir. 2014) ..............................................................7

*Doe v. Taylor Indep. Sch. Dist.*,
  15 F.3d 443 (5th Cir. 1994) ..............................................................17

*Ernso v. Weber*,
  1999 WL 1201907 (E.D. La. Dec. 13, 1999).....................................17

*Goodson v. City of Corpus Christi*,
  202 F.3d 730 (5th Cir. 2000) ..............................................................9

*Graham v. Connor*,
  490 U.S. 386 (1989)..........................................................................15

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hodge v. Layrisson*,
    1998 WL 564263 (E.D. La. Sept. 1, 1998) ............................................................................13

*Illinois v. Wardlow*,
    528 U.S. 119 (2000) ....................................................................................................................9

*Leonard v. Dixie Well Serv. & Supply, Inc.*,
    828 F.2d 291 (5th Cir. 1987) ...................................................................................................14

*Malina v. Gonzales*,
    994 F.2d 1121 (5th Cir. 1993) ...................................................................................................8

*Mannis v. Cohen*,
    2001 WL 1524434 (N.D. Tex. Nov. 28, 2001) ......................................................................13

*Manzanares v. Roosevelt Cty. Adult Detention Ctr.*,
    331 F. Supp. 3d 1260 (D.N.M. 2018) ....................................................................................23

*McNair v. Coffey*,
    279 F.3d 463 (7th Cir. 2002) ...................................................................................................16

*Mitchell v. City of New Orleans*,
    184 F. Supp. 3d 360 (E.D. La. 2016) ................................................................................22, 24

*Odubela v. Exxon Mobil Corp.*,
    736 F. App'x 437 (5th Cir. 2018) ...........................................................................................14

*Roberts v. City of Shreveport*,
    397 F.3d 287 (5th Cir. 2005) .....................................................................................................7

*Rogers v. Jarrett*,
    2023 WL 2706752 (5th Cir. Mar. 30, 2023) (Willett, J., concurring) ....................................23

*Sam v. Richard*,
    887 F.3d 710 (5th Cir. 2018) ...................................................................................................13

*Southard v. Texas Bd. of Crim. Just.*,
    114 F.3d 539 (5th Cir. 1997) ...................................................................................................17

*Sweetin v. City of Texas City, Texas*,
    48 F.4th 387 (5th Cir. 2022) ..................................................................................................7, 8

*Tarver v. City of Edna*,
    410 F.3d 745 (5th Cir. 2005) ...................................................................................................10

*Terry v. Ohio*,
    392 U.S. 1 (1968) ..................................................................................................................9, 12

iv

<u>**TABLE OF AUTHORITIES**</u>
**(continued)**

**Page(s)**

*United States v. Arvizu,*
    534 U.S. 266 (2002) ............................................................................................16

*United States v. Hill,*
    752 F.3d 1029 (5th Cir. 2014) ................................................................8, 9, 11, 12

*United States v. Michelletti,*
    13 F.3d 838 (5th Cir. 1994) (en banc) ................................................................10

*United States v. Rodriguez,*
    564 F.3d 735 (5th Cir. 2009) ..............................................................................11

*Zadeh v. Robinson,*
    928 F.3d 457(5th Cir. 2019) (Willet, J. concurring) ...........................................22

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) (Thomas, J., concurring) ...............................................22

**Statutes**

La. Stat. Ann. § 40:456.1(A) ...................................................................................8

**Other Authorities**

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation,*
    111 CALIF. L. REV. 101, 166–67 .......................................................................22

Louisiana Revised Statutes Tit. 33, § 9091.11(E)(5) .................................................8

Fed. R. Civ. P., Rule 56 ...........................................................................................14

## INTRODUCTION

On June 13, 2020, Bilal and two friends stopped playing video games at his home to help search for a lost dog. As the youths were driving through a neighborhood near Bilal's home, Bilal spotted a police officer—Defendant Kevin Wheeler—in a marked Orleans Levee District Police Department ("OLD-PD") car. They pulled up beside Wheeler. Bilal asked for help finding the lost dog, gave his home address, and asked Wheeler to reach out should he find the lost dog. Wheeler did not help. Instead, he radioed Defendant Ramon Pierre, who along with Wheeler was on patrol for the Hurstville Security and Neighborhood Improvement District ("Hurstville"). Wheeler and Pierre trailed Bilal and his friends, switched on flashing lights, and stopped Bilal and his friends. Wheeler and Pierre then brandished their deadly firearms at Bilal and the others, only ending the encounter after Bilal again told the officers what they knew all along—that he was looking for a lost dog.

Wheeler's apology immediately following the stop has done nothing to quell Bilal's anxiety, nightmares, and sleeplessness resulting from this harrowing experience.

To obtain relief for his harm, Bilal asserts claims under Section 1983 against Wheeler and Pierre for their unreasonable stop and excessive use of force. Wheeler's and Pierre's stop was unreasonable as based on nothing but a hunch of criminal activity and evidence reveals numerous disputes of material fact. Wheeler and Pierre principally assert that they had reasonable suspicion to conduct the stop given Wheeler's purported experience with car burglaries in the area. But that experience is untethered from the facts in this case. It rests on the absurd assertion that Bilal attempted to preemptively mask his intent to burglarize cars by actively seeking out and soliciting a police officer's help in a red herring search for a lost beloved family dog. Wheeler and Pierre also are not entitled to qualified immunity because case law clearly establishes that the stop was unconstitutional.

Wheeler and Pierre also used objectively unreasonable excessive force, and there are material disputes of fact on this issue. Bilal testified that Wheeler and Pierre brandished their deadly weapons at him; Wheeler and Pierre deny this. Wheeler and Pierre are not entitled to qualified immunity for the excessive force claim because their conduct violated Bilal's clearly established rights. Case law clearly establishes that where, as here, all the key factual circumstances weigh against the use of force, officers cannot brandish their deadly weapons at compliant youth. None of Defendants' cases state otherwise.

Bilal also brings claims against, among others, Pierre's supervisors at the Housing Authority of New Orleans, namely Tyrone Martin, Demetrius Jackson, Tommy Mercadal, and Leontine Mullins (collectively, the "HANO Supervisors"). Evidence shows that the HANO Supervisors disregarded Pierre's conduct while on patrol in Hurstville in a manner that amounts to deliberate indifference, establishing their failures to supervise, train, and discipline Pierre.

