UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BILAL HANKINS | * | CIVIL ACTION NO. 21-1129 |
| | * | |
| | * | SECTION: "L"(1) |
| VERSUS | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| KEVIN WHEELER, ET AL. | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

This is a §1983 civil rights action concerning an alleged unreasonable seizure and use of excessive force in June 2020. Before the Court is the defendants' Motion to Compel Independent Mental Examination (Rec. Doc. 269) of the plaintiff, who alleges emotional injury and psychiatric distress as a result of the incident and has produced mental health treatment records reflecting treatment beginning in April 2025. The Court finds good cause for the requested examination and, further, finds that the psychologist's description of the evaluation to be performed is sufficiently detailed to provide an appropriate scope for the examination. Accordingly, the Motion to Compel is GRANTED as provided further herein.

Background

This case arises out of the alleged traffic stop of plaintiff Bilal Hankins, a Black man, and two other Black males by law enforcement officers who were working a private security detail in New Orleans on the night of Saturday, June 13, 2020. Hankins resides in the Uptown neighborhood where the alleged stop occurred and was riding as a rear seat passenger in his friend Tahj Pierre's BMW as they drove slowly through the neighborhood looking for his neighbor Diondra Robbins' chihuahua. Robbins' 12-year-old nephew L.M. was riding in the front passenger seat.

1

When they saw Officer Kevin Wheeler[1] working a private security detail for the Hurstville Security and Neighborhood Improvement District, they allegedly asked him to assist them with their search. But, instead, Hankins alleges that after they continued on their search, Officer Wheeler called Officer Ramon Pierre[2]—also working a private security detail for Hurstville—for backup. The Officers followed Hankins and his companions and then turned on their flashing lights.

According to Hankins, Tahj Pierre turned down a side street, believing the officers had been called to some emergency. But the officers turned down the same street, and Officer Wheeler ordered Tahj Pierre to exit the car with his hands up. He complied. Hankins put his hands out the window to show he was unarmed. Hankins alleges that he and his friends saw both officers brandishing firearms at them.

Hankins alleges that he asked the reason for the stop and that Officer Wheeler stated he had run a license plate check and the BMW was registered to a woman in New Orleans East. According to Hankins, Officer Wheeler demanded to know what the group was doing in the neighborhood. Hankins alleges that he explained that he resided in the neighborhood, that Tahj Pierre was visiting, and that the car was registered to Tahj Pierre's mother. Hankins alleges that he suggested that Officer Wheeler check the address on Tahj Pierre's driver's license because it would match the address on the car's registration.

When Officer Wheeler returned from his vehicle, his whole demeanor had allegedly changed. He asked Hankins to repeat the details about the lost dog and to provide his address. He

---

[1] Officer Wheeler was an off-duty employee of the Orleans Levee District-Police Department ("OLD"). Hankins alleges that the Southeast Louisiana Flood Protection Authority-East ("SLFPA-E") and the Lakefront Management Authority ("LMA") exercise control over the OLD-PD.
[2] Officer Pierre was an off-duty employee of the police department of the Housing Authority of New Orleans ("HANO").

2

then allegedly told Hankins that he thought "you guys were yanking my chain" and allegedly joked "you know, three young men, in a nice car, in this neighborhood."

Hankins alleges that following the incident, Officer Wheeler and Officer Pierre conspired to coverup their conduct by submitting false narratives in their police report and in post-incident incident interviews.

Hankins filed this lawsuit on June 10, 2021, asserting various civil rights claims against Officers Wheeler and Pierre; Hurstville; HANO; SLFPA-E; Kerry Najolia, Michael Brenckle, Darnell Laurent, Thaddeus Petit, Jamel Brown, Carl Perilloux, Tyrone Martin, Demetrius Jackson, Tommy Mercadal, Leontine Mullins; and LMA.

The defendants filed motions for summary judgment on the basis of qualified immunity. The Court granted the motions as to Hankins' federal claims and declined to exercise supplemental jurisdiction over the state law claims. The Fifth Circuit reversed and remanded. The HANO supervisors (Martin, Jackson, Mercadel, and Mullins) filed a renewed motion for summary judgment, which the District Court granted, dismissing Hankins' claims against them. The Fifth Circuit affirmed on January 5, 2026, and the judgment was issued as the mandate on January 26, 2026.