For these reasons, and as discussed below, the Court should deny the HANO Supervisors' Motion for Summary Judgment.

## **STATEMENT OF FACTS**

On the night of June 13, 2020, then 18-year-old Bilal, was looking for Duchess, a lost white chihuahua with brown spots, in his neighborhood. Ex. 1, Hankins Tr. 19:2–14, 22:8–21. Bilal and two of his friends, a college student and a 12-year-old child, searched for the dog. *Id.* at 22:8–25:7, 36:23–37:6. Bilal and the others saw Wheeler, a uniformed police officer in a marked OLD-PD police car. *Id.* at 47:12–23. While the others were initially hesitant to approach, Bilal asked Wheeler whether he had seen the dog. *Id.* at 44:12–48:6. Bilal described the dog and gave Wheeler his home address. *Id.* at 45:21–46:13. But it barely seemed to register with Wheeler, as he did not take any notes or ask any questions. *Id.* at 47:1–8. After speaking with Wheeler, Bilal and his friends resumed their search. *Id.* at 48:15–18.

Wheeler did not help search for the dog, and instead radioed Pierre, who also was on Hurstville patrol, and works full time for the Housing Authority of New Orleans Police Department ("HANO"). Ex. 2, Wheeler Tr. 52:5–25. Pierre was wearing plain clothes and driving his personal truck at the time. Ex. 1, Hankins Tr. 99:22–23; Ex. 3, Pierre Tr. 42:17–43:4. Wheeler expressed skepticism that Bilal truly was searching for a dog, thinking that three Black males, in a nice car in a nice neighborhood at night, must have been seeking to commit a crime such as, according to him, burglary, general theft, or auto theft. *See* Ex. 2, Wheeler Tr. 49:9–51:23.

For all the time that they followed and observed the car in which Bilal rode, Wheeler and Pierre did not observe any behavior by Bilal or his friends that was inconsistent with them looking for the lost dog. Neither officer reported seeing Bilal or his friends reaching toward car door handles, pulling on car door handles, or otherwise touching or surveilling parked cars as they were driving. Ex. 3, Pierre Tr. 80:9–22. Neither officer reported that Bilal or his friends committed any traffic violations. *Id.* at 60:5–15. Wheeler ran a license plate search on the vehicle, and the search confirmed that the vehicle had not been reported stolen and was registered to a New Orleans East address. Ex. 2, Wheeler Tr. 52:5–12.

Wheeler and Pierre spoke as they both tracked Bilal and his friends. *Id.* at 53:14–54:20. Wheeler and Pierre jointly decided to conduct an illegal traffic stop, pulling Bilal and his friends over without reasonable suspicion. *Id.* at 62:11–63:9. Both Wheeler and Pierre brandished their guns at Bilal and his friends and accused them of lying about their search for the lost dog. Ex. 1, Hankins Tr. 61:11–16. Wheeler and Pierre brandished their guns, even though Bilal's, and his friends', actions were entirely peaceful and compliant; and both officers knew that the youths had just requested assistance with locating the lost dog. *Id.* Only after the officers were satisfied that Bilal and his friends proved they were telling the truth did the officers allow Bilal and his friends

to leave. *Id*. at 75:21–78:7; Ex. 3, Pierre Tr. 94:4–9.

On the evening in question, Wheeler was working under OLD-PD's paid detail system, as an officer for Hurstville, a neighborhood adjoining Bilal's own. Pierre, who was in his personal truck and wearing plain clothes, worked full-time for HANO. On that night, Pierre too was working a paid security detail, for HANO and as an officer for Hurstville. Moreover, both had prior disciplinary issues. Wheeler previously was fired from the New Orleans Police Department for tasing an unarmed suspect and lying about it. Ex. 4, Wheeler Termination. Pierre had received reprimands from HANO, including for insubordination.

Wheeler's and Pierre's Hurstville Supervisor Defendant Perilloux, Wheeler's supervisors Defendants Najolia, Brenckle, Petit, Laurent, and Brown, along with Pierre's supervisors Tyrone Martin, Demetrius Jackson, Tommy Mercadal, and Leontine Mullins (collectively, the "Defendant Supervisors") all point various fingers at each other as to who was responsible for supervising Wheeler and Pierre. HANO Defendants and Southeast Louisiana Flood Protection Authority-East ("SLFPA-E") Defendants all admit they did not consider themselves responsible for supervising Wheeler and Pierre on paid detail. Nevertheless, Defendant Supervisors testified that Wheeler and Pierre were responsible for following police guidelines and trainings. Wheeler previously had been fired for using excessive force and lying about it, and Pierre previously had been disciplined for insubordination, yet both officers had no supervision while working a paid detail and carrying guns. Here, Wheeler was in a marked car in his OLD-PD uniform and Pierre was in a private vehicle, in plain clothes.

The HANO Supervisors (Martin, Jackson, Mercadal, and Mullins) are responsible for supervising Pierre. Martin, as a HANO Lieutenant, is the operations commander and is responsible for handing out assignments, conducting investigations, and generally supervising both sergeants

4

and patrol officers. Ex. 5, Martin Tr. 17:11–20, 46:25–48:19. Jackson, as a HANO Sergeant, is responsible for supervising HANO patrol officers including deploying them in the field and ensuring that they comply with HANO's policies and procedures. Ex. 6, Jackson Tr. 16:2–6, 19:17–23. Jackson is also the paid detail coordinator; thus, he is responsible for reviewing officer requests to work paid details and for tracking when and where his officers are working these paid details. *Id.* at 41:6–42:4. Mercadal is a HANO sergeant and responsible for issuing assignments, supervising patrol officers in the field, and handling complaints and disciplinary actions. Ex. 7, Mercadal Tr. 18:4–22. Mullins is also a HANO sergeant, and her responsibilities include ensuring officers are performing assignments as instructed, assisting with any required paperwork, and signing off on arrests or traffic tickets. Ex. 8, Mullins Tr. 38:8–22.