Meanwhile, although trial has not been set, the deadline to complete discovery is March 19, 2026. Presently, the SLFPA and Hurstville defendants seek an independent medical examination of Hankins' mental health ("IME") by Megan Alsop, Psy.D., ABPP of Jefferson Neurobehavioral Group. There appears to be no dispute that defendants are entitled to an IME. Indeed, Hankins alleges that he suffered emotional injury and psychiatric distress as a result of the incident. First Amend. Complaint, Rec. Doc. 22, ¶¶ 123, 131, 135, 140. And he has produced documentation of mental health treatment since at least April 2025.

The issue, though, is the parameters. Defendants insist enough information has been provided about the scope of the examination. The following information has been provided by Dr. Alsop:

> Psychological conditions such as depression, anxiety, and stress-related disorders (e.g., adjustment disorders, posttraumatic stress disorder) can cause problems with day-to-day functioning and quality of life by disrupting behavior, thinking and concentration, and active participation in life activities. Sometimes there may be pain (e.g., headaches, muscle tension) even in the absence of physical injuries. Therefore, the assessment tools used in a psychological evaluation are selected to objectively assess the common psychological, emotional, cognitive, and physical complaints of persons presenting with psychological disorders.
> The psychological evaluation begins with clinical interview followed by the administration of standardized psychological tests and procedures. A detailed review of available records are included. The core of the assessment battery consists of psychological questionnaires that objectively assess a broad range of symptoms and complaints as well as features of personality that may influence psychological functioning. Tests designed to screen cognitive ability (e.g., attention, memory) may also be included depending on the specific nature of the presenting problems and the specific referral questions. However, this assessment of cognition does not represent a comprehensive neuropsychological evaluation. The goal of the psychological evaluation is to characterize the individual's current psychological state that can lead to detailed recommendations regarding the management of the any psychological disorder that is identified. Note that as a matter of practice, we do not provide a specific list of instruments to be administered because research has shown that this may facilitate practices that could result in invalid test results. However, the instruments used in this evaluation are standard psychological tests, which are in common use by psychologists.
> Completion of this evaluation may take up to six to eight hours but may take much less. The clinical interview typically takes from one to two hours. The exact amount of time required to complete the formal testing depends on the specific issues to be assessed and examinee's pace.
> The patient will have an hour break for lunch. Additional breaks are allowed as needed.

Rec. Doc. 269-15, at 2. Dr. Alsop also delivered a letter explaining:

> It is my understanding that the claimant in this case is alleging psychological injuries. A psychological evaluation is a comprehensive assessment of social, emotional, and behavioral functioning. The evaluation's purpose is to objectively document a person's mental health status, using objective psychometric tests that include methods to determine the presence and magnitude of response bias (over- or under- reporting of subjective symptoms) to determine whether a mental health condition exists (First, 2014). If a mental health condition exists, it is then necessary

> to describe its nature (specific diagnoses or constellations of symptoms), its severity, and its cause(s). The evaluation is specific to that which is being alleged from a psychological perspective.
> The psychological test battery is comprised of a number of procedures designed to evaluate functioning in the following domains: general intelligence, attention/concentration, academic skills, effort, and emotional, functional and behavioral status.
> The assessment tools used in a psychological evaluation are selected to objectively assess the common psychological, emotional, cognitive, and physical complaints of persons presenting with psychological disorders. In conducting a psychological evaluation, it is essential to ensure that real and meaningful impairment is not missed. Therefore, my test battery is comprehensive and requires approximately 6-8 hours to complete; the variability in time depends on the specific issues to be assessed and the examinee's pace. The patient will have an hour break for lunch, with additional breaks allowed as needed.

Rec. Doc. 269-16, at 2.

Hankins insists he is entitled to receive a list of the tests that may be administered. He argues this is necessary so that he can object to any tests that are irrelevant, unduly invasive, or beyond the scope of the injuries claimed. He adds that he would agree to production of this information on an attorneys' eyes only basis so there is no risk that plaintiff might prepare or rehearse answers.

<u>Law and Analysis</u>

1. *Independent Medical Examinations*

Upon good cause shown by the moving party, the court may order a physical or mental examination of a party by a suitably licensed or certified examiner when the party's physical or mental condition is in controversy. Fed. R. Civ. Proc. 35(a)(1). While conclusory allegations in the pleadings are not sufficient to meet the "good cause" and "in controversy" requirements of Rule 35, the Supreme Court has recognized that in some cases, the pleadings alone will satisfy the Rule's requirements. <u>Schlagenhauf v. Holder</u>, 379 U.S. 104, 119 (1964). Thus, "[a] plaintiff in a negligence action who asserts mental or physical injury, places that mental or physical injury

clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." Id. (citation omitted).