The HANO Supervisors each admit that they do not supervise Pierre while he is working a paid detail. Rec. Doc. 142-1 at p. 14. Martin expects that HANO officers follow HANO policies and procedures while working paid details, but takes no steps to ensure compliance. Ex. 5, Martin Tr. 72:22–73:14. Martin charges Jackson with responsibility for coordinating with paid detail supervisors. *Id.* at 50:1–51:11. But Jackson has only communicated with Perilloux once regarding, for example, forms patrol officers must complete before working details. Ex. 6, Jackson Tr. 66:25–67:2. Jackson also never provided Perilloux with HANO policies or procedures, HANO officers' POST training certificates, or HANO personnel files. *Id.* at 38:17–22, 65:2–16, 90:4–18. Jackson does not even know whether paid detail supervisors are aware of the HANO policies and procedures that officers are required to follow while working the detail. *Id.* at 39:10–17. Mercadal took no action to supervise officers while they worked paid details, although he understood that HANO officers must follow the "secondary employment policy and procedure" and that they had the same "normal police duties or responsibilities" at paid details. Ex. 7, Mercadal Tr. 49:17–

50:51:1. Mullins admits that she has no idea when her subordinate officers are working paid details. Ex. 8, Mullins Tr. 36:1–3.

The Defendant Supervisors all disclaim any responsible for supervising Wheeler and Pierre. The HANO Supervisors and SLFPA-E Defendants all admit they did not consider themselves responsible for supervising Wheeler and Pierre on paid detail. Nevertheless, Defendant Supervisors testified that Wheeler and Pierre were responsible for following police guidelines and trainings. Wheeler had previously been fired, and Pierre had previously been disciplined for insubordination, yet both officers were left with no supervision while working a paid detail and carrying guns. During the incident here, Wheeler was in a marked car and wearing his OLD-PD uniform and Pierre was in his personal truck, in plain clothes.  Ex. 3, Pierre Tr. 42:17–43:4.

After discovery limited to qualified immunity, material factual issues remain in dispute, including the following:

- Bilal states that Wheeler and Pierre brandished their guns at him and his two friends. Defendants deny this. Whether the officers drew their weapons is critical to determining whether their actions were objectively reasonable under the circumstances.

- Bilal states he offered his address to Wheeler to help search for the dog. Wheeler claims Bilal did not give him an address and it raised his suspicions. The degree to which Bilal actively cooperated with the officers is critical to determining the objective reasonableness of the officers later drawing their guns at Bilal.

- Bilal states that none of the car passengers were hanging out of the car windows prior to the stop. Defendants claim the youths were hanging out of the car windows. Whether Bilal and the other car occupants were hanging out of the windows is critical to determining the objective reasonableness of the officers pulling them over and later drawing their weapons on the unarmed and compliant minors.

- Bilal states that he is deeply traumatized by the events of that night. Defendants claim that Bilal has suffered no emotional distress.

- The HANO Supervisors state that Pierre received training, that they do not supervise him while his is working paid details, and have not failed to discipline him, but there is a material fact dispute as to whether the HANO Supervisors should be and are responsible for supervising, training, and discipling Wheeler and Pierre while they are working a paid detail.

**LEGAL STANDARD**

Courts must deny a summary judgment motion, absent a showing that "there is no genuine issue as to any material fact." *Cox v. Wal-Mart Stores E., L.P.*, 755 F.3d 231, 233 (5th Cir. 2014) (citations omitted). A genuine dispute regarding a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Sweetin v. City of Texas City, Texas*, 48 F.4th 387, 391 (5th Cir. 2022) (citation omitted). At summary judgment, courts "must view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party." *Cox*, 755 F.3d at 233.

**ARGUMENT**

**I.   PIERRE VIOLATED BILAL'S CONSTITUTIONAL RIGHTS.**

To prevail on a supervisory liability claim, a plaintiff must raise a genuine dispute of material fact about whether a subordinate officer violated the constitution. *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). A plaintiff need not show that the subordinate's constitutional violation was objectively unreasonable. *Id.* (concluding supervisor "remains vulnerable to a failure to train claim," where jury found that subordinate's conduct was unconstitutional, albeit not objectively unreasonable).

**A.   Pierre Has Not Shown That His Conduct Was Within the Scope of His Discretionary Authority.**

To invoke qualified immunity, a defendant must first show that their actions were within the scope of their discretionary authority. *Sweetin v. City of Texas City, Texas*, 48 F.4th 387, 392 (5th Cir. 2022) (citation omitted). If defendants establish that they were acting within the scope of their authority, only then does the burden shift to plaintiffs. *Id.* Courts apply state law to determine the scope of an official's discretionary authority, and "[a]n official acts within his discretionary

authority when he performs non-ministerial acts within the boundaries of his official capacity." *Cherry Knoll, LLC v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019).

Here, Pierre fails to make the threshold showing that he had the discretionary authority to conduct a traffic stop and brandish his firearm at Bilal. The statute establishing Hurstville's limited powers did not grant Pierre this authority. *See* La. Stat. Ann. § 33:9091.11(E)(5) (granting Hurstville limited authority to "provide or enhance security patrols in the district"). Statutes governing HANO's circumscribed police powers also did not grant Pierre this authority because his conduct did not further "the protection of persons, properties, or interests *relating to HANO*." La. Stat. Ann. § 40:456.1(A) (emphasis added); *see also id.* § 40:456.1(B). Under these circumstances, Bilal need not show that Pierre violated the constitution. *See, e.g.*, *Sweetin*, 48 F.4th at 391 (reversing lower court's grant of summary judgment on qualified immunity to a city "permit officer," where officer seized drivers without discretionary authority to do so); *see also Malina v. Gonzales*, 994 F.2d 1121, 1126 (5th Cir. 1993) (affirming denial of qualified immunity to a judge who had made a traffic stop because the judge "is no different than any other person who purchases a red light and stops people on the interstate"). Thus, there is a material dispute of fact about whether Pierre violated the constitution.