If the Court finds good cause, the order "must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2). As a result, courts may require the parties to provide sufficient detail regarding the proposed examination so that the Court can adequately delineate the manner, conditions, and scope of the examination. See Kador v. City of New Roads, No. CIV.A. 07-682-D-M2, 2010 WL 2133889, at *3 (M.D. La. May 27, 2010). Such details can also provide "a certain degree of direction regarding those examinations, thereby providing him the opportunity to bring to the Court's attention those tests he deems irrelevant or harmful." Ornelas v. S. Tire Mart, LLC, 292 F.R.D. 388, 398 (S.D. Tex. 2013). Thus, in some instances, courts have required defendant to provide plaintiff with a list of the possible tests that may be conducted during the examination. See id. at 399; Carr v. IF&P Holding Co., LLC, No. CV 22-480, 2024 WL 263511, at *5 (E.D. La. Jan. 24, 2024), on reconsideration in part, No. CV 22-480, 2024 WL 838212 (E.D. La. Feb. 28, 2024). However, there is nothing within the text or purpose of Rule 35 that requires this result in every case. See Ragge v. MCA/Universal Studios, 165 F.R.D. 605, 609 (C.D. Cal. 1995) (concluding that the psychologist's declaration setting forth the nature of the examination to be conducted was sufficient and finding that "[i]t would serve no purpose to require [him] to select, and disclose, the specific tests to be administered in advance of the examination");[3] Daigle v.

---

[3] The only reported case cited by the plaintiff in support of his "list of potential tests" argument is Ornelas, which relied on Newman v. San Joaquin Delta Community College District for that holding. Orenelas, 292 F.R.D. at 388-89. But the Newman court did not order the disclosure of potential tests. 272 F.R.D. 505, 512 (E.D. Cal. 2011). There, the psychologist had identified 26 potential tests sua sponte. The court held that "[a]bsent evidence that a certain test would cause actual harm to [plaintiff], the court cannot itemize tests that are truly unnecessary or appropriate" and ordered that he "conduct the tests he deems necessary." 272 F.R.D. at 512. In considering whether to limit the tests that the psychologist could conduct, the Newman court relied on Ragge, which as noted supra, rejected a request that potential tests be disclosed. id.; see Ragge,165 F.R.D. at 609.

Nabors Drilling USA, LP, No. CIV.A. 05-0336, 2007 WL 580781, at *2 (W.D. La. Feb. 15, 2007) (finding the psychologist's explanation of the nature of the tests to be performed satisfies the notice requirement of Rule 35). Indeed, courts often find that deferring to the examiner is the more appropriate course of action. Tillman v. Masse Contracting Co., No. CV 06-2480, 2006 WL 8456492, at *2 (E.D. La. Dec. 20, 2006) ("This Court finds no reason to specify the tests that examinee should undergo, that decision is best left to the examiner."); Ragge, 165 F.R.D. at 609 (C.D. Cal. 1995) ("Because the mental examination provides one of the few opportunities for a defendant to have access to a plaintiff, and the only opportunity for a defendant to have a plaintiff examined by defendant's expert, some preference should be given to allowing the examiner to exercise discretion in the manner and means by which the examination is conducted, provided it is not an improper examination.").

   2. *Analysis*

All of the requirements to order an independent mental examination are present here. There is no dispute that there is good cause for a mental examination of Hankins in light of his allegations of emotional and psychiatric distress resulting from the incident at issue. There is no dispute that Dr. Alsop is suitably certified. There appears to be no dispute as to the time or place of the examination—defendants say they will facilitate a time and place that will not impose an undue burden on Hankins, and Hankins raises no issue with regard to time or place. Finally, the Court cannot discern a live dispute as to the manner, conditions, and scope of the examination. A detailed description of the evaluation has been provided, and Hankins does not claim that the proposed examination is inappropriate in anyway. Nor does he suggest how a mental examination *might* exceed the scope called for by the emotional and psychiatric injury alleged in this case. He does not request any particular limits or conditions be placed on the examination itself.