### B.   Bilal's Unreasonable Seizure Claim is Supported by Robust Evidence.

The evidence shows a genuine dispute of material fact about whether Wheeler and Pierre lacked reasonable suspicion to stop Bilal. "Warrantless searches and seizures are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (citation omitted). One exception is the *Terry* stop, articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), whereby "police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot." *Goodson v. City of*

*Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). "Under *Terry*, if a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain—that is, seize—the person to investigate." *Hill*, 752 F.3d at 1033 (citation omitted). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (citation omitted).

It is undisputed that Bilal and his friends first approached Wheeler by driving toward his vehicle and requesting assistance finding a lost dog. Ex. 2, Wheeler Tr. 49:6–51:5. Wheeler then ran a computer search on the license plate and determined that the car was registered to an address in New Orleans East. After this encounter, Wheeler concluded that a stop was not necessary. *Id.* at 62:11–63:3. Wheeler then recounted his interaction to Pierre, who himself had not witnessed Bilal's vehicle or interacted with the passengers. *Id.* at 62:11–63:19; Ex. 3, Pierre Tr. 70:22–71:17, 80:23–81:5. Based on this discussion—and before Pierre ever encountered Bilal in the vehicle— Pierre decided that "something is not right here." Ex. 2, Wheeler Tr. 63:4–19; *see also id.* at 69:10– 14. Thereafter, Pierre and Wheeler decided together to stop the vehicle, despite the absence of any new information since Wheeler—who had seen the vehicle and interacted with Bilal—determined that a stop was not justified. *Id.* at 62:11–63:19.

This is not reasonable suspicion. Rather, determining that "something is not right" based on a secondhand account of an officer being approached by individuals asking for help is just the type of "inchoate and unparticularized suspicion" that cannot support a lawful stop. Reasonable suspicion requires "more than a hunch." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc). Yet by all accounts, a hunch is, at most, all that Pierre and Wheeler had when they decided to conduct the stop of three young black males in an affluent neighborhood where

they were perceived by police officers as looking out of place. As Pierre testified, Wheeler and Pierre decided to conduct the stop before Pierre had even seen the vehicle—meaning that Pierre learned no new information about the vehicle or its occupants after Wheeler called and before the stop took place. Ex. 3, Pierre Tr. 70:15–73:20.

Yet Defendants assert that they were justified in conducting the stop because the vehicle was moving slowly and because car burglaries had previously occurred in the neighborhood. *Id.* at 60:5–24. They also assert that the car was not registered to a location close to the encounter—although a license plate search did not show the vehicle as stolen. Ex. 2, Wheeler Tr. 52:10–12. Taken together, these post hoc justifications fall far short of reasonable suspicion. They are also disputed by Bilal's evidence, which describes an ordinary scene of three friends driving around looking for a lost dog. Bilal testified that the vehicle's seat belt indicator did not go off, which it would have if the passengers had not been wearing their seat belts and had been hanging out of the windows as Wheeler asserted. Ex. 1, Hankins Tr. 39:6–14. While Pierre asserts that he saw the front passenger "leaning outside the vehicle as to suggest he was pulling on car door handles," (Ex. 3, Pierre Tr. 80:12–18), this fact is disputed by Bilal, who testified that neither he nor the other occupants leaned out of the vehicle's windows during the stop. Ex. 1, Hankins Tr. 39:21–40:2.[1] And Pierre admits that he did not observe any of the vehicle occupants attempt to open a car door, before he initiated the stop. Ex. 3, Pierre Tr. 80:19–22. Bilal also not only testified that he approached Wheeler voluntarily and without being bidden to so do, but also that he told Wheeler his current address during their first interaction—an action that is inconsistent with a person who is in the process of committing a crime. Ex. 1, Hankins Tr. 45:10–46:13.

---

[1]   Even accepting Pierre's account as true, this behavior would be entirely consistent with Bilal's explanation to Wheeler, recounted to Pierre:  the search for a lost dog. In any event, any credibility determination to be made between Bilal's and Defendants' versions of events leading up to the stop is inappropriate for summary judgment. *See Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005).

Under similar circumstances, courts have declined to find that an officer had reasonable suspicion to conduct a stop as a matter of law. In *Gonzalez v. Huerta*, for example, the Fifth Circuit held that an unconstitutional seizure occurred where an officer detained the plaintiff based solely on "the bare report of a 'suspicious' vehicle in the school parking lot" and "a recent history of burglaries of motor vehicles at the same location." 826 F.3d 854, 857–58 (5th Cir. 2016); *see also Brown v. Texas*, 443 U.S. 47, 52 (1979) (police stop of a suspect was not supported by reasonable suspicion, where the suspect merely "looked suspicious" in a "neighborhood frequented by drug users"); *Alexander v. City of Round Rock*, 854 F.3d 298, 305 (5th Cir. 2017) (declining to conclude as a matter of law that an officer had reasonable suspicion where "the most [the officer] could have observed was a man ([plaintiff]) briefly looking around a vehicle in the parking lot, turning to get into a car, noticing a police car, continuing to get into the car, and beginning to drive further into the parking lot").

Defendants point to no "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009) (citation omitted). Rather, the circumstances are analogous to those in *Hill*, where the court noted the government's "attempt[] to put an ominous gloss on what appears almost entirely ordinary." 752 F.3d at 1034. By contrast to circumstances where reasonable suspicion might be found, Bilal and the other occupants "were not offending any traffic ordinance; there was no evidence of recent crimes in the neighborhood, no reason to suspect that [Bilal] or [the] passenger[s] were wanted by the police, and no other reason to believe that anything unusual was taking place." *Id.* (citation omitted). This might explain why Defendants do not point to any cases supporting their conclusion that the stop was justified under these circumstances. *See* Rec. Doc. 142-1 at p. 12–13. They cite cases to assert that the stop "lasted no longer than necessary,"

but these cases are inapposite because the courts analyzed the length of the stop *only after* first determining that the stop itself was supported by reasonable suspicion, *see id.* at 13–15.[2]

Bilal's expert, Dan Busken, who has 35 years of law enforcement experience, agrees that Wheeler's and Pierre's conduct was not justified. *See, e.g.*, Ex. 9, Busken Report at 18 ("Officer Wheeler's and Officer Pierre's detaining Hankins and the others was inconsistent with law enforcement training as well as recognized, accepted law enforcement practices."). As Mr. Busken explains in his report, while "[p]olice officers learn through training that subjective suspicious activity may draw their attention to some situation or occurrence that may be criminal in nature, . . . without specific, articulable facts, this subjective feeling alone does not constitute objective reasonable suspicion to detain, nor does it provide probable cause to arrest." *Id.* at 19. Mr. Busken also explains that the objective facts did not indicate that any criminal activity was taking place: "the location of the vehicle (away from the location where it was registered), initiating consensual contact with a police officer requesting assistance looking for a lost dog, remaining in the area to look for the dog, rather than leave the area to avoid further contact with the police, and a computer check that revealed the car was not reported stolen." *Id.* at 18.