Instead, he argues that he must be provided with a list of all potential examinations that may be conducted by Dr. Alsop so that he can properly assess the scope. He submits the case law supports his request. He argues that a list of potential examinations is necessary so that he can raise timely objections[4] to any tests that are irrelevant, unduly invasive, or beyond the scope of the injuries claimed. Yet, he does not suggest that Dr. Alsop might, in exercising her professional expertise, administer an unduly invasive test or one that seeks information beyond the scope of the injuries claimed.

Although it is true that some courts have ordered disclosure of all potential examinations to be conducted, the Court finds that such a disclosure is not called for in this case. First, Dr. Alsop has provided a detailed description of her examination, as recounted verbatim above. She explains that "[a] psychological evaluation is a comprehensive assessment of social, emotional, and behavioral functioning." Rec. Doc. 269-16, at 2. The evaluation she will conduct "begins with clinical interview followed by the administration of standardized psychological tests and procedures." Rec. Doc. 269-15, at 2. "The psychological test battery is comprised of a number of procedures designed to evaluate functioning in the following domains: general intelligence, attention/concentration, academic skills, effort, and emotional, functional and behavioral status." Rec. Doc. 269-16, at 2. The " instruments used in this evaluation are standard psychological tests, which are in common use by psychologists." Rec. Doc. 269-15, at 2.

Given the emotional and psychiatric injury alleged in this case, the Court finds that the use of standard psychological tests to assess Hankins' functioning in general intelligence, attention/concentration, academic skills, effort, and emotional, functional, and behavioral status is an appropriate scope for his mental examination. Further, the Court finds that Dr. Alsop's

---

[4] Although he seeks the ability to raise timely objections, he does not seek the list far enough in advance of the examination to allow for such objections to be made.

description of the examination and identification of the types of testing to be conducted is sufficient to have alerted Hankins' counsel to any anticipated testing that might be harmful or outside the scope of the injuries claimed. To be clear, there is no suggestion at all that Dr. Alsop's evaluation may harm Hankins. And as to the scope, Hankins has not raised any concern with the proposed subject matter of the evaluations. Importantly, Dr. Alsop will submit a report of her examination. If any of her opinions or tests have exceeded the scope of the injuries claimed or her expertise, Hankins can seek to exclude her findings from any trial or dispositive motion in this matter.

3. *Attorneys' Fees*

If the Court grants a motion to compel pursuant to Rule 37, it must "after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). However, fees are not to be awarded where: "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." Id.

By its terms, Rule 37 fees are not implicated when a motion for an IME pursuant to Rule 35 is filed. See Terry v. Promise Hosp. of Ascension, Inc., No. CIV.A. 13-128-SDD, 2014 WL 1239397, at *4 (M.D. La. Mar. 25, 2014) ("[T]he motion for an IME is authorized pursuant to Rule 35. Rule 35 has no provision for the awarding of expenses as requested by the Defendant and Rule 37 does not provide for the reimbursement of costs associated with filing a motion under Rule 35."). Nonetheless, defendants have cited a case where a court compelled an IME and ordered the opposing party to pay the movant's attorneys' fees and costs. Smith v. Diamond Offshore Co., No.

9

CIV.A. 07-3954, 2009 WL 1107717, at *4 (E.D. La. Apr. 22, 2009). Indeed, the court has inherent authority issue sanctions. Barcia v. ENI US Operating, Co., No. CIV.A. 05-4501, 2006 WL 1236053, at *3 (E.D. La. May 4, 2006).

Although the Court has found the case law relied on by Hankins to be distinguishable, the Court finds that his attempt to obtain a list of all potential test is not sanctionable. Accordingly, the Court declines to issue an attorneys' fee award.

## Conclusion

The Court finds good cause for an independent medical examination of Hankins' mental health by Megan Alsop, Psy.D., ABPP of Jefferson Neurobehavioral Group, to be conducted at a time and place to be agreed upon by the parties and in accordance with the scope as described by Dr. Alsop in Rec. Doc. 269-15 and Rec. Doc. 269-16. It is therefore ORDERED that defendants' Motion to Compel (Rec. Doc. 269) is GRANTED and the independent medical examination of Hankins shall proceed as ordered herein. Defendants' request for sanctions in the form of attorneys' fees is DENIED.

New Orleans, Louisiana, this 30th day of January, 2026.

                                                    Janis van Meerveld
                                                    United States Magistrate Judge