Thus, there is a genuine dispute of material fact that precludes summary judgment on the issue of whether Bilal's stop was supported by reasonable suspicion.

---

[2] *E.g.*, *Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991) (finding that the officer had reasonable suspicion to make a *Terry* stop and conduct an approximately thirty-minute seizure in light of the "significant," "particular facts of this case," including that the plaintiff and her companions were "traveling at excessive speed in a no passing zone late at night, passed [the officer] in a vehicle that was similar to one that he had noticed earlier . . . in the vicinity of cultivated marijuana fields that he was watching," "[t]he vehicle did not respond initially to [the officer's] siren and flashing blue light," the occupants "did not respond to [the officer's] loud instruction to exit the vehicle," the occupants "appeared to have difficulty exiting, possibly indicating intoxication or drug use," and all three occupants "walked toward [the officer], who was alone").

### C.      Bilal's Excessive Use of Force Claim is Supported by Robust Evidence.

To prove an excessive force claim, a plaintiff must demonstrate "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018).

Bilal has suffered a constitutionally cognizable injury, including nightmares, anxiety, and distress. *See* Ex. 10, Hankins Decl. ¶¶ 9–16. "[W]hether an injury is cognizable depends on the reasonableness of the force, not just the extent of injury." *Sam*, 887 F.3d at 714 (citation omitted). Therefore, "*[a]ny* force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold" and "as long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.* at 713. Here, Bilal's psychological harm exceeds the *de minimis* threshold because he has suffered severe emotional distress resulting from Pierre's and Wheeler's unreasonably excessive force. *See, e.g.*, *Hodge v. Layrisson*, 1998 WL 564263, at *5–6 (E.D. La. Sept. 1, 1998) (finding "emotional distress" satisfies the injury requirement of an excessive force claim where it resulted from a police officer brandishing his firearm in an excessive use of force); *Mannis v. Cohen*, 2001 WL 1524434, at *8 (N.D. Tex. Nov. 28, 2001) (similar).

As set forth in detail by Bilal in his declaration attached hereto, the actions of Wheeler and Pierre have had a significant negative impact on his mental health. Since the incident, Bilal has had trouble sleeping, experiencing traumatizing and deeply disturbing nightmares. Ex. 10, Hankins Decl. ¶ 10. His nightmares have involved flashing cop lights, officers in uniform driving cop cars, and swarms of policemen drawing their guns on him. *Id.* Bilal also has regularly experienced severe stress resulting from the incident, including emotional states of acute anxiety and extreme panic and fright when he is near police officers. *Id.* ¶¶ 11–12. Bilal's emotional distress has only magnified since he moved back to New Orleans in November 2020—he no longer feels safe in his

own neighborhood, regularly experiencing flashbacks to the incident. *Id.* ¶ 12. Moreover, Bilal has become antisocial since the incident, retreating from his friends and family, deleting his social media accounts, and feeling like he wants to disappear from the world. *Id.* ¶¶ 13–14. The effect of this incident has been so drastic that Bilal no longer consistently socializes with his friends, because of his debilitating anxiety and shame for the potential to reveal how this incident "has broken [his] mental state." *Id.* ¶ 15. Most fundamentally, this incident "has had a lasting impact on [Bilal's] sense of self and self-worth." *Id.* ¶ 16.

It is sufficient to rely on Plaintiff's undisputed testimony and recitation of the facts, where not contrary to any other evidence in the record. *See Odubela v. Exxon Mobil Corp.*, 736 F. App'x 437, 441 (5th Cir. 2018) ("[The Court] will not evaluate credibility or weigh evidence" at the motion for summary judgment stage); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987) ("The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed."). In his declaration, Bilal has painfully detailed the severe and prolonged emotional distress resulting from Defendants' conduct, which more than satisfies the injury requirement.

Wheeler's and Pierre's use of force was excessive relative to the need and objectively unreasonable because they brandished their guns at Bilal who posed no threat whatsoever to them. To determine whether force was objectively unreasonable, courts assess the "facts and circumstances of each particular case," including (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

*First*, no crime was at issue because Wheeler and Pierre did not even have reasonable suspicion to conduct a stop. *See supra* § I.A; *see* Rec. Doc. 142-1 at p. 11–13.

*Second*, evidence establishes that at no point did Bilal or any of his friends pose a threat to Wheeler and Pierre, let alone a threat justifying them brandishing their guns at Bilal. For example, it is undisputed that Bilal and his friends affirmatively approached Wheeler, seated in his marked police car, and sought his help in finding the lost dog. Ex. 1, Hankins Tr. 44:12–46:13. Bilal told Wheeler his home address during this first encounter and described the lost dog. *Id.* at 45:21–46:13. Neither Wheeler nor Pierre testified that he observed Bilal and his friends committing any traffic violations, and both admitted that Bilal and his friends were kids. Rec. Doc. 142-2 at ¶ 3. All of these facts show that Bilal posed no threat to the safety of Wheeler and Pierre.

*Third*, Bilal never at all resisted any interaction with Wheeler and Pierre or otherwise attempted to evade them. Notwithstanding Bilal's understandable shock of being pulled over after just having sought Wheeler's help, Bilal and his friends stopped promptly when Wheeler flashed his car lights. Ex. 1, Hankins Tr. 55:16–56:17. The Defendants immediately drawing their weapons on Bilal and his friends was thus an extreme escalation of force that was completely unwarranted and objectively unreasonable given the circumstances.

Defendants cannot overcome the undisputed fact that Bilal and his friends did not resist any interaction with Wheeler and Pierre or otherwise attempt to evade them by mischaracterizing Bilal's testimony to assert that Wheeler and Pierre testified that neither drew their weapon. Rec. Doc. 142-1 at p. 15–16. In fact, Bilal testified repeatedly that both Wheeler and Pierre brandished their guns at him. Ex. 1, Hankins Tr. 64:6–25, 65:15–17. Defendants also argue that Bilal cannot establish a constitutional violation because "merely drawing a weapon" does not "support[] a finding of excessive force." Rec. Doc. 142-1 at p. 15–16. Not so. Here, it was objectively

unreasonable for Wheeler and Pierre to brandish their deadly weapons at compliant youths who had previously sought Wheeler's help finding a lost dog. Bilal's expert agrees that Wheeler's and Pierre's conduct was unjustified. *See* Ex. 9, Busken Report at 17–18 ("[I]t is my opinion that the use of force as alleged by Bilal Hankins in his complaint and in his testimony was not justified based on the totality of the circumstances, inconsistent with generally accepted police practices, or what is generally understood by law enforcement to be appropriate.").

The HANO Supervisors' argument regarding excessive force principally rely on a single, out-of-circuit case, *McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir. 2002). There, an officer "had probable cause to believe that the [plaintiffs] had not paid parking tickets" and "[d]espite seeing the cruiser's flashing lights, the [plaintiffs] did not pull over for some time." *Id.* To the contrary, Wheeler identified no evidence of any potential warrants or other offenses when he ran a database search on the vehicle and Bilal and his friends promptly pulled over after Wheeler activated his lights and used his loudspeaker. Ex. 2, Wheeler Tr. 52:5–12, 70:2–71:11. The *McNair* court further found that the officers had probable cause for their actions, giving their greater discretion to act than the relatively lower standard of reasonable suspicion at issue here. 279 F.3d at 465; *see also United States v. Arvizu*, 534 U.S. 266, 273–74 (2002) (explaining that for reasonable suspicion "the likelihood of criminal activity need not rise to the level required for probable cause").

Accordingly, material disputes of fact exist regarding Bilal's excessive use of force claim.

## II.   THE HANO SUPERVISORS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON BILAL'S SECTION 1983 CLAIMS FOR FAILURE TO SUPERVISE, DISCIPLINE, OR TRAIN.

To establish supervisory liability under Section 1983 liability, a plaintiff must show that (1) the supervisor failed to supervise, train, or discipline an officer; (2) a causal connection existed between the failure to supervise, train, or discipline and the violation of the plaintiff's constitutional rights; and (3) the failure to supervise, train, or discipline amounted to deliberate

indifference to the plaintiff's constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 385–88 (1989); *see also Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003). Municipal liability cases are instructive to the analysis of qualified immunity as it pertains to claims against supervisors sued in their individual capacity. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (engaging in a qualified immunity analysis).

"[D]eliberate indifference" requires evidence "that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). Deliberate indifference can occur through "action or *inaction*." *See Southard v. Texas Bd. of Crim. Just.*, 114 F.3d 539, 550–51 (5th Cir. 1997) (emphasis added). Courts' analysis of supervisory liability differs from that relating to a subordinate officer's constitutional violation because supervisors face "liability [] under Section 1983 if a responsible official supervises, trains, or hires a subordinate with deliberate indifference *toward the possibility* that deficient performance of the task *eventually may* contribute to a civil rights deprivation." *See, e.g.*, *Ernso v. Weber*, 1999 WL 1201907, at *3 (E.D. La. Dec. 13, 1999) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)) (cleaned up).

### A.   The HANO Supervisors' Failure to Supervise Amounts to Deliberate Indifference and Caused the Violation of Bilal's Constitutional Rights.

There is no dispute that the Hurstville paid detail is not, for example, a detail at a restaurant or store, where Pierre might be unlikely to engage in police work. To the contrary, the core purpose of the Hurstville patrol is to provide security on neighborhood streets. Ex. 3, Pierre Tr. 35:6–36:9. The Hurstville patrol is essentially a small police force, and Pierre is engaged in core police functions while working a Hurstville paid security detail. *Id.* at 35:13–36:6. There is no dispute that while on Hurstville details Pierre conducted vehicle stops, carried his gun, and donned a bullet proof vest. *Id.* at 40:2–42:15. He also engaged in these activities without any indicia that he worked

full-time for HANO, as he worked in plain clothes and drove his personal truck. *Id.* at 42:17–43:4; Ex. 1, Hankins Tr. 99:21–23.

Despite the well-known and obvious risks attendant to Pierre possessing his gun, conducting stops, working in plain clothes, and driving his personal vehicle while on the paid detail, each of the HANO Supervisors admits that he or she "does not undertake to supervise [Pierre]" during paid details. Rec. Doc. 142-1 at p. 8. The extent of their knowledge of Pierre's activities is "when and where" Pierre is working a paid detail. *Id.* But that is not enough. Because of the HANO Supervisors' failures to supervise, Pierre knew that no one was supervising him and thus he would be immune from oversight for constitutional violations.

### 1. *Each of the HANO Supervisors' failures to supervise Pierre amounted to deliberate indifference.*

#### a. *Martin utterly failed to supervise Pierre.*

Martin, as HANO Lieutenant, was responsible for all HANO officers. Ex. 5, Martin Tr. 17:11–20, 46:25–48:19. Martin testified that Pierre is "supposed to be" subject to the same supervision when working at HANO or at a paid detail. *Id.* at 73:13–23. But Martin admits that he had minimal contact with Hurstville's supervisor, Perilloux. *Id.* at 72:22–73:14 (explaining that he did nothing to check or confirm whether Perilloux was supervising Pierre on a paid detail). When Martin agreed to permit HANO officers to work paid details at Hurstville, he had just one short call with Perilloux, where Perilloux just asked "if [HANO] had any officers that were interested in working" the paid detail. *Id.* at 30:10–31:12. Martin approved Pierre's paid detail requests without ever contacting anyone at Hurstville. *Id.* at 28:24–29:7. Martin neither shared HANO's policies and procedures with Hurstville nor did he ever ask HANO's detail coordinator, Jackson, to so. *Id.* at 33:19–34:2. Martin admitted that he does not know Pierre's activities while Pierre is working the Hurstville detail. *Id.* at 50:1–12. Martin knows that Hurstville patrol officers

complete activity sheets, but he has never received a copy and thus has not reviewed them. *Id.* at 41:6–18, 44:15–19.

Martin's only effort to supervise Pierre while he is on a paid detail is to "sign off [on] the log," which notes just the time, date, and place at which a HANO officer plans to work a paid detail. *Id.* at 34:2–34:18. The log offers no insight into an officer's expected activities nor any ability for officers to report incidents that have occurred on a paid detail. Ex. 11 (HANO Paid Detail Log) at 17.

### b. *Defendant Jackson utterly failed to supervise Pierre.*

Jackson was the paid detail coordinator meaning he had primary responsibility for administering HANO's paid detail program. Ex. 6, Jackson Tr. 41:6–42:4. When asked whether he is "supervising HANO PD officers while they're working paid details," Jackson confessed, "No." *Id.* at 38:17–22. Jackson expected Pierre to follow HANO's policies and procedures while on paid details, but made no effort to ensure Pierre's compliance. *Id.* at 34:5–20. Jackson spoke with Perilloux only once about the Hurstville paid detail, where Perilloux "showed [Jackson] where they clock in at, told [him] what forms they needed to fill out to work the details" and "[t]hat's about it." *Id.* at 66:25–67:2, 65:2–16. Jackson never asked Perilloux of his efforts to supervise Hurstville patrol officers, or to notify Jackson if HANO officer had incidents with civilians or otherwise during paid details. *Id.* at 69:3–6. Jackson does not know whether Perilloux is aware of the HANO policies that HANO officers must follow while working paid details. *Id.* at 39:10–17, 90:4–18. Jackson never provided Perilloux with HANO officers' POST training certificates or HANO personnel files, including that of Pierre. *Id.* at 90:4–91:7. Thus, HANO officers are being "supervised" by Perilloux, although Perilloux is unaware of the officers' relevant training or whether they have recently been subject to disciplinary infractions—e.g., as to Pierre, for insubordination. Ex. 12, (HANO000846-000872).

Jackson also was responsible for maintaining the threadbare paid detail logs and this was his only means of tracking relevant information. Ex. 6, Jackson Tr. 47:15–18, 54:6–23. Jackson has never contacted paid detail supervisors while his officers were working the Hurstville detail. *Id.* at 45:8–24. Jackson also, for example, testified that he "assumes" Pierre would notify the detail supervisor about brandishing a gun on a citizen, but Jackson cannot be sure that Pierre's detail supervisor would report the incident to HANO. *Id.* at 59:18–60:10.

### c.    *Mullins utterly failed to supervise Pierre.*

Mullins supervised Pierre at HANO, but never spoke with Perilloux and never provided anyone at Hurstville with HANO's policies. *See* Ex. 8, Mullins Tr. 34:24–35:5, 50:2–4. Mullins has no idea when her subordinate officers are working paid details. *Id.* at 36:1–3.

### d.    *Mercadal utterly failed to supervise Pierre.*

Mercadal did nothing to supervise officers working paid details. Ex. 7, Mercadal Tr. 50:8–10. Despite knowing that officers were to follow HANO's policies while on paid details, Mercadal never informed anyone at Hurstville of those policies or provided them with HANO officers' POST training certificates. *Id.* at 59:8–24. Mercadal does not even know who the supervisor is at Hurstville and he has never spoken to Perilloux. *Id.* at 58:23–59:7. He understood that HANO officers working paid details were to follow the "secondary employment policy and procedure" and that they had the same "normal police duties or responsibilities[.]" *Id.* at 49:17–51:1. But Mercadal asserts that these officers are responsible for supervising themselves. *Id.* at 57:4–8.

### e.    *All the HANO Supervisors failed to supervise Pierre with knowledge of his history of violating HANO policies.*

HANO internal complaints show that Pierre was insubordinate. Ex. 12, (HANO000846-000872). In just the year prior to the incident here, Pierre faced discipline at HANO for "fail[ing] to follow instructions given" to him, constituting "insubordination, discourtesy and misconduct."

*Id.* He also was suspended for seven days in 2015, again for insubordination and refusing to follow a supervisor's directive. *Id.*

All the HANO Supervisors knew of Pierre's prior insubordination. Ex. 5, Martin Tr. 64:13–25, 71:6–72:22 (explaining Pierre failed to inform his supervisor of his whereabouts); Ex. 6, Jackson Tr. 60:14-61:9 (similar); Ex. 8, Mullins Tr. 43:8–45:13 (explaining Pierre's insubordination in 2019, where he ignored her instructions). But these supervisors still authorized Pierre to work a paid detail at Hurstville, where there was *no* supervision at all. Ex. 8, Mullins Tr. 49:10–13; Ex. 5, Martin Tr. 71:23–72:3. Bilal's expert, Dan Busken, who has 35 years of law enforcement experience, agrees that the HANO Supervisors' conduct was not justified. *See, e.g.*, Ex. 9, Busken Report at 25 ("[P]olice officers working the Hurstville Paid Detail are essentially performing police duties without supervision and monitoring. Based on my training, knowledge, and expertise, this creates a well-known and obvious risk that police officers will violate the law.").

### 2. *Case law supports that the HANO Supervisors' failure to supervise amounts to deliberate indifference.*

The HANO Supervisors argue that deliberate indifference requires "notice of a pattern of similar violations, which were fairly similar to what ultimately transpired" or a single incident "when the municipality provided no training whatsoever." Rec. Doc. 142-1 at p. 20 (citation omitted). But the HANO Supervisors ignore their own admission that they provided no supervision whatsoever to Pierre, even though they knew Pierre was conducting stops, carrying his HANO-issued gun, and engaging in other core police work at Hurstville. Ex. 6, Jackson Tr. 65:14–16 (indicating HANO officers would be patrolling Hurstville streets); *see supra* § II.A.. Bilal also presents evidence that Pierre's training was inadequate. *See infra* § II.B. Under these circumstances, this Court can find that the HANO Supervisors were deliberately indifferent to Bilal's constitutional rights to be free from an unlawful search and the excessive use of force. *Cf.*

*Ball v. LeBlanc*, 792 F.3d 584, 593–94 (5th Cir. 2015) (holding "substantial risk of serious harm" from heat stroke amounted to constitutional violation, where "no one at Angola, including these plaintiffs, has ever had a heat-related incident and that these prisoner's medical records do not show signs of heat-related illness"); *see also Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 376 (E.D. La. 2016) (finding deliberate indifference where supervisor "implemented a policy to promote aggressive street patrol activities where officers would essentially be relieved of the responsibility to comply with constitutional provisions and would be insulated from accountability for their illegal actions"). The HANO Supervisors' cited authority regarding patterns of violations, therefore, are inapplicable here. *See* Rec. Doc. 142-1 at p. 20–22.

### 3. *Qualified immunity does not apply at all because it is contrary to the Notwithstanding Clause of the original text of Section 1983.*

There is a "growing, cross-ideological chorus of jurists and scholars" recognizing that qualified immunity has no basis in the text of Section 1983 or the common law. *Zadeh v. Robinson*, 928 F.3d 457, 480–81(5th Cir. 2019) (Willet, J. concurring); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring) (courts applying the doctrine are not "engaged in 'interpret[ing] the intent of Congress in enacting'" § 1983 and further "the sort of 'freewheeling policy choice[s]'" that is antithetical to the judicial role). For example, recent scholarship illuminates that the doctrine of qualified immunity "has no place in Section 1983" because it was adopted on the mistaken presumption that a relevant statute was silent about the common law. *See generally* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CALIF. L. REV. 101, 166–67 (forthcoming); *see also Rogers v. Jarrett*, --- F.4th ----, 2023 WL 2706752, at *7 (5th Cir. Mar. 30, 2023) (Willett, J., concurring) (describing "Professor Reinert's scholarship" as "game-changing" because it "supercharges the critique that" the doctrine of qualified immunity "does not merely *complement* the text—it brazenly *contradicts* it," which is especially important

"in this text-centric judicial era when jurists profess unswerving fidelity to the words Congress chose").[3] For these reasons, the Court should not apply the doctrine of qualified immunity at all.

**B.     The HANO Supervisors' Failure to Train Pierre Amounts to Deliberate Indifference and Caused Pierre's Violation of Bilal's Constitutional Rights.**

The HANO Supervisors also failed to train Pierre because they cannot know whether Pierre needs more or different training, given their admission that they are not supervising him while he is engaging in police work. *See supra* § II.A. Pierre's lack of training also caused the constitutional violation. For example, Bilal testified that Pierre and Wheeler conducted the stop based on racial profiling. *See* Ex. 1, Hankins Tr. 71:1–11. Pierre's training records do not reflect any training specifically related to racial profiling and stops, in the year prior to the incident or of the incident. *See* Rec. Doc. 142-14 at p. 7–8. Pierre also testified that he has been subject to complaints regarding stops. Ex. 3, Pierre Tr. 65:1-17. Thus, there is a material dispute of fact regarding whether the HANO Supervisors' failed to train Pierre.

**C.     The HANO Supervisors' Failure to Discipline Pierre Amounts to Deliberate Indifference and Caused Pierre's Violation of Bilal's Constitutional Rights.**

Material disputes of fact exist about the HANO Supervisors' failure to discipline Pierre. As shown above, the HANO Supervisors were deliberately indifferent to Bilal's constitutional rights in failing to supervise Pierre. They also failed to discipline Pierre as they were not even aware of his conduct, given their lack of supervision. *See Mitchell*, 184 F. Supp. 3d at 376.

Moreover, Jackson conducted a cursory investigation. *See* Rec. Doc. 142-18. Jackson did not record the interviews or even take notes on statements. Ex. 6, Jackson Tr. 32:3–14. He asked

---

[3] Courts also should be cautious before curbing individuals' right to a jury of their peers.  *See Manzanares v. Roosevelt Cty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018) ("[I]n a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable….").

Pierre only ***three questions*** about the incident, which supports that the investigation was perfunctory. *Id.* at 88:14–89:6.

Confronted with this evidence, the HANO Supervisors argue that "a single incident of a failure to discipline following the plaintiff's complaint of an alleged incident cannot be the cause of the alleged incident." Rec. Doc. 142-1 at p. 23 (citation omitted). But here Pierre knew that none of the HANO Supervisors (and no one from Hurstville) was supervising him and thus that he would not face any discipline for constitutional violations. HANO's cursory investigation following the incident only supports that Pierre's misconduct would go unchecked.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the HANO Supervisors' motion for summary judgment based on qualified immunity.

Dated:  April 4, 2023                                   Respectfully submitted,

                                                        */s/ Christopher M. Andrews*
                                                        Christopher M. Andrews (*pro hac vice*)
                                                        candrews@cooley.com
                                                        Cooley LLP
                                                        55 Hudson Yards
                                                        New York, NY 10001
                                                        Telephone: (212) 479-6862

                                                        Patrick E. Gibbs (*pro hac vice*)
                                                        pgibbs@cooley.com
                                                        Cooley LLP
                                                        3175 Hanover Street
                                                        Palo Alto, CA  94304
                                                        Telephone: (650) 843-5000

                                                        Amara Lopez (*pro hac vice*)
                                                        alopez@cooley.com
                                                        Cooley LLP
                                                        355 S. Grand Avenue
                                                        Los Angeles, CA 90071
                                                        Telephone: (213) 561-3220

                                                        Tina Jensen (*pro hac vice*)

24

tjensen@cooley.com
Cooley LLP
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 550-6000

*and*

Bridget Wheeler
LA Bar No. 37546
Stephanie Willis
LA Bar No. 31834
swillis@laaclu.org
Nora Ahmed (*pro hac vice*)
Nahmed@laaclu.org
ACLU Foundation of Louisiana
1340 Poydras Street, Suite 2160
New Orleans, LA 70112
Telephone: (504) 522-0628

*Counsel for Plaintiff Bilal Hankins*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing pleading has been served upon all counsel of record by electronic transmission, this 4th day of April 2023.

_____
Christopher Andrews