# Exhibit 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


BILAL HANKINS,

                              CASE NO. 2:21-CV-01129

        Plaintiff,

v.                          JUDGE ELDON E. FALLON

KEVIN WHEELER, ET AL,       MAGISTRATE JUDGE JANIS

                            VAN MEERVELD

        Defendants.




* * * * * * * * * * * * * * * * * * * * * * * * *

              TRANSCRIPT OF THE DEPOSITION OF:

                  RAMON MICHAEL PIERRE,

TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * *


        REPORTED AT THE LAW OFFICES OF:

        MOULEDOUX, BLAND, LEGRAND & BRACKETT, LLC

        701 POYDRAS STREET, SUITE 600

        NEW ORLEANS, LOUISIANA  70139


        COMMENCING AT 2:12 P.M., ON JANUARY 20, 2023.

                                        Page 1

APPEARANCES

FOR THE PLAINTIFF:
  COOLEY LLP
  (BY:  TINA JENSEN, ESQ.)
  4401 EASTGATE MALL
  SAN DIEGO, CALIFORNIA  92121
  (858) 550-6000
  tjensen@cooley.com

  (BY:  CHRISTOPHER M. ANDREWS, ESQ.)
   [VIA VIDEOCONFERENCE]
  55 HUDSON YARDS
  NEW YORK, NEW YORK  10001
  (212) 479-6862
  candrews@cooley.com

FOR THE DEFENDANT HOUSING AUTHORITY OF NEW ORLEANS:

  STONE PIGMAN WALTHER WITTMAN, LLC
  (BY:  RACHEL W. WISDOM, ESQ.)
  909 POYDRAS STREET, SUITE 3150
  NEW ORLEANS, LOUISIANA  70122
  (504) 593-0911
  rwisdom@stonepigman.com

FOR THE DEFENDANTS HURSTVILLE SECURITY AND
NEIGHBORHOOD IMPROVEMENT DISTRICT, ORLEANS LEVEE
DISTRICT POLICE, KEVIN WHEELER, ROMAN PIERRE, AND
CARL PERILLOUX:
  MOULEDOUX, BLAND, LEGRAND & BRACKETT, LLC
  (BY:  MARK E. HANNA, ESQ.)
  701 POYDRAS STREET, SUITE 600
  NEW ORLEANS, LOUISIANA  70139
  (504) 595-3000
  mhanna@mblb.com

REPORTED BY:
  YOLANDA J. PENA
  CCR NO. 2017002, RPR
  STATE OF LOUISIANA

Page 2

STIPULATION

IT IS STIPULATED AND AGREED by and among the parties that this deposition is hereby being taken pursuant to the Federal Rules of Civil Procedure.

All formalities, excluding the reading and signing of the transcript by the witness, are hereby waived.

All objections, except as to the form of the question and responsiveness of the answer, are considered reserved until trial or other use of the deposition.

Page 4

INDEX

PAGE

STIPULATION..........................................4
EXAMINATION BY:
  MS. JENSEN......................................5
  MR. HANNA....................................115, 118
  MS. WISDOM...................................117
CERTIFICATE......................................119
LIST OF EXHIBITS

Exhibit A..........................................73
  (Map)
Exhibit B.........................................115
  (Louisiana driver's license)

Page 3

RAMON MICHAEL PIERRE, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. JENSEN:

Q.  Well, to begin, can you please state and spell your name for the record?

A.  Ramon, R-a-m-o-n.  You want my middle -- middle name?

Q.  Yes, please.

A.  Michael, M-i-c-h-a-e-l, Pierre, P-i-e-r-r-e.

Q.  How would you prefer to be addressed?  Mr. Pierre or Officer Pierre?

A.  It doesn't matter.

Q.  In the past five years, have you used any other names?

A.  No.

Q.  And do you have a driver's license on you today?

A.  Yes.

Q.  Great.  Could you please hand that to the court reporter?  She'll make a copy.

MR. HANNA:  Just your identification.

THE WITNESS:  The address on that ID is not correct.

Page 5

2 (Pages 2 - 5)

BY MS. JENSEN:

Q. What is your current residential address?

A. Residential address? 2828 Megan Lane, Marrero, Louisiana 70072.

Q. All right. My name is Tina Jensen. I am an attorney representing Bilal Hankins, the plaintiff in this action. Do you understand that?

A. Yes.

Q. Do you understand that the testimony you give today is under oath and that you must testify truthfully and completely?

A. Yes.

Q. Is there any reason, whatsoever, why you cannot provide truthful or competent testimony today?

A. No.

Q. Have you ever testified in court or been deposed before?

A. Yes, I've testified in court.

Q. Have you ever been named as a defendant relating to conduct committed in the course of your job?

A. This is the first time, I believe, I've been sued. Yes. It's the first time I've been named as a defendant, yes.

Q. This is the first time --

Page 6

A. Yes.

Q. -- you've been named as a defendant?

A. Yeah.

Q. In what other cases have you testified?

A. What --

Q. In what other cases have you testified?

A. A murder trial, several robbery cases, you know, drugs.

Q. All criminal cases?

A. All criminal cases.

Q. No civil cases?

A. Not that I can recall, that I did a civil case in -- no, no. I got subpoenaed for an accident, but we -- I didn't go to trial on that.

Q. All right. I know you have experience with this process. Well, first, let me back up.

Have you ever been deposed before?

A. What do you mean by "deposed"?

Q. What we're doing right now where --

A. A deposition?

Q. -- you're giving -- yes, sworn testimony in a deposition.

A. I've never been a part of a deposition. I've been a part of, you know, going to trial and --

Q. Okay.

Page 7

A. -- and -- or being briefed with the DA or whatnot. But as far as this setting, no, it's the first time.

Q. Okay. Well, just a couple of ground rules to help make today's deposition proceed efficiently.

The basic process is I'll ask you questions, and you'll have an opportunity to answer those questions in as much time as you need. It's possible that you won't know or won't be able to recall certain facts or details. That's okay. You can tell me what you do know. And what I do not want is for you to guess or speculate.

Does that make sense?

A. Yes.

Q. If you don't understand a question that I ask, please feel free to tell me, and I'll repeat the question or rephrase it. But unless your counsel instructs you not to answer a question, I'm entitled to answers to the questions that I ask.

And most important, the court reporter is here to capture every single word said by you, me, and the other attorneys here. The goal is to have, at the end of the day, a transcript that accurately reflects the questions that I've asked, the answers that you've given, and the objections that have been made. There

Page 8

are a few things that we can do to make that possible and life easier for our court reporter.

First, it's important that we don't talk over each other or interrupt each other so that the court reporter can accurately capture what we say. To that end, please let me finish a question completely before you begin answering it, and I'll do my best not to interrupt you. Second, the court reporter will not be able to capture nonverbal answers, like nods or shrugs, so please try to respond verbally to every question.

We might take a break during the deposition, but I certainly won't keep you here all night. If you need take a break at any point, feel free to let me know, and we'll pause and go off the record. I only ask that if I've posed a question, that you answer the question before we break.

Do you have any questions about the ground rules that we've just covered?

A. No.

Q. And you're represented by counsel today?

A. Yes.

Q. Did you prepare in any way for your testimony today?

A. Yes.

Q. Did you meet with counsel?

Page 9

3 (Pages 6 - 9)

A. Yes.

Q. How many times did you meet?

A. I can't recall.

Q. More than one?

A. More than one.

Q. How long were those meetings?

A. An hour, two hours. I didn't check my watch to -- to see.

Q. Who else was present besides your attorney?

A. Wheeler.

Q. Anyone else?

A. No.

Q. And what documents did you review to prepare today?

A. I -- I reviewed -- I was shown my statement that I gave to my house -- to the Housing Authority of New Orleans, but that's pretty much it.

Q. Did you --

A. And a -- and a map. I'm sorry. A map.

Q. Any other documents?

A. Not that I recall, no.

Q. Did you review Wheeler's statement?

A. No. I never seen Wheeler's statement.

Q. Did you take notes on any of those documents?

A. No.

Page 10

Q. Did any of these documents refresh your recollection about events related to this lawsuit?

A. Yes.

Q. Did you review any video of the incident?

A. No.

Q. Did you listen to any audio recordings?

A. No.

Q. Did you discuss this deposition with anyone other than your attorney?

A. No. Other than -- I'm sorry. Other than my supervisors, who simply had said we have a deposition. So if that's talking in depth about it, that's as far as -- as far as we said. "On this date, we have a deposition. On this date, we have a deposition. On this date, I have to go talk to them." And that's pretty much it.

Q. And when you say "pretty much it" --

A. That's it. I'm sorry. That's it.

Q. So to make sure I understand, you're saying that there was a discussion of the fact -- of the deposition, that this was going to take place?

A. No. It was the facts of the deposition. It was the facts that they were going and testify at the deposition. They -- they specifically said, "Well, today, I'm going to this deposition," or "Today, I have

Page 11

to speak at this deposition." There was no -- there was no talking of what was said or what was going to be said or anything like that.

Q. Understood. Thank you.

Sitting here today, do you have an understanding of what this lawsuit is about?

A. Yes, pretty much.

Q. And other than Mr. Hanna, have you had any conversations with any other attorneys about this case?

A. No other attorneys.

Q. Have you ever interacted or communicated with any of -- any of the lawyers in this room or appearing virtually at this deposition, other than your attorney?

A. No.

Q. Any communications with other officers at the Housing Authority of New Orleans Police Department about this case?

A. No.

Q. And can you agree that if I use the acronym HANO today, that you will understand me to be referring to the Housing Authority of New Orleans Police Department?

A. Yes.

Q. Okay. Great.

A. Let's revisit. When you -- the question prior

Page 12

to that one, you asked me have I spoken to any other officers in reference to this case. Other than my supervisors when I had to give my statement in reference to it. If that's --

Q. Thank you for the clarification.

A. -- if that's what you mean. That's -- that's what I did. I said speak to my supervisors when the complaint came out and I had to give a statement. If that's the question, then that's -- then that's the officers I -- I've spoken to. Now, I'm not sure -- if you mean other officers outside of my supervisors, then that's no. But to speak to my supervisors in reference to this case, that's yes. I did speak to them about it.

Q. Understood. Thank you.

A. Okay.

Q. Have you had any communications with any representatives at the Hurstville Security District -- such as supervisors, board members, or anyone else affiliated with Hurstville -- about this lawsuit?

A. Only person I've spoken to was Ryan Perilloux, would be the immediate supervisor for me. As far as board members, no. I couldn't tell you who a board member is.

Q. And did you say Ryan Perilloux?

Page 13

4 (Pages 10 - 13)

A.  I -- I believe his name is Ryan Perilloux. I know his last name is -- I know his last name is Perilloux.  It could have been a different name, but I -- I -- for some reason, I just think his name is Ryan.  I'm sorry.

Q.  Does Carl sound familiar?

A.  Carl Perilloux, yes.

Q.  Okay.

A.  Yes.

Q.  Any communications with representatives or employees of the Orleans levee police about this litigation?

A.  No.

Q.  Have you discussed this case with any non-lawyers?

A.  No.

Q.  All right.  Let's just talk a little bit about your professional history.

Have you served in the military?

A.  No.

Q.  When did you begin working in law enforcement?

A.  The year was 1998.  I want to say the month is May.

Q.  Where did you attend police academy?

A.  New Orleans Police Department.

Page 14

Q.  And have you worked for any other law enforcement agencies other than the HANO Police Department?

A.  The New Orleans Police Department.

Q.  Any others?

A.  No.

Q.  Had you ever been terminated from a law enforcement position?

A.  For NOPD, yes.  But I ended up resigning under investigation.

MR. HANNA:  I'm going to object to the form of the question to the extent it's not relevant to the qualified immunity issue.  But subject to the objection, he's already answered.

BY MS. JENSEN:

Q.  Today -- oh, let me back up.

What were the circumstances of that investigation?

MR. HANNA:  Same objection.

You can answer.

THE WITNESS:  I can answer?

MR. HANNA:  Yes, you can.

A.  It dealt with Hurricane Katrina and officers leaving in reference to Hurricane Katrina.

Page 15

BY MS. JENSEN:

Q.  And you were under investigation?

A.  Yes, I was able to --

MR. HANNA:  Same objection.

A.  I was able to --

THE WITNESS:  I can --

MR. HANNA:  You can answer, yeah.

A.  I was able to resign under investigation.

BY MS. JENSEN:

Q.  What was the basis of that investigation as it pertained to you?

MR. HANNA:  Same objection.

You can answer.

A.  Due to Hurricane Katrina.  In reference to Hurricane Katrina.  If you're asking was I -- was I terminated under any other thing, criminal nature or abuse of power, anything like that, no.  I was not terminated because of that.

BY MS. JENSEN:

Q.  With respect to the investigation about your conduct, you said it had to do with Hurricane Katrina. Could you be more specific?  Why were you under investigation for something having to do with Hurricane Katrina?

MR. HANNA:  Same objection.

Page 16

You can answer.

A.  Officers did not leave their post.  They was given permission to leave their post in reference to take care of their families and make sure they was okay.  So there was a whole bunch of miscommunication during that time when you have command staff saying one thing, patrol officers saying another thing.  So that kind of, you know, messed it up things.

I was -- had a hearing in reference to my employment with New Orleans Police Department.  And so rather than continue the hearing and going through all that, I decided to resign my post at the New Orleans Police Department, but it was under investigation.

BY MS. JENSEN:

Q.  Were they investigating whether you left your post without permission?

A.  Yes.

MR. HANNA:  Same objection.

You can answer.

A.  That's what I believe it was about, yes.

BY MS. JENSEN:

Q.  And today, I see that you're wearing a shirt with a -- an emblem that says, "New Orleans Police Department," but it also says, "Housing Authority of New Orleans."  Can you explain what the emblem is?

Page 17

5 (Pages 14 - 17)

A. This is my Class C work shirt for the Housing Authority of New Orleans Police Department. What you just described was inside of a sewn-on badge. It doesn't have a badge number on it, but it states who and what under -- it states who and what authority I'm under. I work under -- I work for the Housing Authority of New Orleans as a police officer.

Q. So is it -- is it describing, on that emblem, New Orleans Police Department? Or is it saying Housing Authority of New Orleans Police Department? Because sitting here, what I am seeing is "New Orleans Police Department" are the bigger letters?

A. It -- it says, "New Orleans Housing Authority in New Orleans" -- it says, "New Orleans, Housing Authority of NO Police Department."

Q. Okay. So to be clear, that badge is not saying you are an officer with the New Orleans Police Department?

MR. HANNA: Object to the form of the question.

You can answer the question.

A. It does not state that I'm an employee of the New Orleans Police Department, yes.

BY MS. JENSEN:

Q. Okay. Thank you.

Page 18

Do you currently have any outside employment other than your employment with HANO police?

A. I work outside -- what we would consider details, yes.

Q. Okay. We'll talk about that.

Any other outside employment, other than paid details?

A. No, that's it.

Q. Do you hold a statewide peace officer commission?

A. Yes.

Q. When did you receive it?

A. The first one I received in 1998 with New Orleans Police Department.

Q. And did it ever lapse?

A. It lapsed, yes.

Q. What were the circumstances of the time that it lapsed?

A. I had no longer -- I was no longer a police officer. I had moved to Texas.

Q. And when was that?

A. 2005.

Q. And when did you receive the commission again?

A. I can't think of a specific date, but I -- I received my commission again with the -- with the

Page 19

Housing Authority of New Orleans.

Q. Is it -- go ahead.

A. No.

Q. Is it still current?

A. Yes.

Q. Did it lapse at any point from when you received it when you started at HANO until now?

A. No. Well, it only lapsed -- not -- only lapse I have is from when I left NOPD to when I joined HANO. Once I joined HANO, it has not lapsed.

Q. Okay. Understood.

Do you have any other law enforcement certifications?

A. No.

MR. HANNA: Object to the form.

You can answer.

A. No.

BY MS. JENSEN:

Q. Under your statewide peace officer commission, what do you understand your duty to be as a law enforcement officer?

MR. HANNA: Object to form.

You can answer.

A. To be a conservator of the peace.

BY MS. JENSEN:

Page 20

Q. And what does that mean?

A. To be a peace officer, to -- to protect the citizens, the laws in the constitutions, the laws -- ordinance, local, municipality, state, and federal laws that we're all governed by.

Q. What do you understand your duty to be when you're completely off the clock? So what I mean by that is you're not working a shift for HANO; you're not working a shift for paid detail. Do you have any duties as a law enforcement officer?

MR. HANNA: Object to form.

You can answer.

A. I believe I'm like everybody else, a private citizen.

BY MS. JENSEN:

Q. If you're in a different part of the state other than New Orleans, can you pull someone over for a traffic violation?

MR. HANNA: Object to the form.

You can answer.

A. I have no jurisdiction.

BY MS. JENSEN:

Q. What is your jurisdiction as a law enforcement officer with your current commission?

A. If it's in the -- within the Parish of

Page 21

6 (Pages 18 - 21)

Orleans.

Q. And what does that mean?

A. Within the Parish of --

MR. HANNA: Object to form. Object to form.

You can answer. Go ahead.

A. Within the Parish of Orleans. I mean, the parish in which I work in. I live in Orleans Parish in the New Orleans area. Well, I don't live in New Orleans. But the New Orleans area. The New Orleans -- the City of New Orleans, I'm sorry. I'm going to say it like that.

BY MS. JENSEN:

Q. So you understand your jurisdiction to be the City of New Orleans?

A. Yes.

Q. When did you first begin working for HANO?

A. I want -- August of 2010.

Q. In what role did you first begin working with them?

A. HANO, at that time, was a security company. Security -- our department at that time was security.

Q. Security. So it was not as a law enforcement officer?

A. At that time, no.

Page 22

Q. And when did that change?

A. I'm -- I can't get the year right, so I wouldn't -- it -- it was before this incident. I can't get -- I can't remember the year. I don't recollect the year we switched over to -- to become a -- a police agency.

Q. Were you required to reinstate your commission in order to become a security --

A. I was --

Q. -- personnel?

MR. HANNA: Go ahead.

A. I was -- what do you mean by "security" -- what?

BY MS. JENSEN:

Q. When you described the position you held when you first began working for HANO, you said it was a security position?

A. Yes.

Q. And in that security position, it was not a law enforcement position at that time?

A. That would --

MR. HANNA: Object to form.

You can answer.

A. That would be correct.

BY MS. JENSEN:

Page 23

Q. And my question is: In that role, in your security position, were you required to renew your commission with -- as a statewide police officer at that time?

MR. HANNA: Object to form.

You can answer.

A. I believe you're confusing yourself. At that time, we were a security agency provided for the Housing Authority of New Orleans. Some years later, we went before the state and became a police agency. And so then I had to go and -- go back to the academy to -- to serve -- to recertify myself as a peace officer within the state, within Louisiana, yes.

BY MS. JENSEN:

Q. What academy did you attend at that time?

A. I believe it was Lafourche, the Lafourche academy.

Q. Okay. And approximately when was that?

A. I want to say -- I could be wrong. I want to say 2012. I want to say 2012. It could be wrong. It could be 2013 -- '12 -- yeah, 2013 or 2012. I want to say that, but I don't know. I can't remember the exact dates.

Q. During your hiring process at HANO, were you asked if you'd ever been terminated from a job?

Page 24

MR. HANNA: Object to form. It's not relevant to the issue at hand, qualified immunity.

But subject to the objection, you can answer.

A. Yes, I was asked.

BY MS. JENSEN:

Q. Did you disclose that you had been terminated from the New Orleans Police Department?

MR. HANNA: Same objection.

You can answer.

A. I disclosed I was terminated, but I also disclosed that I -- technically, I resigned under investigation, so I was not fired. So I have documentation stating that I resigned under investigation.

BY MS. JENSEN:

Q. Would you agree with the statement that you were terminated?

A. I --

MR. HANNA: Same objection.

You can answer.

A. I agree with the statement that I resigned under investigation. That's my documentation that I have; I resigned under investigation.

Page 25

7 (Pages 22 - 25)

BY MS. JENSEN:

Q. Would New Orleans Police Department have documentation that said you were terminated?

MR. HANNA: Object to form.

You can answer.

A. They have -- they may have documentation to say I was terminated. I have documentation, signed, that said I resigned under investigation.

BY MS. JENSEN:

Q. Are you still working with the HANO Police Department now?

A. Yes.

Q. And what is your current position?

A. Police officer.

Q. Do I understand correctly you've had two positions with HANO: the security position and then police officer position?

A. You can -- if that's how you want to say it, yes. But you could say it's just one position. I've been employed with the Housing Authority of New Orleans.

Q. Any promotions during the time that you've --

A. No.

Q. -- been a police officer?

Do you wear a uniform when you're on patrol

Page 26

with HANO?

A. Yes.

Q. And what does it look like?

A. The one you described today.

Q. Can you please describe it for the record?

A. It is a polo-type shirt. It has my name on it, my title, Officer R. Pierre. On the sleeves, on each side, right and left, at the bottom, it has HANO, H-A-N-O, PD, which -- which states the Housing Authority New Orleans Police Department. It's an acronym. It is dark blue in color.

Q. Thank you. And what about pants?

A. Pants are the same, dark blue in color with two pockets on the -- you got regular pockets for your hands, and you also have two pockets on the side at the thigh level where you can place items in.

Q. And can you describe the other equipment that you are wearing now?

A. What do you mean?

Q. It looks like you have a radio and a gun; is that correct?

A. Yes. Yes, I have a department-issued gun belt, which has my radio -- department-issued radio. I also have a departmental-issued taser, a Magazine that -- two -- two Magazine pouch that covers both my

Page 27

magazines that I -- that have my ammunition in it, and a gun holster, which also secures my issued weapon. And I have a handcuff pouch that secures my handcuffs.

Q. Thank you. And did you say that you have a gun holster on what would be your right side?

A. Yes.

Q. And you have a gun on your left side?

A. I have a taser on my left.

Q. That's the taser that I can see --

A. That's a taser.

Q. -- on your -- your left?

A. That's a taser on my left.

Q. Okay. Thank you.

And you have -- do you have a department-issued gun on --

A. Yes.

Q. -- your right side?

A. Yes.

Q. Okay. And that's part of the uniform you're required to wear when you're working, correct?

A. Yes.

Q. Okay. So you are allowed to carry a gun while working as a HANO police officer?

A. Yes.

Q. In fact, are you required to carry it?

Page 28

A. Yes.

Q. Are you allowed to carry a gun while working a paid detail?

A. Yes.

Q. Are you required to carry a gun while working a paid detail?

A. Yes.

Q. How do you know?

A. It's part of my uniform, ma'am.

Q. Are you required to wear your uniform when you're working a paid detail?

A. Yes.

Q. How do you know?

A. Because it's a requirement. I have to -- unless stated otherwise, it is a requirement that I wear my uniform. The detail that I was working was not a plainclothes detail.

Q. Whose requirement is it to wear your HANO police uniform while on paid detail?

A. It is a requirement of, one, my department, unless stated otherwise; two, the person who I'm working the detail for, unless stated otherwise.

Q. When did you begin working for Hurstville?

A. I want to say August of 2018.

Q. In what role?

Page 29

8 (Pages 26 - 29)

A.  As to provide safety and security for the -- the residents in that Hurstville district area.

Q.  Prior to being hired by Hurstville, how did you find out about the position?

A.  I believe my -- my sergeant told me about it, Sergeant Demetrius Jackson.

Q.  So Sergeant Jackson told you about the position.  Then what happened next?

A.  I believe I talked to Carl Perilloux and, you know, gave my information.  And he called me up and asked if I wanted to work.

Q.  Did you contact Carl, or did he contact you first?

A.  That's 2018.  I can't remember who called who first.

Q.  Are you still working with Hurstville?

A.  Yes.

Q.  Same position?

A.  Yes.

Q.  Did you ever receive a change of position or status with Hurstville after the incident?

MR. HANNA:  Object to form.

You can answer.

A.  We -- well, I -- from the time of the incident, I think it was maybe two months, three months

Page 30

we didn't work until the investigation -- investigation was -- was completed by -- by my agency.

BY MS. JENSEN:

Q.  And when you say "we didn't work," who are you referring to?

A.  That was in reference to Officer Wheeler.

Q.  Who do you report to while working for Hurstville?

A.  Carl Perilloux.

Q.  Is that every shift?

A.  Yes.

Q.  Do you report to anyone at HANO during your shift?

A.  No.

Q.  Who do you report to if there's an incident which you believe requires backup?

A.  That requires backup?  We would have our radios.  If we request backup, I don't particularly say we report to anybody in reference to -- you have to get permission for backup.  We just -- if we needed backup, we'll -- we'll call the district -- the NOPD that's in the area or the other Hurstville personnel that's working with you on that particular night for backup.  But -- but that's pretty much it.

Q.  Your radio that you described, that's an NOPD

Page 31

channel?

A.  Yes.

Q.  And you are connected to that radio system through your HANO-issued equipment.  Do I understand that correctly?

A.  Yes.

Q.  And when you want talk to someone else who is working at the same time that you are while at Hurstville, how would you contact them?

A.  Through our Hurstville phone.

Q.  You have Hurstville-issued phones?

A.  Yes.

Q.  Okay.  Have you worked at the same time as Kevin Wheeler prior to the incident?

A.  Yes.

Q.  How many times?

A.  I can't -- I can't recall the number, how many times we worked together.

Q.  More than five?

A.  More than five.

Q.  In terms of your working relationship, what is your opinion of his law enforcement judgment?

MR. HANNA:  Object to the form of the question.

You can answer.

Page 32

A.  Fine.

BY MS. JENSEN:

Q.  Do you ever have any doubts about something he did as a law enforcement officer while working on patrol in Hurstville?

MR. HANNA:  Object to the form.

But you can answer.

A.  No.

BY MS. JENSEN:

Q.  How long have you known him?

A.  Professionally?

Q.  In any capacity.

A.  Mainly when I worked Hurstville.

THE REPORTER:  I'm sorry?

A.  Mainly when I worked Hurstville.

BY MS. JENSEN:

Q.  And that's when you first met him?

A.  Yes.

Q.  Have you ever been social outside of work?

A.  No.  Not that -- no.

Q.  Have you ever called him?

A.  Outside of work?

MR. HANNA:  Object to form.

BY MS. JENSEN:

Q.  Have you ever called Wheeler at any point for

Page 33

9 (Pages 30 - 33)

any reason, work or outside of work?

A.  Only for work.

Q.  Have you ever texted him?

A.  We only called each other.

Q.  Have you ever texted him?

A.  Not --

MR. HANNA:  Object to form; asked and answered.

But go ahead.

MS. JENSEN:  He did not answer that question.

A.  I only --

MR. HANNA:  I disagree.

But go ahead.

A.  I only called him.

BY MS. JENSEN:

Q.  So no, you have never texted him?

MR. HANNA:  Object to form; asked and answered.

But go ahead.

A.  We only call each other in reference to work-related.  We're not -- we're not friends outside of work.

BY MS. JENSEN:

Q.  I understand.  But just a yes-or-no question.

Page 34

Have you ever texted him --

A.  No.

Q.  -- for any reason?

A.  No.  We only called.

Q.  Thank you.

At the time of the incident, what position were you working for Hurstville?

A.  At the time of the incident?  Well, I normally worked for Hurstville for securing the area, the neighbors, the residents of that area.

Q.  What is the name or title for that role?

A.  Name or title for what role?

Q.  When you're working a paid detail for Hurstville, what is the name or title for that role that you're in?

A.  I'm --

MR. HANNA:  Object to form.

You can answer.

A.  I'm a police officer working a paid detail for providing security for that particular area that I'm working at in New Orleans.

BY MS. JENSEN:

Q.  And what were your responsibilities?

A.  My responsibilities are to patrol that particular area.  We have a phone, and we have

Page 35

residents call to let us know when they're coming home.  If they left home, they want us to check their residence just to make sure everything is okay and any other crimes that we may see, you know.  So we're actually securing the neighborhood, protecting the neighborhood.

Q.  Did you ever receive calls for service from dispatch?

A.  No.

MR. HANNA:  Wait, wait.  At what time?

While at Hurstville?

BY MS. JENSEN:

Q.  While working for Hurstville, did you ever receive calls from dispatch for service?

MR. HANNA:  And who is dispatch?

BY MS. JENSEN:

Q.  You described a radio system that you had --

MR. HANNA:  Okay.

BY MS. JENSEN:

Q.  -- while working in Hurstville.  You were connected to that radio system through your HANO-issued equipment, correct?

A.  Yes.

Q.  Did you ever receive calls for service through that dispatch system in your capacity as a security

Page 36

person for Hurstville?

A.  The answer is no, I have not received a call from the dispatcher, pertaining to a particular house, calling me by my unit number to go to this particular house.  That answer is no.

But if an incident was to occur in that particular area and if I'm close or the nature of the incident, I would then maybe answer it to assist NOPD or to back them up at that particular -- wherever that particular call is.

Q.  And you said you would maybe answer it.  What would determine if you answered a call for service in the Hurstville area that came over the radio while you were on patrol as a paid detail officer for Hurstville?

A.  It depends upon the nature of the call, how volatile it is, or whether or not I'm by myself or that adequate backup is near or far away from me so I can get there.

Q.  Is part of your role, working for Hurstville, to conduct traffic stops?

A.  Part of our -- if an incident occurs or something that is -- we find that is suspicious, that may be harmful or could be potentially harmful to the residents of that area, then we may inject a traffic stop.  But it's not a requirement that we do traffic

Page 37

10 (Pages 34 - 37)

stops; it's at our -- it's at our discretion.

Q. To make sure I understand correctly, if you see someone, for instance, violating a traffic law while you're working in Hurstville, you are not required to pull that person over?

A. That -- I'm not required.

Q. Are you given the authority to do so?

A. Yes.

Q. By who?

A. By the State of Louisiana as a police officer, ma'am.

Q. When you worked for Hurstville, were you assigned a partner?

A. No. We work individual. If they schedule somebody else at the same time or before time or during time or after, we -- then that person is there. But we're not saying, "Okay. Y'all two ride together. Y'all" -- no.

Q. How would you know who else was working during your shift?

A. When I get there.

Q. When you get where?

A. When I report to duty, I find out whether or not somebody is there or not.

Q. Where would you report to duty?

Page 38

A. I report at -- to the Hurstville area, at the security area. We -- we have a house that we go to to pick up the phones, to clock in. And you just -- just look at how many phones are there. If two are there or three are there and I know I have one, I know I'm by myself. If one is missing, somebody is out there.

Q. And what house would you go to --

A. It's a residence -- it's a residence inside the Hurstville Security District.

Q. Is it a private residence?

A. It's a private residence.

Q. So there's a private residence that serves as the place where paid detail officers check in for shifts and check out?

A. I'm not sure if it's that, what -- how you described it. But we use a portion. It's just -- it's like a little shack or whatnot they allow us to use, and that's where our stuff is at. I have never spoken to -- as far as -- other than saying, "Hello, how you doing?" greeting them. As far as asking them what was their title or role with the Hurstville Security District, I've never asked them any questions.

Q. So what you're describing is a shed that's on the property of some private residence within this neighborhood?

Page 39

A. There you go. Yes, ma'am.

Q. Do you wear your HANO uniform when you're on patrol for Hurstville?

A. Yes.

Q. Do you ever wear plain clothes while you're on patrol for Hurstville?

A. No.

Q. What were you wearing the night of the incident?

A. The uniform you described earlier in this deposition, ma'am.

Q. Your HANO Police Department issued uniform?

A. Yes, ma'am.

Q. With all of the same equipment that you described?

A. Yes, ma'am.

Q. Including your department-issued gun?

A. Yes, ma'am.

Q. Were you wearing a vest?

A. That night of the incident?

Q. Correct.

A. I put -- I had it with me.

Q. You had a vest with you?

A. Yes.

Q. At some point in time, do you begin to wear

Page 40

that vest?

A. Yes.

Q. Was it your personal vest?

A. It was department-issued by the Housing Authority of New Orleans.

Q. Can you describe that vest?

A. It is a bulletproof vest that covers my chest and back area.

Q. Does it say anything?

A. It has a small nameplate with my name on it.

Q. Anything else?

A. No.

Q. Does it say what department you work for?

A. It's -- no, doesn't have anything on it.

Q. Doesn't say "police" on the back?

A. No.

Q. At what point did you put it on that night?

A. When we approached the vehicle at -- at the traffic stop.

Q. When you say "we approached the vehicle," that's when you put it on. Could you be more specific about when? Was it before you came to a stop? As you were driving? Was it --

A. When we came to a stop and exit -- before I exited my vehicle, I was putting on my vest. I put my

Page 41

11 (Pages 38 - 41)

vest on.

Q. After you came to a stop?

A. Yes, when I came to a stop.

Q. Did you put it on while you were sitting in the vehicle or --

A. That's hard to do, ma'am. I exited out the vehicle, and I put the vest on.

Q. Okay. Does Hurstville have any requirements for the clothing or equipment that you carry while on patrol?

MR. HANNA: Object to the form; asked and answered.

But you can go ahead and answer again.

A. Hurstville doesn't have any requirements, other than we wear our uniforms.

BY MS. JENSEN:

Q. Do you drive a Hurstville vehicle during these shifts?

A. No.

Q. Do you drive a HANO police car during these shifts?

A. No.

Q. What vehicle do you drive?

A. My personal vehicle.

Q. What is the make and model of the vehicle you

Page 42

were driving the night of the incident?

A. Silver in color, 2015 Nissan Titan truck.

Q. I'm sorry. You said silver?

A. Silver.

Q. On the night of the incident in question, were there any markings on your truck that would -- that would indicate that you were a police officer?

THE WITNESS: I can answer?

MR. HANNA: Huh?

THE WITNESS: I can answer it?

MR. HANNA: Yeah.

THE WITNESS: Okay.

A. Only markings I have -- only markings that I had that -- that night was blue lights that can come off and on, placed on and off, inside of my vehicle.

BY MS. JENSEN:

Q. Can you describe those lights?

A. They are police -- they are police lights, blue in color. They're two of them that I had on the dashboard of my vehicle.

Q. Do the lights make any sounds?

A. No.

Q. Do they go on top of the vehicle or --

A. On each side of my dashboard.

Q. Okay. Where did you get those lights?

Page 43

A. You can -- police store, online.

Q. So anyone can go and buy these particular lights?

A. Yes.

Q. Do you buy them personally?

A. Yes.

Q. So these were not HANO-issued lights?

A. No.

Q. Did HANO have -- let me rephrase.

MS. JENSEN: Why don't we take a quick break.

(Recess taken.)

BY MS. JENSEN:

Q. Do you understand you're still under oath?

A. Yes, ma'am.

Q. I just want to go back to what we were discussing earlier about how you began working in Hurstville.

You said, at some point, you were talking to Carl Perilloux about the position, correct?

A. Yes.

Q. Did you send him any information about your current or past job positions?

A. No. It's not a requirement.

Q. It was not a requirement to send him any

Page 44

documentation of your past work history?

A. Reference to?

Q. When you first spoke to Carl about the position in Hurstville up to the point where you were officially brought on, did he ask for any information about your past work history?

A. No.

Q. Did he ask for any documentation about your past work history?

A. No.

Q. Did he ask for any references?

A. In reference to what? What do you mean by "references"?

Q. Well, many times when a person is applying for a job position, the person who is considering hiring will ask for references, such as people that have worked with you in the past who can describe, to this person, the kind of worker you are.

Did he ask for anything like that?

A. He's -- I can't assume so. The only person I believe he talked to was Sergeant Jackson, is the one who told me about the detail.

Q. But he did not ask you to provide him with any references?

A. No.

Page 45

12 (Pages 42 - 45)

Q. Do you understand what I mean by "references" now?

A. Yes.

Q. Okay.

A. It's something that's not required. They don't do that.

Q. Did you consent to a background check in the course of your being hired by Hurstville?

A. They don't do background checks, ma'am.

Q. Okay. Going back to Hurstville, then. When you are on patrol -- let me rephrase.

The night of the incident, you said you were driving your personal vehicle, correct?

A. Yes.

Q. A truck?

A. Yes.

Q. Did you receive permission from anyone to drive your personal vehicle that night?

MR. HANNA: Object to form.

You can answer.

A. No. That's -- you either have a patrol car or you can use your personal vehicle.

BY MS. JENSEN:

Q. Do you have a patrol car as a HANO police officer?

Page 46

A. Yes.

Q. And why weren't you driving your HANO police car that night?

A. HANO doesn't allow -- at that time, does not allow us and still doesn't allow us to use our vehicles for Hurstville.

Q. When you say HANO doesn't allow us to use our vehicles for Hurstville --

A. Housing Authority vehicles.

Q. They don't allow you to use Housing Authority vehicles for Hurstville, correct?

A. Yes, that'd be correct.

Q. Do they allow you to use Housing Authority vehicles for any paid detail?

A. Other than getting to and from there, yes. If you go there, yes. But as far as using it in the capacity -- as far as patrol, no, they don't allow us to use them.

Q. Have you ever been told the basis for that?

A. Just they don't allow us to use them. That was it. I didn't -- I'm not an officer that going to ask why or dig deep into that. They tell me I can, I can. Tell me I can't, I can't. You tell me I can, I -- I'll use it. Tell me I can't, okay.

Q. Do I understand correctly that no one at HANO

Page 47

has given you a reason that you can't use your HANO police car while doing a patrol on a paid detail?

A. They didn't want us to use them on details. They didn't want us to use it for -- for that detail. We couldn't use them, so I didn't -- I didn't argue the point or even indulge further.

Q. Do I understand correctly that you are allowed to use the HANO police vehicle to drive to a paid detail?

A. If I'm working a paid detail that does not require me to use my unit and I'm just going to the detail, yes, I can use my vehicle. But if I have to use the vehicle in scopes of my duty as a police officer, then I cannot use it.

Q. I'm not quite sure I understand. Can you explain further what you mean when you're talking about driving a HANO police officer -- or a HANO police vehicle to a paid detail assignment but then not using the same vehicle during the shift?

A. If I'm working the detail at the Louisiana --

MR. HANNA: Go ahead.

A. If I'm working a detail at the Louisiana Superdome -- well, the Caesars Superdome and I'm working the Saints game, I'm not -- I'm not performing any traffic details. So I have to get to the detail.

Page 48

I am allowed to drive my HANO unit to the Superdome, park it, go inside, work the game. After the game is over with, I'm relieved of my duty. Get back in my vehicle and go home, go anywhere where I freely go because I am not -- there's not -- that detail has not been used for that purpose. It's just to go to and from work, like a person would normally go.

If there was a doctor, they go to their workplace, they leave. That's it. They don't use their vehicles to block traffic. They don't use their vehicles to take anybody home or commute patients. That's -- that's why I use that -- that's what I use the unit for, if I'm working, you know, a detail at that particular place.

BY MS. JENSEN:

Q. That's when you used a marked vehicle?

A. That's what I use a marked vehicle for, to get to and from that particular location.

Q. And when you have a detail that involves some sort of patrol in a vehicle on streets, the rules changed. Do I understand that correctly?

A. That -- that'd be correct.

Q. And how did the rules change?

A. I'm not allowed to use the vehicle in a police capacity, ma'am.

Page 49

13 (Pages 46 - 49)

Q.   And why is that?

A.   I do not question the Housing Authority of New Orleans' policy.  They tell me I can use it this way; they're telling me I can't use it in that way.  I leave it like that.  I say "yes, sir," "yes, ma'am," and keep going.

Q.   When you're working a paid detail, are you allowed to conduct traffic stops?

MR. HANNA:  Object to form; asked and answered.

You can answer.

A.   When I'm working -- when you say "paid details," what ones are you specifically talking about?

BY MS. JENSEN:

Q.   A moment ago, you described certain paid details that involved patrols in a vehicle on streets while others, such as a paid detail at the Superdome, would not involve anything having to do with traffic.  Correct?

A.   Correct.

Q.   As it pertains to a paid detail where you would be on streets patrolling in a vehicle, are you allowed to pull over vehicles?

MR. HANNA:  Object to form.

You can go ahead and answer.

Page 50

A.   When you say what vehicle am I -- I need you to be specific on what details you're talking about, ma'am.

BY MS. JENSEN:

Q.   Sure.  When you're doing a paid detail that involves a patrol on streets, you're in your -- you're in a vehicle, and you're patrolling streets.  You established a moment ago that those paid details, you are not allowed to drive a -- a marked HANO vehicle, correct?

A.   When you say a vehicle, what -- you reference to a HANO vehicle?

Q.   When you're in a paid detail shift that involves driving a vehicle through streets on patrol, you said a moment ago that for those shifts, you are not allowed to drive a HANO-issued vehicle.  Correct?

A.   That would be correct.

Q.   During those shifts that I just described -- on streets on patrol, you're in your personal vehicle because you're not allowed to drive a HANO-issued vehicle on those shifts -- are you allowed to pull vehicles over?

A.   I don't pull any vehicles over.  I'm not allowed to pull any vehicles over because you can't pull a vehicle over in your personal vehicle because I

Page 51

don't have the sirens to do so.  It's not an unmarked vehicle -- an unmarked issued police vehicle.  I need you to be more specific on what you're trying to -- trying to get to.  You're speaking in general.  You have to speak with specifics.

Q.   When you're on a shift where you're driving streets on patrol and you're in a vehicle, you established before that you are not allowed to be in your marked HANO police vehicle because HANO doesn't allow it.  Correct?

A.   Counsel, you're saying shifts.  That's general.  That's 20.  I need you to break that down to one.  What are you talking about when you reference to "shifts"?

If I work Hurstville -- if I'm working Hurstville Security District patrol, I can use my personal -- I'm using my personal vehicle, right.  I do not conduct traffic stops in that personal vehicle unless I had a fully marked vehicle with me and that fully marked vehicle -- police vehicle either -- if that's the individual that's working that particular night from the New Orleans Police Department, levee board, and/or sheriff's office.

But if you're asking do Ramon Pierre, driving his personal vehicle, pulls people over with his

Page 52

personal vehicle during the Hurstville security shift that I'm working, that answer is no.

Q.   So you don't pull vehicles over while working a Hurstville shift because you're not driving a marked police vehicle.  Do I understand that correct?

A.   That's not what I said.  I did not -- I cannot pull a vehicle over.  I am not pulling the vehicle over.  I'm going to need a fully marked police unit there with me in order to conduct a stop -- a traffic stop because you have citizens -- if they see a plain -- if they see a plain truck pulling them over, they will assume it's somebody that's trying to rob them, trying to do this, trying to do that.

So if you have that marked unit, that's a whole different other -- whole different other story, whole different other thing because they see the marked unit and the personal vehicle.  So you see the marked unit.  Then you can say, "Okay.  This the police.  They stopping me.  They're -- they're conducting a traffic stop," and pull over.  But if you're asking me whether I pull a vehicle over in my personal truck alone, that answer is no.

Q.   So you agree that when you're in your personal vehicle, regardless of the existence of flashing blue lights on your dashboard -- that you do not have the

Page 53

14 (Pages 50 - 53)

authority to conduct the traffic stop?

MR. HANNA: Object to form.

You can answer.

A. I have to have a marked unit with me. I would -- I would -- it would be safe, and it could be -- it could be safer, and -- it could be safer if I have that marked unit with me. I'm not saying I can't do it. I don't do it. But it would be safer for myself, as well as the citizen, if I have that marked vehicle with me.

BY MS. JENSEN:

Q. A few moments ago, you said, "I can't conduct a traffic stop because I'm not in a marked vehicle." And just now, you said, "I can. I just choose not to."

Can you help me understand what you're trying to say there? Because it sounds like two different things to me.

MR. HANNA: Object to the form. This is really getting to the point where you're badgering the witness, and it's becoming repetitive and badgering and harassing. The same question has been asked now for -- going on 15 minutes. So I would ask you to just move on because it's the same question over and over.

Page 54

MS. JENSEN: He's not answering the question.

MR. HANNA: Maybe not to your satisfaction. Maybe not the way you want to hear it, but he's asked -- he's been answering your question now for several minutes. You've repetitively asked the same thing over and over again. So please move on. I will allow a little more discretion here, but I mean, this is the same thing over and over. Go ahead.

MS. JENSEN: He has stated that he can't pull someone over if he's in his personal vehicle. And then just now, he changed his answer to say that he can; he just chooses not to.

MR. HANNA: Well, any lawyer would tell you if you ask the same question over and over again 25 times, you may get a variation in responses over 25 answers. And that's essentially what we're getting here.

But go ahead. I just ask you to please move on because it's becoming repetitive. Let's go ahead and get the question out on the table one more time, and let's try to get an

Page 55

answer to your satisfaction. And then let's try to move on to some other element of this deposition.

BY MS. JENSEN:

Q. Do you have the authority, as a law enforcement officer, to pull someone over while working for Hurstville when you're in your personal truck?

A. If I'm a police officer at that time, do I have authority under -- whose authority do I have that under?

Q. Any authority.

A. I would not do it because my truck does not have sirens to notify the individual that they're being pulled over by the police. It's a safety concern. It's a safety concern. It's a safety concern.

If it's just a regular traffic violation -- it's just a regular traffic movements violation, I wouldn't do it. If it's something that a -- an incident that occurred that was of -- of life or death, I would make that decision. That is at my discretion to make that decision, but that would be -- that would be at my discretion.

Q. You did not answer my question.

Yes or no, do you have the authority to pull over a citizen when you're in your personal truck?

Page 56

MR. HANNA: Okay. I'm going to object to the form of the question. It's repetitive; it's badgering the witness. I'm not going to instruct him not to answer the question. I'm going to reserve all rights for the record with regard to the repetitive nature of these questions.

Plus, you cannot limit a question to "yes" or "no." He always has the right to answer your question "yes" or "no" and to explain. So he has the right to answer "yes" or "no," and he can explain his answer. You cannot limit him to "yes" or "no."

MS. JENSEN: Mr. Hanna, there are no --

MR. HANNA: Go ahead.

MS. JENSEN: -- speaking objections. You can object to form only.

MR. HANNA: But I can -- I can manage this deposition to the extent that the questions become repetitive over and over and over again. So I beg to differ with you on that. I'm going to allow him to answer, but please move on.

You can answer "yes" or "no," and you can explain.

Page 57

15 (Pages 54 - 57)

THE WITNESS: Okay.

BY MS. JENSEN:

Q. Do you have the authority, as a law enforcement officer, to pull over a citizen when you are in your personal truck?

MR. HANNA: Object to the form; asked and answered.

You can go ahead and answer again.

A. I would say yes, but for safety reasons -- for safety reasons, in particular what has occurred, whether or not I would pull a person over in my personal vehicle. If it's just a traffic violation, I would not.

If it's something of life or death or an investigative that -- that I need an investigative -- depending on type of investigation, I will -- I will still -- I will still wait for a marked unit to come there and be with me for safety purposes -- for safety reasons of that of the citizen and that of myself.

BY MS. JENSEN:

Q. Did Carl Perilloux instruct you about the lights on your vehicle?

A. About having the lights?

Q. Correct.

A. Yes, he asked me if I had lights.

Page 58

Q. And why did he want to know if you had lights?

MR. HANNA: Object to form.

You can answer.

A. Because the -- the citizens know -- that live in that area, that utilizes that service, recognizes the fact that we have lights on our vehicle. And the number of times that you get calls from certain citizens to return home or they're coming home, they become familiar with -- with the officers that work in that area. So they see my truck, and they see my lights; they know it's me.

BY MS. JENSEN:

Q. Did he want you to have -- did he state that he wanted you to attach lights to your truck so that you could pull vehicles over?

A. He wanted me to have lights that it will recognize that -- the citizens would know that, one, Hurstville does have security working that night, and once they call for whatever reason that we have to go to their residence, they'll know that the police were there.

Q. How often do you conduct a traffic stop during a Hurstville shift?

MR. HANNA: Object to form.

You can answer.

Page 59

A. I don't do traffic stops. I don't pull vehicles over on traffic stops while I'm working Hurstville.

BY MS. JENSEN:

Q. The night of the incident when your vehicle came to a stop, the BMW came to a stop, Officer Wheeler's vehicle came to a stop, what would you call that?

A. It was a traffic stop. It was a traffic -- it was a traffic stop based upon an -- recorded investigation in reference to what we may have believed individuals were attempting to break in cars or pull on car door handles, pull on the car doors. It had nothing to do with a -- a violation of -- a moving violation.

Q. At any point, did you observe a moving violation?

A. It wasn't the nature of what I was investigating -- what we were investigating. So moving violations was not in our thought process.

Q. So no, you didn't observe a moving violation?

MR. HANNA: Object to form.

You can answer.

A. I can't recall whether I did or didn't.

BY MS. JENSEN:

Page 60

Q. When you did conduct a traffic stop while on a shift for Hurstville, how would that be documented?

MR. HANNA: Object to form.

You can answer.

A. I don't really conduct traffic stops. I've never -- well, only conduct traffic stops while working Hurstville. Now, what was -- I didn't -- I just said I don't conduct traffic stops. What was the other part of your -- your question?

BY MS. JENSEN:

Q. Well, a few moments ago, you described --

A. No, no. No, no. The question --

Q. Excuse me. Let me finish.

A few moments ago, you described the night of the incident, when you came to a stop and Wheeler came to a stop, the BMW came to a stop. You described that as a traffic stop?

THE WITNESS: Excuse me.

BY MS. JENSEN:

Q. Correct?

THE WITNESS: Could you read back the question that she asked prior to that? Because that's the question I'm going to answer.

BY MS. JENSEN:

Page 61

16 (Pages 58 - 61)

Q. Excuse me. You're required to answer my question.

A. No, I understand that. But you asked another question off of a question that I asked you to repeat. I didn't --

Q. We're getting there.

A. But you -- but you said -- no, no. You didn't repeat the same question that I asked you. You said it in a different way. That wasn't the question I asked you. I asked you could you repeat what you just said, and you didn't do that. You asked another -- you asked a question -- the same subject but you asked it in a different way other than the question that I asked you to repeat so I can finish that. That's what I'm asking you to do.

MR. HANNA: Okay. Just let her ask the next question, and let's try and see if we can move it along. We haven't even gotten, really, to the incident, and we've been going and hour and a half.

So go ahead, Counsel.

BY MS. JENSEN:

Q. When you pulled over or came to a stop that night -- your vehicle, Wheeler's vehicle, the BMW -- what would you call that stop?

MR. HANNA: I think he already answered that question. So I'm going to object to the form of the question.

MS. JENSEN: Mr. Hanna --

MR. HANNA: It's asked and answered.

MS. JENSEN: He did answer that question. Then he said that he was confused or that he didn't call it a traffic stop. I'm trying to establish my question of how would a traffic stop, during a Hurstville shift, be documented. He then said, after calling it a traffic stop, that he doesn't conduct traffic stops. We're trying to get a clear record here, so I want to make sure that we have that.

MR. HANNA: And I'm going to object to the form because it's been asked --

MS. WISDOM: In the interest of a clear record, I think it'd be important to ask the witness, maybe, to distinguish between an investigatory stop and a traffic stop. Because I think he did mention both in his answers. And I really do think it's unfair to him to try to box him in when he's already spoken both of investigatory stops and traffic

stops.

MR. HANNA: Go ahead, Counsel.

MS. WISDOM: I'm not trying to pick on you.

MS. JENSEN: Oh, really?

MS. WISDOM: Just it seems like he's not getting a fair shake here.

MR. HANNA: Object -- I'm just objecting to the form of the question to the extent it's, in my view, repetitive.

But go ahead. It's been asked and answered, but go ahead.

BY MS. JENSEN:

Q. When you're working a Hurstville shift and you stop a citizen, do you document it?

A. That, yes.

Q. How would it be documented?

A. On our -- we have a -- I call it a trip sheet, but it's a document. We have a documentation where we have to write how many areas we patrol or if we have been to residence or if we did stop a vehicle, we would document on the form, paperwork that we have to turn in at the end of the night.

Q. Did you document this stop that night?

A. Yes.

Q. Have you ever had a complaint filed against you, during your work as a law enforcement officer, for your conduct during a stop of any kind?

MR. HANNA: I'm going to object to the form. Not relevant to the qualified immunity issue.

Subject to the objection, you can answer.

A. Yes.

BY MS. JENSEN:

Q. How many times?

MR. HANNA: Same objection.

A. I don't recall.

BY MS. JENSEN:

Q. Many times?

MR. HANNA: Same objection.

A. I don't recall.

BY MS. JENSEN:

Q. You recall that you have had complaints related to your conduct during a stop.

A. I'm --

MR. HANNA: Same objection.

BY MS. JENSEN:

Q. But -- but you cannot recall how many complaints?

17 (Pages 62 - 65)

A. I'm not --

MR. HANNA: Let her finish the question, let me object, and then you can answer. She just finished a question.

I object to the form of the question.

Now you can answer.

A. I don't remember. I can't recall how many times.

BY MS. JENSEN:

Q. And what departments or entities were you working for at the time of the incidents that led to the complaints?

MR. HANNA: Object to the form.

You can answer.

A. What department? Whether it was Hurstville? HANO? NOPD?

BY MS. JENSEN:

Q. Or any other paid detail entity. Let me finish my question before you answer. Go ahead.

MR. HANNA: Same objection.

A. I don't know. I -- I don't keep a tab, a log. I don't -- I don't do that.

BY MS. JENSEN:

Q. Have you had any other complaints about your conduct during a stop while working for Hurstville?

Page 66

MR. HANNA: Object to form.

You can answer.

A. No.

BY MS. JENSEN:

Q. Turning to the incident that night, when did you start your shift?

A. I don't remember the time.

Q. What were your assigned duties that shift?

A. The same as always.

Q. Please describe.

A. Answer the phones when they call -- the residents call and patrol the area.

Q. What did you do that night prior to the stop?

A. I was patrolling the area.

Q. When you say "patrolling the area," can you please describe with specifics what you mean?

MR. HANNA: Object to the form.

You can answer.

A. Hurstville security area boundaries on where I was at. From Freret to Jefferson, Jefferson to Tchoupitoulas, Tchoupitoulas to State Street, State Street back to Freret. In that big square box area and all the streets in between.

BY MS. JENSEN:

Q. Did you stop anyone else that night other than

Page 67

the three occupants of the BMW?

A. I can't recall.

Q. You can't recall?

A. I can't recall if I stopped -- if I stopped anybody? Probably not. I don't think I did.

Q. On a typical shift for Hurstville, how many stops would you make?

A. What you mean by "stops"?

Q. Any kind of stop.

A. Depends on how much that phone rings. If the phone doesn't, don't stop -- don't stop -- don't stop. For stops at the residence, check for a stop at residence, a vehicle, anything like that.

Q. And when did you become aware that Officer Wheeler was working for Hurstville at the same time that night?

A. As I stated earlier, when I -- that particular night, I'm not sure. I'm not sure if he was there before me or I was there before him. I'm not sure. When I went in, I saw the -- the phones gone. I saw -- I know I had a phone there, and I know another phone was gone, but that -- that was it.

Q. Did you see him out in the neighborhood cruising around?

MR. HANNA: Object to form.

Page 68

You can answer.

BY MS. JENSEN:

Q. That night?

A. That night?

MR. HANNA: Same objection.

A. I'm not sure. I'm not sure if I called him or he called me to let me know he was out. I'm not -- I'm not particularly sure how did that come about.

BY MS. JENSEN:

Q. At some point in time, you learned about the BMW and its occupants involved in this incident, correct?

A. Yes.

Q. How did you come to find out about them?

A. Officer Wheeler called me.

Q. Do you recall around what time he called you?

A. I'm not sure the time.

Q. Prior to Wheeler contacting you about the BMW, had you observed the BMW and its occupants?

A. No.

Q. When Wheeler contacted you, what did he say?

A. When he contacted me, he asked me about the -- he asked me -- he asked me something to the effect -- he ran the plate, and he asked me -- he was unfamiliar with the -- he was unfamiliar with the -- the address,

Page 69

18 (Pages 66 - 69)

and he gave me the address and a ZIP code. So when he gave the ZIP code, I said that -- that residence -- that -- that resident -- the residence comes back to a New Orleans East address. I didn't know particularly where in New Orleans East, but because of the ZIP code, I knew it was in New Orleans East.

Q. And how did you know that?

A. Because we -- I work in --

MR. HANNA: Object to the form.

Go ahead.

A. I work in public housing, ma'am. We have what's known at Section 8 properties, and the majority of our Section 8 properties were in New Orleans East.

BY MS. JENSEN:

Q. So he told you he had run a plate, gave you an address, and then what did he say?

A. Gave me an address and a ZIP code. He didn't know where -- he was unfamiliar with the address. So I said -- so he then gave me a ZIP code. When he gave me the ZIP code, I told him the address was in New Orleans East.

Q. And then what did he say?

A. In reference to what?

Q. The BMW.

A. I'm not -- I'm not -- he just asked for the

Page 70

address. That's when he told me about, you know, what -- what was going on and the incident, you know, and what they had told him. And there was -- you know.

Q. Describe the conversation.

A. In reference to -- he told me about the incident. They were looking for a dog or whatnot, and he also described the occupants in the vehicle and what the occupants were doing inside this vehicle.

Q. And what did -- when you say he described the occupants of the vehicle, what did he say?

A. He described that there was a driver. He described that there were a passenger, and they were driving at a slow -- slow speed and that the driver -- not the driver, excuse me. The passenger, that was located in the front seat, body was lean -- leaning outside of the vehicle from what he believed -- they said that they was looking for a dog.

But the position of the passenger was in a position to where he could be pulling on car door handles, the way he was positioned outside of the -- the way his body was positioned from that particular seat, leaning outside the vehicle.

Q. Did he say anything else?

A. I can't go -- go into other details. I can't remember further details, but that's the -- that's the

Page 71

gist of what our conversation was about.

Q. Do you recall him stating the race of the occupants of the vehicle?

A. That -- no, I can't recall.

Q. Do you recall him stating the approximate age of the occupants in the vehicle?

A. He said young people.

Q. Did he ask you to look for the vehicle?

A. No. He asked me to come towards that area -- yes, with him. Yes.

Q. And did he ask you to assist him in conducting a stop?

A. Yes.

Q. Was that before you had personally seen the BMW?

A. Yes.

Q. Did you agree to assist him?

A. Yes.

Q. So at that point -- at that point, he asked you to come to the area where he was, correct? Or help me understand.

A. He asked me to come to the area where he was. I was not near him. I was not around him when -- when he first came into contact with the -- with the BMW and the occupants inside.

Page 72

Q. From the time of his call that you are describing to the time that the three vehicles came to the stop, were you on the phone with him that entire time?

A. I can't recall if I was on the phone the whole time.

Q. From the time of his call to the time of the stop, did you learn any additional information about the BMW?

A. No.

Q. So after you received this initial information from Wheeler, you agreed to conduct a stop. Describe what you did next.

A. We -- the vehicle was located and -- the vehicle was located, and I was behind the vehicle. Wheeler was behind me. And I positioned my vehicle to where me and Wheeler could be side by side so that -- as I stated earlier, that they can see a marked unit rather than just my personal truck, for safety reasons. And we -- we -- the vehicle pulled over.

Q. I'm going to introduce, as Exhibit A, a map of the area.

(Exhibit A was marked for identification.)

BY MS. JENSEN:

Q. Do you recognize this as a map of the

Page 73

19 (Pages 70 - 73)

Hurstville neighborhood area?

A. Yes.

Q. Please mark on this map your route starting at where you were when you received the call from Wheeler to where you marked your car for traffic -- where you parked your car for the traffic stop.

A. I was at -- this one-way. Joseph not on this street. Okay. Okay. I was at Loyola and Joseph. And --

MR. HANNA: Would you object if I gave him some orientation for this map?

MS. JENSEN: I'll allow it.

MR. HANNA: Okay. So with this map, to your right would be going downtown. To your left would be going uptown. This is the lake, and that way (indicating) to the bottom of the page is the river. Okay?

THE WITNESS: Okay.

MR. HANNA: Just orientation.

BY MS. JENSEN:

Q. Are you comfortable with the orientation at this point?

A. Yes. I was at Loyola and Joseph.

Q. When you first received the call from Wheeler, correct?

Page 74

A. I believe so, yeah. Yeah. Loyola --

MR. HANNA: There's Loyola and Joseph right there.

THE WITNESS: Loyola and Joseph.

MS. JENSEN: Okay. And, Mr. Hanna, now that he's comfortable with the orientation of the map, I'll ask that you don't point at this point.

BY MS. JENSEN:

Q. Do you need a pen to mark your route?

So if you could, please start from that point you just indicated.

A. That's Loyola and Joseph.

Q. From there, please mark, on this map, your route that you took to where you came to a stop.

A. You're asking me something that happened two -- two and a half years ago. I couldn't tell you if I drove down Loyola, Jefferson, whatnot. We ended up at -- we ended at Chestnut and Octavia. So this is Octavia. Okay. This is Octavia. This is Jefferson. Or this is Octavia. This map is not -- this is Octavia and --

MR. HANNA: I'm going to object to the map to the extent that some of the streets are not clearly marked on the map but...

Page 75

A. All right. This is Chestnut. Okay. Okay. We ended here (indicating). We started -- well, I started here (indicating) and -- I can't see. Okay. Wait a minute. Where the hell is -- oh, Chestnut. Okay. That's where we ended at, Chestnut and Octavia. Yeah.

BY MS. JENSEN:

Q. You don't recall the route that you took from the start, that you marked, to the stop point. Do I understand that correctly?

A. I don't recall which way I drove. If you're asking me where I drove to get to this location, that was nearly two and some years ago. I couldn't tell you which way I drove. I can't remember if I went down this street, that street. The only thing I know is we -- I was there (indicating) and we ended here (indicating).

Q. Understanding that you don't recall the full route that you took from your starting point to your stopping point, at some point you recall seeing Wheeler?

A. Yes.

Q. Approximately where was that when you first saw Wheeler?

A. If I saw Wheeler it's probably in the area in

Page 76

which he told me -- probably was in this area here (indicating) because this is the area he was in. I was on the other side of the -- I was to the side of the area -- on the side of Hurstville area. So it's probably on this area where he was at between Joseph, Jefferson, Octavia, Camp, Magazine Street. That's the area where I met him up at.

Q. Would you please mark that area with a circle?

A. (Witness complies.)

Q. So to the best of your recollection, somewhere within that circle is likely when you first spotted Wheeler, correct?

A. Yes.

Q. Would you please mark that with a "W1" for the record?

A. Somewhere in this area (indicating).

Q. Sure. Thank you.

And at some point, you recall seeing the BMW?

A. Yes.

Q. Do you recall where the BMW was located?

A. In this area (indicating).

Q. In the same circle?

A. In the same circle.

Q. Would you please mark that with a "V1"?

A. V?

Page 77

20 (Pages 74 - 77)

MR. HANNA: It's going to get really confusing if -- can --

MS. JENSEN: I'm handling it.

MR. HANNA: Okay. I'm going to object to the use of the map if you don't take steps to make sure it doesn't become confusing. Can we go off the record? Can we go off the record?

MS. JENSEN: No. I'm not comfortable with going off the record.

MR. HANNA: Usually lawyers are cooperative when it comes to doing diagrams, and we have a conversation to make sure it doesn't get confusing. But if you don't to do that, then go ahead. Where do you want him to mark this V1?

BY MS. JENSEN:

Q. The V1 is in the circle where you have agreed was the likely area where you first saw the BMW.

A. It was in this area (indicating). I can't remember exactly which street you're talking about, which street you want me to put it on.

Q. Understood.

A. So I'm just going to say in this area (indicating). Only thing I do know is we didn't go

Page 78

past Coliseum, and we didn't go to Magazine Street, and we didn't cross over Jefferson, and we didn't get to Nashville.

Q. A few moments ago, you said the most likely area where you first saw the BMW was the same circle --

A. Yes.

Q. -- where you most likely first saw Wheeler, correct?

A. The same circle. That's where I saw Wheeler at and the BMW.

Q. Great. Please mark, within that circle, V1.

A. V1. Now, we're marking V1. That's not saying that's the area where I saw him. I'm just marking V1 saying this is the area --

Q. You're saying somewhere within the circle is most likely where you first --

A. Yes, ma'am.

Q. -- saw the vehicle?

Can you please describe generally that circle that you just wrote on the map?

MR. HANNA: He already did. Objection.

MS. JENSEN: Verbally.

MR. HANNA: He did that already. He already did it. It's on the record. But go ahead.

Page 79

A. That's --

MR. HANNA: It has been asked and answered.

A. That's between Joseph Street -- that's between Magazine, Joseph, Camp, Octavia. We didn't go to Coliseum, and we didn't pass up Magazine. We didn't cross over Jefferson, and we didn't go to Nashville.

BY MS. JENSEN:

Q. Thank you. When you saw the BMW, what did you observe from the time you first saw it to the time the vehicle came to a stop?

A. The vehicle was driving at a slow rate of speed. The passenger on the front passenger side -- no, I'm sorry, not the front. The passenger in the front -- on the passenger's side in the front was still leaning outside the vehicle as to suggest he was pulling on car door handles. The vehicle came to a stop at Octavia and Chestnut.

Q. At any point, did you observe any of the occupants of the vehicle attempt to open a car door handle?

A. No.

Q. Did you and Wheeler discuss what you would do once the vehicles came to a stop?

A. We were stopping the vehicle, and Wheeler told

Page 80

me what they said about looking for a dog. And once -- when he stopped the vehicle, the driver -- we asked the driver to step out. The driver stepped out. And I believe Wheeler asked him, "Now, tell us the story again, in reference to the dog." I'm not finished.

Q. I'm --

MR. HANNA: No, no. He has got the right to finish his answer.

Please go ahead, finish your answer.

A. In reference to a dog, the driver said, "We were looking for a lost dog." The driver then said -- so we asked, "Well, what area the dog was lost in?" or "What area the dog came from?" The driver said the 800, 700 block of Camp Street, which was nowhere near where we was at.

Once the driver said that, he was immediately -- he was immediately corrected by your client and said, "No, we were in the" -- "No, the dog lives in the 49-, 4700 block of Camp Street."

We was at Octavia and Joseph -- Octavia and Chestnut. Camp is one block heading towards the river. Camp is one block heading towards the river and then going in a downtown direction to whereby -- where the resident -- well, your client said he lived at.

So that's when, once he was corrected, I was

Page 81

21 (Pages 78 - 81)

like, okay, well, it's not far-fetched that they could be looking for a dog in this area because it's some blocks down the street. But, initially, the driver said we was in the 8- or 1100 block of Camp Street, which was far away from where we was at.

BY MS. JENSEN:

Q. Prior to coming to a stop, did you and Officer Wheeler discuss who would be in charge at the stop?

A. I can't recall that.

Q. You marked on the map the general area of the stop, before, with the X, correct?

A. Yes.

Q. Could you please describe how the vehicles were positioned at that stop?

A. Me and Wheeler was side by side and the -- the BMW was in front of us.

Q. When you say "side by side," which side were you on and which side --

A. I can't --

Q. -- was he on?

A. I can't recall who -- what side we was on. I know we were side by side because, as I stated earlier and testified earlier, you would want a marked vehicle there so that the occupants of the other vehicle can

Page 82

see the marked vehicle, for safety reasons.

So we were side by side. Whether I was on the left or whether I was on the right -- you're asking me something -- to remember something that happened two-something years ago. I couldn't tell you.

Q. But you recall that the BMW was in front, correct?

A. Yes.

Q. How did you and Wheeler decide where to stop in relation to one another?

A. We stopped side by side.

Wheeler is a trained -- as far as my knowledge, he's a trained police officer with years of experience. I'm also a trained police officer with years of experience. We don't have to know each other to understand certain -- certain dynamics. So when we were side by side, it wasn't like, "I take the right, and you take the left." We just got side by side.

Q. Going back a moment to where -- when you first saw the BMW to the time it came to a stop in that general area, do you recall at what point Wheeler turned on his lights?

A. I'm -- I can't recall.

Q. Describe what you did after your vehicle came to a stop.

Page 83

A. The vehicle came to a stop -- my vehicle?

Q. Your vehicle.

A. Well, my vehicle came to a stop. I exit my vehicle, put my vest on and approached the vehicle, as normally for safety purposes, protocol. I shine my flashlight because it wasn't a well lit area. And I asked to see their hands. They showed me their hands. They didn't pose, at that time, a threat to myself and to -- and what I believe to Wheeler. And once they put their hands down, we conducted our -- our investigation.

And like I stated earlier, Wheeler asked the driver to step out. The driver stepped out. And then Wheeler asked him, "Now, tell me the story again, in reference to the dog," as I stated earlier, with all that happened, that transpired after that.

Q. So your vehicle came to a stop. You put on a bulletproof vest. You approached the vehicle. Correct?

A. Yes.

Q. And approximately how close were you, in terms of distance --

A. I don't know.

Q. -- from the vehicle once you came to a stop -- once you approached it?

Page 84

MR. HANNA: Wait a second, just for clarification. "From the vehicle," which vehicle?

BY MS. JENSEN:

Q. You described approaching the BMW.

MR. HANNA: Okay.

BY MS. JENSEN:

Q. When you say "approached," you're describing walking, correct?

A. Yes.

Q. And at some point, you stopped walking and put yourself in a position where you could see the BMW and the occupants, correct?

A. Uh-huh.

Q. When you --

MR. HANNA: Wait, wait, wait. The answer is yes?

THE WITNESS: Yes. I'm sorry.

MR. HANNA: She can't take down "uh-huh" or "uh-uh." Go ahead. Sorry.

BY MS. JENSEN:

Q. Once you stopped walking and you were in position to look at the BMW and the occupants of the car, approximately what was the distance between where you were standing and the BMW?

Page 85

22 (Pages 82 - 85)

A. I don't know the approximate position, as far as number of feet. But I can tell you, by being a law enforcement officer, it was a reasonable, safe distance that would be considered reasonable for officer safety as well as safety of the occupants in that -- in the other vehicle as well.

Q. How do you determine what makes a distance reasonable or not?

A. Through training.

Q. Did you ask the occupants of the vehicle to show their hands before the driver was ordered out of the car? Or after?

A. Before he was -- he was still inside the vehicle.

Q. Did you identify yourself?

A. As a police officer?

Q. In any way.

A. Yes.

Q. What did you say?

A. When we -- we identified ourselves by the marking of the unit, by his marking of the unit. When I stepped out of the vehicle, they understood that that was -- Wheeler -- they understood that was me as police officers.

Q. Earlier you described that there would be

Page 86

safety concerns with you pulling over a vehicle in an unmarked car because a citizen wouldn't recognize necessarily that you were an officer, correct?

MR. HANNA: Object to the form. It has been asked and answered. But go ahead.

A. Yes.

BY MS. JENSEN:

Q. Why do you believe that they knew that you were an officer at that point?

A. Why do I believe? Because as far as -- as far as my understanding, they had prior conversation with Officer Wheeler. So they were familiar with -- he -- who he was. They were -- they spoke to him earlier.

And so when we pulled -- when we pulled -- when they was coming to a stop, they knew there was Wheeler there because, you know, they saw the lights and everything. And I got out the vehicle as well.

Q. Did you say, "I'm a police officer," or anything along those lines, verbally?

A. No, I don't recall if I did or didn't.

Q. Do you recall if Wheeler said, "Police," or anything verbally to indicate he was a police officer?

A. I'm -- I don't recall him saying anything. But they had prior conversation -- they had prior conversation with Wheeler prior to my arrival there.

Page 87

Q. When you were standing looking at the BMW -- let me rephrase.

When you approached the BMW, you were walking. You came to a stop. From that point, did you ever move to a different part of the area to see a different part of the vehicle? Or did you stay in place?

A. When we approached the vehicle, I'm not sure if I was on the right or the left of Wheeler or he was on my right or my left of the vehicle. I did not move, as far as to the front of the vehicle, no. The side of the vehicles -- no, I think I stayed in the back, and he came to where we were.

Q. Who was at the scene besides you and Wheeler?

MR. HANNA: Object to form.

You can answer.

A. At the time of the investigation, it was me -- it was myself, Wheeler, the three occupants.

BY MS. JENSEN:

Q. At any point, did anyone else come to the scene?

A. Nobody else came to the scene.

I discovered later that a citizen observed the scene, but at that time, we was doing the investigatory stop. Only person -- only people that I know that were there was the three occupants of the vehicle, myself,

Page 88

and Wheeler -- Officer Wheeler, I'm sorry.

Q. And who was that citizen that you described?

A. The citizen? The -- the BMW had come to a stop at the intersection but in front of a residence, home, at the corner. And we discovered later the resident observed the traffic stop.

Q. Describe what Officer Wheeler did after he got out of his vehicle once he came to a stop at the scene?

A. That's something you have to ask Officer Wheeler.

THE REPORTER: I'm sorry?

THE WITNESS: That's something she have to ask Officer Wheeler, what he did.

A. Like I said, only thing we did -- Wheeler only asked me -- asked -- after we asked the driver to step out, only thing Wheeler -- looked at the driver and said, "Now, tell him the story that you told me," something to that effect. And the young man went to talking about the dog.

BY MS. JENSEN:

Q. I'm asking what you personally observed him do.

A. In reference to what?

Q. Once he came to a stop in his vehicle and he got out of the car, please describe what he did.

Page 89

23 (Pages 86 - 89)

A. I couldn't tell you. I wasn't looking at Officer Wheeler when we were approaching that vehicle. Ma'am, I'm looking at them three people in that car.

Q. Were you --

A. Officer Wheeler is not a threat to me or potential threat to me. I'm looking at the three individuals in that car, for safety of myself and safety of them.

Now, once that came to an end, when we were comfortable, Officer Wheeler then asked the young man, after we asked him to step out, "Could you please explain" -- well, "Explain what happened in reference to the dog." Say what -- talking about in reference to the dog. And that was it. That's how that conversation started.

Q. Where were his hands during that stop?

A. Whose hands?

Q. Officer Wheeler's.

A. Again, ma'am, I'm focusing on this vehicle with three occupants. I'm not doing this (demonstrating). And -- safety. I'm not looking to my left; I'm not looking to my right. I'm focusing on those three occupants inside of that vehicle.

Q. Did you have a gun on your person that entire time?

Page 90

A. Yes, ma'am.

Q. Did you have your hands on the gun?

A. No, ma'am.

Q. Did you point your gun at the car?

A. No, ma'am.

Q. During the stop, did you see any movement from within the vehicle?

A. Other than the fact -- when I asked them to put their hands up, that's the only movement they did.

Q. Describe the driver's appearance, to the best of your recollection.

A. Physical appearance? African American male. Hair color, I can't recall. Even clothing, I can't remember. You're asking me something that was two -- two-something years ago. I don't remember what they had on.

Q. I understand.

Do you remember approximately how old he appeared?

A. He was a young person.

Q. To the best of your recollection, can you describe the appearance of the occupant in the passenger seat?

A. The front passenger seat?

Q. Correct.

Page 91

A. Young kid. Couldn't remember what he had on. I knew he was African American. And don't remember his -- his texture, the color of his skin.

Q. Had you seen him before?

A. No.

Q. Had you seen the driver before?

A. No.

Q. Describe the appearance of the occupant in the back seat.

A. Other than the fact that he was African American, that's it. I can't remember what clothing he had or anything else. I don't remember how tall he was because he didn't get out of the vehicle.

Q. Do you recall in what position he was seated in the back seat?

A. He was behind the driver -- no, I'm sorry. Which one were you talking about?

Q. The person in the back seat.

A. He was behind the driver.

Q. Do you recall the approximate age that he appeared?

A. I don't know the approximate age. He was a young person.

Q. Did you observe anything from the occupants of the vehicle that, in your law enforcement experience,

Page 92

appeared to be threatening at any point during the stop?

MR. HANNA: Object to form.

You can answer.

A. No. They had -- once we -- they asked that they raise their hands, they didn't appear to be a threat at any point -- at that point.

BY MS. JENSEN:

Q. Did you personally say anything to anyone in the car during the stop, other than what you had said before, directing them to show their hands?

A. We talked to the driver, as I stated earlier, once we asked the driver to step out. And the driver -- Wheeler looked at the driver and said, "Now, say what you told me again," or something to that effect. And he began talking about what hundred block they had started looking for the dog in.

And I was like, "Wait a minute. That's a long way from here." He was immediately corrected by your client that this -- "No, that wasn't the location. This is the location where we came from."

Q. When you said, "Wait a minute. That's a long way from here," were you speaking to the driver?

A. I was speaking to the driver.

Q. Okay. Approximately how long was the time

Page 93

24 (Pages 90 - 93)

between when all the vehicles came to a stop to when the BMW was allowed to leave?

A. Repeat the question again.

Q. From the time the three vehicles came to a stop -- understanding that it wasn't at the exact same moment in time. But the general point when all three vehicles came to a stop to the time that the BMW was allowed to leave, approximately how much time passed?

A. Three to five minutes.

Q. Were you in fear of your life at any point during that stop?

A. No.

Q. Were you in fear of your life at any point when you were following the BMW prior to it coming to a stop?

A. No.

Q. Do you believe that any of the occupants of the vehicle posed an imminent danger of death or serious injury to anyone?

MR. HANNA: I'm going to object to the form of the question.

You can answer.

A. I can't say that. I can't say that. I don't know what was in their thinking.

BY MS. JENSEN:

Page 94

Q. In your -- let me rephrase.

From the time that you first observed the BMW to the time they were allowed to leave, in your law enforcement judgment, do you recall believing that the occupants of the vehicle posed an imminent danger of death or serious injury to anyone?

MR. HANNA: Object to the form.

You can answer.

A. I can't answer. I don't know what's in their thinking. I don't know.

BY MS. JENSEN:

Q. To be clear, I'm not asking for your thinking. But when you are assessing any situation as a law enforcement officer, you're making an assessment of threat, correct?

A. Yes.

Q. And in your threat assessment that night from the time you first observed the BMW to the time they were allowed to leave, did you assess that they posed an imminent danger of death or serious injury, based on your law enforcement experience?

A. At that -- from the time -- from the time we first saw them? I can't answer. I don't know. I don't know. You're asking me a question about the unknown. I don't know. I don't know what was in their

Page 95

mind. I don't know.

At the time when we stopped them and they put their hands up -- we asked them to put their hands up. They showed us their hands. We then asked the driver to step out. At that time while we were talking, I still don't know what's in their thinking. I still don't know what they would do as far as harm, imminent danger. I still don't know. I can't say that.

I can't say I was safe. I can't say I was good. I can't say -- only thing I know, during that time we conducted an investigation, we were safe. The officers were safe as well as the occupants in that vehicle were safe.

MR. HANNA: Can we take a bathroom break?

MS. JENSEN: We can take a break.

(Recess taken.)

BY MS. JENSEN:

Q. After the BMW was allowed to leave but before you left the scene, did you and Wheeler stay and talk with each other?

A. I'm not -- not sure how long, if it was -- if it was any. But it wasn't long.

Q. Describe what you can recall of the conversation.

Page 96

A. Just that, you know -- can't -- can't -- can't recall verbatim. But, okay, made sense. Could -- could have been, could not be, meaning they could have been pulling on car handles or they could have been looking for a dog.

Q. Who left the scene first? You or Wheeler?

A. I'm not sure.

Q. Where did you go after that, after you left that scene?

A. In the area. I can't remember exactly where I drove to.

Q. After the stop, did you report it to dispatch?

A. I believe Wheeler may have reported it to his -- his agency, as far as protocol. But I don't think we -- I don't think we -- I'm not sure -- I'm not sure if we notified the NOPD. I'm not sure.

Q. You don't recall personally notifying NOPD dispatch?

A. Yes, I don't recall.

Q. On a patrol for Hurstville, if you conduct a stop, were you supposed to call something like that in to dispatch?

A. It's up to you. It's up to your discretion. It's up to your discretion, if you -- if you do something like that. But I'm not -- it's my -- it's up

Page 97

25 (Pages 94 - 97)

to me, whether or not I want to -- depend on what -- what's the nature.

If we're doing just a regular escort for somebody, then no. If we're doing something where somebody think they may have seen something, it depends on the nature of it. If it's something you can handle without involving NOPD dispatch, you do it. So it's at your discretion.

Q. So you're not instructed as a rule that, if you stop someone, you are supposed to report it to dispatch, correct?

A. I'm not. I'm not.

Now, Officer Wheeler has a different set of rules. But like I said earlier, it depends on what the nature of it is.

Q. When you say, "I'm not instructed," just to be clear, you're not instructed by Hurstville or HANO, correct?

A. I'm not instructed by -- I'm not instructed by HANO. But Hurstville, you want to at least document what goes on during that day. So I do document, but I'm not calling anybody on the phone or anything like that.

Q. Understood.

What happened at the end of your shift last

Page 98

night -- I mean that night? Excuse me.

A. Turned in the paperwork and went home.

Q. When you say "turned in the paperwork," what do you mean?

A. The documentation that we have where we have to document where we go at, times of stops, or things like that. And I turned that in along with the phone, the GPS, and went home -- clocked out and went home.

Q. Did anyone at Hurstville instruct you about traffic stops?

MR. HANNA: Object to form.

You can answer.

A. No.

BY MS. JENSEN:

Q. Did anyone at HANO instruct you about traffic stops while on paid detail?

A. No.

Q. Did anyone at Hurstville instruct you about the use of race in law enforcement decisions?

MR. HANNA: Object to form.

You can answer.

A. No.

BY MS. JENSEN:

Q. Did anyone at HANO instruct you about the use of race in law enforcement decisions?

Page 99

A. No.

Q. Did anyone at Hurstville instruct you about pointing a gun at citizens?

A. No.

Q. Did anyone --

MR. HANNA: Object to form.

BY MS. JENSEN:

Q. Did anyone at HANO instruct you about pointing a gun at citizens, when it is okay and when it is not?

A. No.

Q. At some point, you learned there was a complaint about this incident, correct?

A. Yes.

Q. How did you learn that there was a complaint?

A. From my sergeant.

Q. Who is your sergeant?

A. Demetrius Jackson.

Q. What was your reaction upon learning there was a complaint?

A. I was shocked.

Q. Why were you shocked?

A. Because of the nature of the complaint.

Q. What was it about the nature of the complaint that shocked you?

A. I was accused of pulling a gun out on young

Page 100

people, and I didn't do that.

Q. At some point, you were asked to write your recollection of the incident, correct?

A. Yes.

Q. Who asked you to do that?

A. Sergeant Jackson.

Q. Did he tell you what to write --

A. No.

Q. -- in the description?

A. No.

Q. Do you recall writing whether or not Officer Wheeler was pointing his gun at any point during the encounter?

A. Officer Wheeler did not point his gun during the encounter.

Q. Do you recall writing in your statement whether or not he did?

A. I don't think I wrote that. I don't -- I'm not sure if I specifically said, "We did not pull our guns," but we did not pull our guns, unless I had my statement right here in front of me so I can read it.

Q. Did you understand the nature of the complaint was that you were accused of pulling a gun on someone?

A. Yes.

Q. But you do not recall whether or not you wrote

Page 101

26 (Pages 98 - 101)

if you pulled a gun on someone?

A. I have to read my statement. You're asking me to remember something that I wrote two and a half years ago, ma'am. Unless I read my statement -- but unless -- I may have wrote it in there, saying I didn't pull my gun, or I may have didn't. But I may have described the incident, but I did not pull my weapon out on anyone.

Q. When was the last time you reviewed the statement that you wrote?

A. It was a while ago.

Q. Approximately?

A. I can't give a definite approximate. It's not like I go look it up.

Q. Sometime within the last two months?

A. I can't -- no.

Q. Did you review it in preparation for this deposition?

A. Certain lines were read to me, but I didn't read it or grab my statement back, what I said, no.

Q. You did not personally read what you wrote?

A. I read -- I read what I wrote when I gave my investigation -- when I gave my statement because I typed it. And when we was --

MR. HANNA: Don't discuss --

Page 102

THE WITNESS: Oh.

MR. HANNA: -- anything that we discussed in any means. That's attorney-client communication.

BY MS. JENSEN:

Q. I'm not asking you to discuss the substance of your conversation with your attorney; I'm only asking for the information about your preparation with that document. Did you read your statement in preparation for this deposition?

A. No, I didn't read it.

Q. Did you -- okay.

At some point, you were interviewed about this incident, correct?

A. Yes.

Q. What was the time and date of when you were interviewed?

A. Of what? Of today or when it occurred?

Q. After it occurred, you were interviewed by someone at HANO, correct?

A. Yes.

Q. Do you recall the time and date of when you were interviewed?

A. If I recall about the incident, a week and a day after it happened.

Page 103

Q. Who interviewed you?

A. Sergeant Jackson.

Q. Approximately -- approximately how long was the interview?

A. I -- I don't know. I can't recall.

Q. Who else was present during the interview?

A. All that I know is -- that I remember, me and Sergeant Jackson.

Q. Do you recall whether he asked you if you had pointed a gun at the occupants of the vehicle?

A. Yes.

Q. And what was your answer?

A. "No."

Q. Do you recall whether he asked you if Officer Wheeler had pointed his gun at any of the occupants of the vehicle?

A. Yes.

Q. What was your answer?

A. "No, he didn't."

Q. Did you understand that there could be job-related consequences for lying?

A. Yes.

Q. But you were never officially sworn to tell the truth, correct?

MR. HANNA: Object to form.

Page 104

A. I was being truthful when I answered the questions.

BY MS. JENSEN:

Q. When you were interviewed by that officer -- you said Jackson?

A. Sergeant Jackson.

Q. Did he swear you in to tell the truth or have anyone else swear you in to tell the truth before that interview?

A. No, ma'am.

Q. At the point of that interview, what evidence had you reviewed in the case?

MR. HANNA: Object to form.

You can answer.

A. Other than the fact that we just said it didn't happen.

BY MS. JENSEN:

Q. Did you review anything stated by the occupants of the vehicle?

A. No.

Q. I didn't quite hear, sorry.

A. No.

Q. No. Did you ever request to review the complaints?

A. What do you mean? What do you mean, request

Page 105

27 (Pages 102 - 105)

it? See what they wrote?

Q. Uh-huh.

A. I -- they read it off to me, and then I observed it on -- on social media.

Q. What do you mean, that you observed it on social media?

A. The -- your -- your client, as well as the driver of the vehicle, got political figures involved, and the political figure read off the complaint that they wrote on the state floor.

Q. Do you recall what social media you were viewing when you saw this?

A. Facebook.

Q. Was this a post or a live stream?

A. It's a live stream from the state house, but it was a post.

Q. Okay. Did anyone make you aware in advance that they would be speaking -- or someone would be speaking on the state house floor about this incident?

A. No.

Q. Do you make it a regular habit to watch live feeds of state house proceedings?

A. No.

Q. Could you explain to me how it came to be that you were watching a live stream of a state house

Page 106

proceeding at the time that this incident was discussed?

A. I was not -- wait a minute, hold up.

I was not watching a live stream at the time this incident was being discussed. You're asking me a question in reference to the statement -- did I know the statement of what the -- your client stated, right?

I didn't know what he actually stated -- or what he actually said in his complaint until I viewed a post -- a Facebook post of your client as well as the driver, their parents using a political figure on the state -- Louisiana State floor. And that's where I found out what he actually said.

Q. How did you know their names?

A. I didn't know your clients' names. They read my name; they read Officer Wheeler's name. They described the incident on the -- in the statement. And the statement that was read was -- the statement that was read was the complaint that was lobbied by your -- your client.

Q. I guess what I'm trying to understand is: How was it that you came to see this post?

A. Well, this is -- this is not during the course of the investigation. This is not during the statement time, that I'm talking to Sergeant Jackson, if that's

Page 107

what you're alluding to. That's not during that time. This is further down. This is -- this is some days or maybe weeks later.

Q. So we established that you weren't viewing a live stream, correct?

A. We weren't viewing a live stream. It was recorded live. At that particular time, the state house is doing whatever they're doing for the state business.

Now, it was posted on social media. Now, that's one thing. But if you're talking about the time I'm being interviewed and getting -- me conducting an investigation by Sergeant Jackson, that's two different things. I didn't learn -- you asked me earlier, did I know about what did your client state in his complaint. I didn't know about what he stated in his -- in your complaint until I saw that post from that live stream from the state house.

Q. Prior to that, you did not understand what he had said in the complaint?

A. Other than the fact that the complaint was I pointed guns at them.

Q. A few minutes ago, you said the complaint was read to you. Is that not correct?

MR. HANNA: Object to form.

Page 108

You can answer.

A. The complaint was -- the complaint was stated to me in reference to it was pointing guns at them. "Y'all pointed guns at them."

Now, the full statement, I can't remember all that. Like I said, I heard -- this was further down. We're talking about two different incidents. When I was being investigated -- when the investigation was -- by Demetrius Jackson, I was told that -- about the -- we pulled guns out.

When you're referencing -- when I saw the live stream, that's when they read off the full statement off the live stream from the state house that was posted on Facebook. That's when I got the full statement of what he said.

BY MS. JENSEN:

Q. Do you now have additional information about the occupants of the vehicle that you didn't have that night?

A. Rephrase. What you mean?

Q. Do you now know, for instance, how old they are, their approximate ages?

MR. HANNA: Object to form.

A. I don't know their approximate ages. Only thing I do know is that it was a young teenager and

Page 109

28 (Pages 106 - 109)

young people. I can't differ exact ages.

BY MS. JENSEN:

Q. Any actual threat that you now believe the occupants posed to you or Wheeler that night?

A. I can't say what was in their minds at the time.

Q. Well, of course, you can't say what was in their mind. But in your law enforcement experience, you have to make threat assessments, correct?

A. Uh-huh.

MR. HANNA: Wait, wait, wait.

THE WITNESS: I'm sorry.

MR. HANNA: Answer the question out loud, please. Wait, wait. We need an answer to the question. I heard an "uh-huh."

THE WITNESS: Oh, I'm sorry.

MR. HANNA: That's an affirmative response, but it doesn't go well on transcripts.

THE WITNESS: Okay.

MR. HANNA: Can we read the question back again and get an answer? Thanks.

(Last question read back by reporter.)

A. Yes.

MR. HANNA: There we go. You can go

Page 110

ahead.

BY MS. JENSEN:

Q. Any actual threat that you now believe the occupants posed to you or Wheeler that night?

MR. HANNA: Object to form. It has been asked and answered. But go ahead.

A. Again, I can't say whether or not they posed a threat. I can't -- I can't say for sure. I don't know what's in their minds.

BY MS. JENSEN:

Q. Are you saying you did not make a threat assessment that night?

A. I made an assessment in reference to that particular time. Once the initial investigation -- when we ask them to show their hands, they showed their hands. Once they showed their hands, we said, "Okay, you can pull them down."

Now, in that sense, okay, they don't pose a threat at this point, but I'm still -- officer safety. So that's why -- that's why I would never say, no, they didn't pose a threat, because anything can happen at any particular time.

Q. Have you ever communicated with Wheeler about this incident?

MR. HANNA: Object to form.

Page 111

You can answer.

A. Yes, yes.

BY MS. JENSEN:

Q. Outside of your meetings with your attorney, have you ever communicated with him about this incident?

A. Yes.

Q. When did you communicate with him?

A. When it first happened. And then periodically, as we found out we were being sued, we asked whether or not -- "How long this is going to keep going on?" or when -- "Have you heard anything?" or, you know, things of that nature.

Q. How did you communicate with him?

A. Phone.

Q. Text message or --

A. Phone.

Q. -- audio?

A. Phone.

Q. When you say "phone," it could mean text or audio, so I'm just trying to --

A. Audio.

Q. -- clarify.

A. Audio.

Q. Audio, okay.

Page 112

Would that have been you calling him on his personal phone? Or on some other phone?

A. Personal phone.

Q. His personal phone. Not his Hurstville-issued phone or anything like that?

A. No.

Q. When did you learn you were being represented by counsel in this case?

A. When this came about. When this came about and being sued. I couldn't tell you a specific date.

Q. Do you recall who told you that you would be represented?

A. If any -- if anybody, it would have been Carl Perilloux.

Q. Do you have any regrets about what happened to the occupants in the vehicle that night?

MR. HANNA: Object to the form of the question.

You can answer.

THE WITNESS: Huh?

MR. HANNA: You can answer.

A. Regrets in reference to the --

BY MS. JENSEN:

Q. Anything that you would do over again, if you could?

Page 113

29 (Pages 110 - 113)

MR. HANNA: Object to the form of the question.

You can answer.

A. No.

BY MS. JENSEN:

Q. Has Wheeler ever expressed any regrets to you about how the incident went down?

A. No.

Q. Do you believe everything happened as it should?

MR. HANNA: Object to the form.

A. Yes.

BY MS. JENSEN:

Q. Were you wearing a body camera that night?

A. No.

Q. Did you have a dashboard camera?

A. No.

Q. Take any cell phone video?

A. No.

Q. Ever discuss this incident with anyone else?

MR. HANNA: Object to form.

But you can answer.

A. Other than my supervisors.

BY MS. JENSEN:

Q. Do you have any documents in your custody or

Page 114

control regarding law enforcement training you've received?

A. In like -- what you mean?

Q. For instance, at home or in your office at HANO. These would be your documents.

A. Other than my POST certificate.

Q. Do you have any notes about this incident?

A. No.

MS. JENSEN: That's all I have.

MR. HANNA: Rachel, why don't we step outside and chat a minute.

(Recess taken.)

MS. JENSEN: I'd like to enter as Exhibit B the copy of Ramon Pierre's driver's license.

MR. HANNA: No problem.

(Exhibit B was marked for identification.)

EXAMINATION

BY MR. HANNA:

Q. Officer Pierre, on the night of the stop, did Officer Wheeler ever take a driver's license from the driver of the BMW?

A. Yes.

Q. Okay. Did you observe that?

A. Yes.

Page 115

Q. Okay. And what did you observe Officer Wheeler to do once he obtained the license of the driver of the BMW?

A. He returned to his unit to document that he stopped -- that he had the guy's driver's license and notified his -- his agency, as well as he ran the guy's driver's license information.

Q. And did you hear anything or did Officer Wheeler say anything about any information he gained from the driver's license?

A. Yes.

Q. What did you hear him say?

A. He came back and said the driver's license matched the address, the registration of the -- the driver's license matched the registration of the vehicle as well as, you know, the information given by the driver.

Q. Okay. And did you and Officer Wheeler take that information into consideration with your ultimate decision as to what to do that night?

A. Yes.

Q. At times -- after this stop and you are out of your vehicle and Officer Wheeler is out of his vehicle, were there times that Officer Wheeler did come into your vision, your field of vision?

Page 116

A. Yes.

Q. Okay.

MR. HANNA: That's all I have.

EXAMINATION

BY MS. WISDOM:

Q. I have a few, only a few. And they're about your POST training. You receive POST training annually at the housing authority; is that right?

A. Yes.

Q. Okay. And that's a web-based training?

A. Yes.

Q. You get on the computer, and you participate in training that the state provides through a web-based program; is that right?

A. Yes.

Q. Does that training cover use of firearms?

A. Yes.

Q. Does it cover conducting vehicle stops?

A. Yes.

Q. Does it cover the topic of racial profiling?

A. Yes.

Q. Do you understand, from that training and your experience as a police officer, that you are not to consider a person's race when making your decisions as a police officer?

Page 117

30 (Pages 114 - 117)

A.  Yes.

Q.  And that training also covers officer safety, doesn't it?

A.  Yes.

Q.  And you're up-to-date on all of your POST training; is that correct?

A.  Yes.

MS. WISDOM:  That's all the questions I have.

MR. HANNA:  I have one follow-up to that.

RE-EXAMINATION

BY MR. HANNA:

Q.  Did you make a decision that night to stop the BMW because the occupants were African American?

A.  No, I did not.

MR. HANNA:  That's all.

MS. JENSEN:  That's all I have.

(This proceeding was concluded at 4:57 p.m. on January 20, 2023.)

Page 118

Ms. Tina Jensen, Esq.

tjensen@cooley.com

January 24, 2023

RE: BILAL HANKINS vs. KEVIN WHEELER

January 20, 2023, Ramon Michael Pierre (JOB NO. 5670697)

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, noting the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 120

REPORTER'S CERTIFICATE

I, YOLANDA J. PENA, Certified Court Reporter in and for the State of Louisiana, Registered Professional Reporter, and as the officer before whom this testimony was taken, do hereby certify that RAMON PIERRE, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in the foregoing # pages.

I further certify that said testimony was reported by me in the Stenotype reporting method, was prepared and transcribed by me or under my direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I have been informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services.

I further certify that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board.

I further certify that I am not an attorney or counsel for any of the parties, that I am neither related to nor employed by any attorney or counsel connected with this action, and that I have no financial interest in the outcome of this matter.

This certificate is valid only for this transcript, accompanied by my original signature and original raised seal on this page.

Prairieville, Louisiana, this 24th day of January, 2023.

YOLANDA J. PENA, CCR, RPR
CCR NO. 2017002, RPR NO. 907346

Page 119

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, noting the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 121

31 (Pages 118 - 121)

BILAL HANKINS vs. KEVIN WHEELER
Ramon Michael Pierre (JOB NO. 5670697)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____  _____

WITNESS                    Date

Page 122

Veritext Legal Solutions
866 299-5127

[& - ago]

| & | | | |
|---|---|---|---|
| **&** 1:21 2:19 120:23 121:9 | **2025.520** 120:9 120:12 | **7** | **acted** 119:11 |

**&** 1:21 2:19 120:23 121:9

**0**

**01129** 1:4

**1**

**1** 121:1
**10001** 2:9
**1100** 82:4
**115** 3:6,13
**117** 3:7
**118** 3:6
**119** 3:8
**12** 24:21
**1434** 119:12
**15** 54:23
**1998** 14:22 19:13

**2**

**20** 1:25 52:12 118:20 120:5
**2005** 19:22
**2010** 22:18
**2012** 24:20,20 24:21
**2013** 24:21,21
**2015** 43:2
**2017002** 2:24 119:23
**2018** 29:24 30:14
**2023** 1:25 118:20 119:18 120:3,5

**2025.520** 120:9 120:12
**212** 2:9
**24** 120:3
**24th** 119:17
**25** 55:19,20
**2828** 6:3
**29403** 119:22
**2:12** 1:25
**2:21** 1:4

**3**

**30** 121:1
**3150** 2:13
**37:2554** 119:4

**4**

**4** 3:3
**4401** 2:5
**4700** 81:19
**479-6862** 2:9
**49** 81:19
**4:57** 118:19

**5**

**5** 3:5
**504** 2:14,21
**55** 2:8
**550-6000** 2:6
**5670697** 120:5 122:2
**593-0911** 2:14
**595-3000** 2:21

**6**

**600** 1:22 2:20

**7**

**700** 81:14
**70072** 6:4
**701** 1:22 2:20
**70122** 2:14
**70139** 1:23 2:20
**73** 3:11

**8**

**8** 70:12,13 82:4
**800** 81:14
**858** 2:6

**9**

**907346** 119:23
**909** 2:13
**92121** 2:5

**a**

**ability** 119:7
**able** 8:9 9:9 16:3,5,8
**above** 1:15 120:6
**abuse** 16:17
**academy** 14:24 24:11,15,17
**accident** 7:13
**accompanied** 119:16
**accurately** 8:23 9:5
**accused** 100:25 101:23
**acronym** 12:19 27:11

**acted** 119:11
**action** 6:7 119:14
**actual** 110:3 111:3
**actually** 36:5 107:8,9,13
**additional** 73:8 109:17
**address** 5:24 6:2,3 69:25 70:1,4,16,17,18 70:20 71:1 116:14
**addressed** 5:12
**adequate** 37:17
**advance** 106:17
**advisory** 119:12
**affiliated** 13:20
**affirmative** 110:17
**african** 91:12 92:2,10 118:15
**age** 72:5 92:20 92:22
**agencies** 15:2
**agency** 23:6 24:8,10 31:2 97:14 116:6
**ages** 109:22,24 110:1
**ago** 50:15 51:8 51:15 54:12 61:11,14 75:17

Page 1

[ago - arrangement]

| | | | |
|---|---|---|---|
| 76:13 79:4<br>83:5 91:15<br>102:4,11<br>108:23<br>**agree**  12:19<br>25:18,23 53:23<br>72:17<br>**agreed**  4:3<br>73:12 78:18<br>**ahead**  20:2<br>22:6 23:11<br>34:9,14,20<br>42:13 48:21<br>50:25 55:11,22<br>55:24 57:15<br>58:8 62:21<br>64:2,11,12<br>66:19 70:10<br>78:15 79:25<br>81:9 85:20<br>87:5 111:1,6<br>**al**  1:7<br>**allow**  39:17<br>47:4,5,5,7,10<br>47:13,17,20<br>52:10 55:8<br>57:22 74:12<br>**allowed**  28:22<br>29:2 48:7 49:1<br>49:24 50:8,23<br>51:9,16,20,21<br>51:24 52:8<br>94:2,8 95:3,19<br>96:19 | **alluding**  108:1<br>**american**  91:12<br>92:2,11 118:15<br>**ammunition**<br>28:1<br>**andrews**  2:7<br>**annually**  117:7<br>**answer**  4:10<br>8:7,18 9:15<br>15:21,22 16:7<br>16:13 17:1,19<br>18:21 20:16,23<br>21:12,20 22:6<br>23:23 24:6<br>25:5,11,22<br>26:5 30:23<br>32:25 33:7<br>34:10 35:18<br>37:2,5,8,11<br>42:13 43:8,10<br>46:20 50:11,25<br>53:2,22 54:3<br>55:15 56:1,23<br>57:4,10,11,12<br>57:22,24 58:8<br>59:3,25 60:23<br>61:4,24 62:1<br>63:6 65:8 66:3<br>66:6,14,19<br>67:2,11,18<br>69:1 81:8,9<br>85:17 88:15<br>93:4 94:22<br>95:8,9,23<br>99:12,21 | 104:12,18<br>105:14 109:1<br>110:13,14,22<br>112:1 113:19<br>113:21 114:3<br>114:22<br>**answered**<br>15:15 34:8,19<br>37:12 42:12<br>50:10 58:7<br>63:1,5 64:12<br>80:3 87:5<br>105:1 111:6<br>**answering**  9:7<br>55:1,5<br>**answers**  8:19<br>8:24 9:9 55:20<br>63:23<br>**anybody**  31:19<br>49:11 68:5<br>98:22 113:13<br>**appear**  93:6<br>**appearance**<br>91:10,12,22<br>92:8<br>**appeared**  91:19<br>92:21 93:1<br>**appearing**<br>12:12 120:18<br>121:7<br>**applying**  45:14<br>**approached**<br>41:18,20 84:4<br>84:18,25 85:8<br>88:3,7 | **approaching**<br>85:5 90:2<br>**approximate**<br>72:5 86:1<br>92:20,22<br>102:13 109:22<br>109:24<br>**approximately**<br>24:18 76:23<br>84:21 85:24<br>91:18 93:25<br>94:8 102:12<br>104:3,3<br>**area**  22:9,10<br>30:2 31:22<br>35:9,10,20,25<br>37:7,13,24<br>39:1,2 41:8<br>59:5,10 67:12<br>67:14,15,19,22<br>72:9,20,22<br>73:22 74:1<br>76:25 77:1,2,4<br>77:4,5,7,8,16<br>77:21 78:19,20<br>78:24 79:5,13<br>79:14 81:12,13<br>82:2,11 83:21<br>84:6 88:5<br>97:10<br>**areas**  64:20<br>**argue**  48:5<br>**arrangement**<br>119:10 |

Veritext Legal Solutions<br>866 299-5127

[arrangements - block]

arrangements 119:10
arrival 87:25
article 119:12
asked 8:24 13:1 24:25 25:6 30:11 34:7,18 39:22 42:11 50:9 54:22 55:5,7 58:6,25 61:22 62:3,4,8 62:9,10,11,11 62:12,13 63:5 63:17 64:11 69:22,23,23,24 70:25 72:9,19 72:22 80:2 81:2,4,12 84:7 84:12,14 87:5 89:15,15,15 90:10,11 91:8 93:5,13 96:3,4 101:2,5 104:9 104:14 108:14 111:6 112:11
asking 16:15 39:20 52:24 53:20 62:14 75:16 76:12 83:3 89:21 91:14 95:12,24 102:2 103:6,7 107:5
assess 95:19

assessing 95:13
assessment 95:14,17 111:12,13
assessments 110:9
assigned 38:13 67:8
assignment 48:18
assist 37:8 72:11,17
assume 45:20 53:12
attach 59:14
attempt 80:20
attempting 60:12
attend 14:24 24:15
attorney 6:6 10:9 11:9 12:13 103:4,7 112:4 119:13 119:14
attorneys 8:22 12:9,10
audio 11:6 112:18,21,22 112:24,25
august 22:18 29:24
authority 2:11 10:16 12:16,21 17:24 18:2,5,7

18:10,13,15 20:1 24:9 26:20 27:10 38:7 41:5 47:9 47:10,13 50:2 54:1 56:5,9,9 56:11,24 58:3 117:8 119:4
aware 68:14 106:17

**b**

b 3:13 115:14 115:17 121:1
back 7:16 15:17 24:11 37:9 41:8,15 44:16 46:10 49:3 61:21 67:22 70:3 83:19 88:11 92:9,15,18 102:20 110:22 110:23 116:13
background 46:7,9
backup 31:16 31:17,18,20,20 31:23 37:17
badge 18:3,4 18:16
badgering 54:20,21 57:3
based 60:10 95:20 117:10 117:13

basic 8:6
basis 16:10 47:19
bathroom 96:14
becoming 54:20 55:23
beg 57:21
began 23:16 44:17 93:16
behalf 1:15
believe 6:22 14:1 17:20 21:13 24:7,16 30:5,9 31:16 45:21 75:1 81:4 84:9 87:8 87:10 94:17 97:13 110:3 111:3 114:9
believed 60:11 71:16
believing 95:4
belt 27:23
best 9:7 77:10 91:10,21 119:7
big 67:22
bigger 18:12
bilal 1:4 6:6 120:4 122:1
bit 14:17
bland 1:21 2:19
block 49:10 81:14,19,21,22 82:4 93:16

[blocks - circle]

blocks  82:3
blue  27:11,13
  43:14,19 53:24
bmw  60:6
  61:16 62:24
  68:1 69:11,18
  69:19 70:24
  72:15,24 73:9
  77:18,20 78:19
  79:5,10 80:9
  82:17 83:6,20
  85:5,12,23,25
  88:1,3 89:3
  94:2,7,14 95:2
  95:18 96:19
  115:22 116:3
  118:15
board  13:19,23
  13:23 52:23
  119:9,12
body  71:15,21
  114:14
bottom  27:8
  74:16
boundaries
  67:19
box  63:24
  67:22
brackett  1:21
  2:19
break  9:11,13
  9:16 44:11
  52:12 60:12
  96:15,16

briefed  8:1
brought  45:5
bulletproof
  41:7 84:18
bunch  17:5
business  108:9
buy  44:2,5

**c**

c  2:1 5:11 18:1
ca  120:9,12,20
caesars  48:23
california  2:5
call  31:21
  34:21 36:1
  37:2,10,12,15
  59:19 60:8
  62:25 63:8
  64:18 67:11,12
  73:1,7 74:4,24
  97:21
called  30:10,14
  33:21,25 34:4
  34:15 35:4
  69:6,7,15,16
calling  37:4
  63:11 98:22
  113:1
calls  36:7,14,24
  59:7
camera  114:14
  114:16
camp  77:6 80:5
  81:14,19,21,22
  82:4

candrews  2:10
capacity  33:12
  36:25 47:17
  49:25
capture  8:21
  9:5,9
car  42:20 46:21
  46:24 47:3
  48:2 60:13,13
  71:19 74:5,6
  80:17,20 85:24
  86:12 87:2
  89:25 90:3,7
  91:4 93:10
  97:4
care  17:4
carl  2:18 14:6,7
  30:9,12 31:9
  44:20 45:3
  58:21 113:14
carry  28:22,25
  29:2,5 42:9
cars  60:12
case  1:4 7:12
  12:9,17 13:2
  13:13 14:14
  105:12 113:8
cases  7:4,6,7,9
  7:10,11
cause  1:16
ccp  120:9,12
ccr  2:24 119:22
  119:23
cell  114:18

certain  8:9
  50:15 59:7
  83:16,16
  102:19
certainly  9:12
certificate  3:8
  115:6 119:1,15
certifications
  20:13
certified  1:17
  119:2
certify  119:3,5
  119:8,11,13
change  23:1
  30:20 49:23
  122:4,7,10,13
  122:16,19
changed  49:21
  55:14
channel  32:1
charge  82:8
chat  115:11
check  10:7 36:2
  39:13,14 46:7
  68:12
checks  46:9
chest  41:7
chestnut  75:19
  76:1,4,5 80:18
  81:21
choose  54:14
chooses  55:15
christopher  2:7
circle  77:8,11
  77:22,23 78:18

Page 4

[circle - constitutions]

79:5,9,11,15,19
**circumstances**
  15:18 19:17
**citizen**  21:14
  54:9 56:25
  58:4,19 64:15
  87:2 88:22
  89:2,3
**citizens**  21:3
  53:10 59:4,8
  59:17 100:3,9
**city**  22:11,15
**civil**  4:5 7:11
  7:12 119:12
  120:19,20
**clarification**
  13:5 85:2
**clarify**  112:23
**class**  18:1
**clear**  18:16
  63:13,18 95:12
  98:17
**clearly**  75:25
**client**  81:18,24
  93:20 103:4
  106:7 107:7,10
  107:20 108:15
**clients**  107:15
**clock**  21:7 39:3
**clocked**  99:8
**close**  37:7
  84:21
**clothes**  40:5
**clothing**  42:9
  91:13 92:11

**code**  70:1,2,5
  70:17,19,20
  119:12 120:9
  120:12,19,20
**coliseum**  79:1
  80:6
**color**  27:11,13
  43:2,19 91:13
  92:3
**come**  43:14
  58:17 69:8,14
  72:9,20,22
  88:19 89:3
  116:24
**comes**  70:3
  78:12
**comfortable**
  74:21 75:6
  78:9 90:10
**coming**  36:1
  59:8 82:7
  87:15 94:14
**command**  17:6
**commencing**
  1:25
**commission**
  19:10,23,25
  20:19 21:24
  23:7 24:3
**committed**  6:20
**communicate**
  112:8,14
**communicated**
  12:11 111:23
  112:5

**communication**
  103:4
**communicati...**
  12:15 13:17
  14:10
**commute**  49:11
**company**  22:21
**competent**  6:14
**complaint**  13:8
  65:1 100:12,14
  100:19,22,23
  101:22 106:9
  107:9,19
  108:15,17,20
  108:21,23
  109:2,2
**complaints**
  65:19,25 66:12
  66:24 105:24
**complete**  119:9
**completed**  31:2
  120:7,17 121:6
**completely**
  6:11 9:6 21:7
**completion**
  121:10
**compliance**
  119:8,11
**complies**  77:9
**computer**
  117:12
**concern**  56:14
  56:15,15
**concerns**  87:1

**concluded**
  118:19
**conduct**  6:20
  16:21 37:20
  50:8 52:18
  53:9 54:1,12
  59:22 61:1,5,6
  61:8 63:12
  65:3,20 66:25
  73:12 97:20
**conducted**
  84:10 96:11
**conducting**
  53:19 72:11
  108:12 117:18
**confused**  63:7
**confusing**  24:7
  78:2,6,14
**connected**  32:3
  36:21 119:14
**consent**  46:7
**consequences**
  104:21
**conservator**
  20:24
**consider**  19:3
  117:24
**consideration**
  116:19
**considered**
  4:11 86:4
**considering**
  45:15
**constitutions**
  21:3

Page 5

**[contact - department]**

contact 30:12 30:12 32:9 72:24 120:9
contacted 69:21,22
contacting 69:18
continue 17:11
contractual 119:11
control 115:1
conversation 71:4 72:1 78:13 87:11,24 87:25 90:15 96:25 103:7
conversations 12:9
cooley 2:4
cooley.com 2:6 2:10 120:2
cooperative 78:12
copy 5:22 115:14
corner 89:5
correct 5:25 23:24 27:21 28:20 36:22 40:21 44:20 46:13 47:11,12 49:22 50:19,20 51:10,16,17 52:10 53:5 58:24 61:20

69:12 72:20 74:25 77:12 79:8 82:12 83:7 84:19 85:9,13 87:3 91:25 95:15 98:11,18 100:12 101:3 103:14,20 104:24 108:5 108:24 110:9 118:6 119:7
corrected 81:17 81:25 93:19
corrections 120:14,15 121:3,4
correctly 26:15 32:5 38:2 47:25 48:7 49:21 76:10
counsel 8:17 9:20,25 52:11 62:21 64:2 113:8 119:13 119:14 120:18 120:21 121:7
couple 8:4
course 6:20 46:8 107:23 110:7
court 1:1,17 5:22 6:16,18 8:20 9:2,4,8 119:2

cover 117:16 117:18,20
covered 9:18
covers 27:25 41:7 118:2
crimes 36:4
criminal 7:9,10 16:16
cross 79:2 80:7
cruising 68:24
current 6:2 20:4 21:24 26:13 44:23
currently 19:1
custody 114:25
cv 1:4

**d**

d 3:1
da 8:1
danger 94:18 95:5,20 96:8
dark 27:11,13
dashboard 43:20,24 53:25 114:16
date 11:13,14 11:15 19:24 103:16,22 113:10 118:5 120:16 121:5 122:24
dates 24:23
day 8:23 98:21 103:25 119:17

days 108:2
dealt 15:24
death 56:19 58:14 94:18 95:6,20
decide 83:9
decided 17:12
decision 56:20 56:21 116:20 118:14
decisions 99:19 99:25 117:24
deep 47:22
defendant 2:11 6:19,24 7:2
defendants 1:8 2:16
defined 119:12
definite 102:13
demetrius 30:6 100:17 109:9
demonstrating 90:21
department 12:16,22 14:25 15:3,4 17:10 17:13,24 18:2 18:9,10,12,15 18:18,23 19:14 22:22 25:9 26:2,11 27:10 27:22,23 28:15 29:20 40:12,17 41:4,13 52:22 66:15

Veritext Legal Solutions
866 299-5127

[departmental - doing]

| | | | |
|---|---|---|---|
| **departmental** 27:24 | 39:16 40:10,15 50:15 51:18 | **diego** 2:5 | 98:7,11 |
| **departments** 66:10 | 61:11,14,16 71:7,9,11,12 | **differ** 57:21 110:1 | **dispatcher** 37:3 |
| **depend** 98:1 | 85:5 86:25 | **different** 14:3 | **distance** 84:22 85:24 86:3,7 |
| **depending** 58:16 | 89:2 102:7 107:17 | 21:16 53:15,15 53:16 54:16 | **distinguish** 63:20 |
| **depends** 37:15 68:10 98:5,14 | **describing** 18:8 39:23 73:2 | 62:9,13 88:5,5 98:13 108:13 109:7 | **district** 1:1,2 2:17,17 13:18 |
| **deposed** 6:17 7:17,18 | 85:8 | **dig** 47:22 | 30:2 31:21 39:9,22 52:16 |
| **deposition** 1:13 4:4,12 7:20,22 | **description** 101:9 | **directing** 93:11 | **doctor** 49:8 |
| 7:23 8:5 9:11 | **detail** 21:9 29:3 29:6,11,16,17 | **direction** 81:23 119:6 | **document** 64:15,19,22,24 |
| 11:8,11,14,14 11:21,22,24,25 | 29:19,22 35:13 35:19 37:14 | **disagree** 34:13 | 98:20,21 99:6 103:9 116:4 |
| 12:1,13 40:11 56:3 57:19 | 39:13 45:22 47:14 48:2,4,9 | **disclose** 25:8 | **documentation** 25:15,24 26:3 |
| 102:18 103:10 119:10 120:19 | 48:10,12,18,20 48:22,25 49:5 | **disclosed** 25:12 25:13 | 26:6,7 45:1,8 64:19 99:5 |
| 120:22,24 121:8,10 | 49:13,19 50:7 50:17,21 51:5 | **discovered** 88:22 89:5 | **documented** 61:2 63:11 |
| **depth** 11:12 | 51:13 66:18 99:16 | **discretion** 38:1 55:9 56:20,22 | 64:17 |
| **describe** 27:5 27:17 41:6 | **details** 8:10 19:4,7 48:3,25 | 97:23,24 98:8 | **documents** 10:13,20,24 |
| 43:17 45:17 67:10,16 71:4 | 50:13,16 51:2 51:8 71:24,25 | **discuss** 11:8 80:23 82:8 102:25 103:6 | 11:1 114:25 115:5 |
| 73:12 79:19 82:14 83:24 | **determine** 37:12 86:7 | 114:20 | **dog** 71:6,17 81:1,5,10,11,12 |
| 89:7,25 91:10 91:22 92:8 | **determined** 120:18,22 | **discussed** 14:14 103:3 107:2,5 | 81:13,18 82:2 84:15 89:19 |
| 96:24 | 121:7 | **discussing** 44:17 | 90:13,14 93:17 97:5 |
| **described** 18:3 23:15 27:4 | **diagrams** 78:12 | **discussion** 11:20 | **doing** 7:19 39:20 48:2 |
| 31:25 36:17 | | **dispatch** 36:8 36:14,15,25 97:12,18,22 | 51:5 71:8 |

Veritext Legal Solutions
866 299-5127

**[doing - excuse]**

78:12 88:23 90:20 98:3,4 108:8,8
**door** 60:13 71:19 80:17,20
**doors** 60:13
**doubts** 33:3
**downtown** 74:14 81:23
**drive** 42:17,20 42:23 46:18 48:8 49:1 51:9 51:16,20
**driver** 71:11,13 71:14 81:2,3,3 81:10,11,13,16 82:3 84:13,13 86:11 89:15,16 92:6,16,19 93:12,13,14,14 93:23,24 96:4 106:8 107:11 115:22 116:3 116:17
**driver's** 3:14 5:18 91:10 115:14,21 116:5,7,10,13 116:15
**driving** 41:23 43:1 46:13 47:2 48:17 51:14 52:6,24 53:4 71:13 80:12

**drove** 75:18 76:11,12,14 97:11
**drugs** 7:8
**due** 16:14
**duly** 5:2 119:4
**duties** 21:10 67:8
**duty** 20:20 21:6 38:23,25 48:13 49:3
**dynamics** 83:16

**e**

**e** 1:6 2:1,1,19 3:1 5:11,11,11 120:9,12 121:1 122:3,3,3
**earlier** 40:10 44:17 68:17 73:18 82:23,24 84:12,15 86:25 87:13 93:13 98:14 108:14
**easier** 9:2
**east** 70:4,5,6,13 70:21
**eastern** 1:2
**eastgate** 2:5
**effect** 69:23 89:18 93:16
**efficiently** 8:5
**either** 46:21 52:20

**eldon** 1:6
**element** 56:2
**emblem** 17:23 17:25 18:8
**employed** 26:20 119:14
**employee** 18:22
**employees** 14:11
**employment** 17:10 19:1,2,6
**encounter** 101:13,15
**ended** 15:9 75:18,19 76:2 76:5,16
**enforcement** 14:21 15:2,8 20:12,21 21:10 21:23 22:23 23:20 32:22 33:4 56:6 58:4 65:2 86:3 92:25 95:4,14 95:21 99:19,25 110:8 115:1
**enter** 115:13
**entire** 73:3 90:24
**entities** 66:10
**entitled** 1:16 8:18
**entity** 66:18 119:10

**equipment** 27:17 32:4 36:22 40:14 42:9
**errata** 120:14 120:16 121:3,5
**escort** 98:3
**esq** 2:4,7,13,19 120:1
**essentially** 55:21
**establish** 63:9
**established** 51:8 52:8 108:4
**et** 1:7
**events** 11:2
**everybody** 21:13
**evidence** 105:11
**exact** 24:22 94:5 110:1
**exactly** 78:21 97:10
**examination** 3:4 5:4 115:18 117:4 118:12
**examined** 5:2
**except** 4:9
**excluding** 4:6
**excuse** 61:13,18 62:1 71:14 99:1

Page 8

**[exhibit - full]**

| | | | |
|---|---|---|---|
| **exhibit** 3:11,13 73:21,23 115:14,17 | **families** 17:4 | **first** 5:2 6:22 6:23,25 7:16 | 50:9,24 54:2 54:18 57:2,17 |
| **exhibits** 3:9 | **far** 8:2 11:12 11:13 13:22 37:17 39:19,20 47:16,17 82:1 82:5 83:12 86:1 87:10,10 88:10 96:7 97:14 | 8:3 9:3 19:13 22:17,19 23:16 30:13,15 33:17 45:3 72:24 74:24 76:23 77:11 78:19 79:5,7,16 80:10 83:19 95:2,18,23 97:6 112:9 | 58:6 59:2,24 60:22 61:3 63:3,17 64:9 64:22 65:5 66:5,13 67:1 67:17 68:25 70:9 87:4 88:14 93:3 94:21 95:7 99:11,20 100:6 |
| **existence** 53:24 | | | |
| **exit** 41:24 84:3 | | | |
| **exited** 41:25 42:6 | | | |
| **experience** 7:15 83:14,15 92:25 95:21 110:8 117:23 | **fear** 94:10,13 **federal** 4:5 21:4 121:1,8,9 | **five** 5:15 32:19 32:20 94:9 | 104:25 105:13 108:25 109:23 111:5,25 113:17 114:1 114:11,21 |
| **explain** 17:25 48:16 57:11,12 57:25 90:12,12 106:24 | **feeds** 106:22 **feel** 8:16 9:13 **feet** 86:2 **fetched** 82:1 **field** 116:25 | **flashing** 53:24 **flashlight** 84:6 **floor** 106:10,19 107:12 **focusing** 90:19 90:22 | **formalities** 4:6 **format** 119:8 **forth** 119:4 **found** 107:13 112:10 |
| **expressed** 114:6 | **figure** 106:9 107:11 | **follow** 118:10 **following** 94:14 | **frcp** 121:1 **free** 8:16 9:13 |
| **extent** 15:12 57:19 64:9 75:24 | **figures** 106:8 **filed** 65:1 **financial** 119:10,15 | **follows** 5:3 120:8 **foregoing** 119:5 | **freely** 49:4 **freret** 67:20,22 **friends** 34:22 |
| **f** | **find** 30:4 37:22 38:23 69:14 | **form** 4:9 15:12 18:19 20:15,22 | **front** 71:15 80:13,14,15,15 |
| **facebook** 106:13 107:10 109:14 | **fine** 33:1 **finish** 9:6 61:13 62:14 66:2,19 81:8,9 | 21:11,19 22:4 22:5 23:22 24:5 25:1 26:4 | 82:17 83:6 88:10 89:4 91:24 101:21 |
| **fact** 11:20 28:25 59:6 91:8 92:10 105:15 108:21 | **finished** 66:4 81:5 | 30:22 32:23 33:6,23 34:7 34:18 35:17 | **full** 76:18 109:5 109:12,14 |
| **facts** 8:10 11:22,23 | **firearms** 117:16 | 42:11 46:19 | |
| **fair** 64:7 | **fired** 25:14 | | |
| **fallon** 1:6 | | | |
| **familiar** 14:6 59:9 87:12 | | | |

**[fully - hanna]**

**fully** 52:19,20
53:8
**further** 48:6,16
71:25 108:2
109:6 119:5,8
119:11,13

**g**

**gained** 116:10
**game** 48:24
49:2,2
**general** 52:4,12
82:11 83:21
94:6
**generally** 79:19
**getting** 47:15
54:19 55:21
62:6 64:7
108:12
**gist** 72:1
**give** 6:9 13:3,8
102:13
**given** 8:25 17:3
38:7 48:1
116:16
**giving** 7:21
**go** 7:14 9:14
11:15 20:2
22:6 23:11
24:11,11 34:9
34:14,20 37:4
39:2,7 40:1
42:13 43:23
44:2,16 47:16
48:21 49:2,4,4
49:4,6,7,8

50:25 55:10,22
55:24 57:15
58:8 59:19
62:21 64:2,11
64:12 66:19
70:10 71:24,24
78:7,7,15,25
79:1,24 80:5,7
81:9 85:20
87:5 97:8 99:6
102:14 110:18
110:25,25
111:6
**goal** 8:22
**goes** 98:21
**going** 7:24
11:21,23,25
12:2 15:11
17:11 22:12
46:10 47:21
48:11 50:6
53:8 54:22
57:1,3,5,22
61:23 62:19
63:2,16 65:4
71:2 73:21
74:14,15 75:23
78:1,4,10,24
81:23 83:19
94:20 112:11
112:12
**good** 96:10
**gotten** 62:18
**governed** 21:5

**gps** 99:8
**grab** 102:20
**great** 5:21
12:24 79:11
**greeting** 39:20
**ground** 8:4
9:17
**guess** 8:12
107:21
**guidelines**
119:9
**gun** 27:20,22
28:2,5,7,15,22
29:2,5 40:17
90:24 91:2,4
100:3,9,25
101:12,14,23
102:1,6 104:10
104:15
**guns** 101:20,20
108:22 109:3,4
109:10
**guy's** 116:5,6

**h**

**h** 5:11 27:9
122:3
**habit** 106:21
**hair** 91:13
**half** 62:20
75:17 102:3
**hand** 5:21 25:2
**handcuff** 28:3
**handcuffs** 28:3
**handle** 80:21
98:6

**handled** 120:8
**handles** 60:13
71:20 80:17
97:4
**handling** 78:3
**hands** 27:15
84:7,7,10
86:11 90:16,17
91:2,9 93:6,11
96:3,3,4
111:15,16,16
**hankins** 1:4 6:6
120:4 122:1
**hanna** 2:19 3:6
5:23 12:8
15:11,20,23
16:4,7,12,25
17:18 18:19
20:15,22 21:11
21:19 22:4
23:11,22 24:5
25:1,10,21
26:4 30:22
32:23 33:6,23
34:7,13,18
35:17 36:10,15
36:18 42:11
43:9,11 46:19
48:21 50:9,24
54:2,18 55:3
55:17 57:1,14
57:15,18 58:6
59:2,24 60:22
61:3 62:16
63:1,4,5,16

Veritext Legal Solutions
866 299-5127

**[hanna - identified]**

64:2,8 65:4,12 65:16,22 66:2 66:13,20 67:1 67:17 68:25 69:5 70:9 74:10,13,19 75:2,5,23 78:1 78:4,11 79:21 79:23 80:2 81:7 85:1,6,16 85:19 87:4 88:14 93:3 94:20 95:7 96:14 99:11,20 100:6 102:25 103:2 104:25 105:13 108:25 109:23 110:11 110:13,17,21 110:25 111:5 111:25 113:17 113:21 114:1 114:11,21 115:10,16,19 117:3 118:10 118:13,17

**hano**   12:20 15:2 19:2 20:7 20:9,10 21:8 22:17,21 23:16 24:24 26:10,16 27:1,8 28:23 29:18 31:12 32:4 36:21 40:2,12 42:20

44:7,9 46:24 47:2,4,7,25 48:1,8,17,17 49:1 51:9,12 51:16,20 52:9 52:9 66:16 98:17,20 99:15 99:24 100:8 103:20 115:5

**happen**   105:16 111:21

**happened**   30:8 75:16 83:4 84:16 90:12 98:25 103:25 112:9 113:15 114:9

**harassing** 54:21

**hard**   42:6

**harm**   96:7

**harmful**   37:23 37:23

**heading**   81:21 81:22

**hear**   55:5 105:21 116:8 116:12

**heard**   109:6 110:15 112:12

**hearing**   17:9,11

**held**   23:15

**hell**   76:4

**hello**   39:19

**help**   8:5 54:15 72:20

**hired**   30:3 46:8

**hiring**   24:24 45:15

**history**   14:18 45:1,6,9

**hold**   19:9 107:3

**holster**   28:2,5

**home**   36:1,2 49:4,11 59:8,8 89:5 99:2,8,8 115:4

**hour**   10:7 62:20

**hours**   10:7

**house**   10:16 37:3,5 39:2,7 106:15,19,22 106:25 108:8 108:18 109:13

**housing**   2:11 10:16 12:16,21 17:24 18:1,6,9 18:13,14 20:1 24:9 26:20 27:9 41:4 47:9 47:10,13 50:2 70:11 117:8

**hudson**   2:8

**huh**   43:9 85:14 85:19 106:2 110:10,15 113:20

**hundred**   93:16

**hurricane** 15:24,25 16:14 16:15,21,24

**hurstville**   2:16 13:18,20 29:23 30:2,3,16,21 31:8,22 32:9 32:10,11 33:5 33:13,15 35:7 35:9,14 36:11 36:13,20 37:1 37:13,14,19 38:4,12 39:1,9 39:21 40:3,6 42:8,14,17 44:18 45:4 46:8,10 47:6,8 47:11 52:15,16 53:1,4 56:7 59:18,23 60:3 61:2,7 63:10 64:14 66:15,25 67:19 68:6,15 74:1 77:4 97:20 98:17,20 99:9,18 100:2 113:4

**i**

**identification** 5:23 73:23 115:17

**identified** 86:20

Veritext Legal Solutions
866 299-5127

**[identify - january]**

| | | | |
|---|---|---|---|
| **identify**  86:15 | **including**  40:17 | **instruct**  57:4 | 108:13 109:8 |
| **immediate** 13:22 | **indicate**  43:7 87:22 | 58:21 99:9,15 99:18,24 100:2 | 111:14 |
| **immediately** 81:17,17 93:19 | **indicated**  75:12 | 100:8 | **investigative** 58:15,15 |
| **imminent** 94:18 95:5,20 | **indicating** 74:16 76:2,3 | **instructed**  98:9 98:16,17,19,19 | **investigatory** 63:21,25 88:23 |
| 96:7 | 76:16,17 77:2 | **instructs**  8:18 | **involve**  50:18 |
| **immunity** 15:13 25:3 | 77:16,21 78:20 78:25 | **interacted** 12:11 | **involved**  50:16 69:11 106:8 |
| 65:5 | **individual** 38:14 52:21 | **interest**  63:18 119:15 | **involves**  49:19 51:6,14 |
| **important**  8:20 9:3 63:19 | 56:13 | **interrupt**  9:4,8 | **involving**  98:7 |
| **improvement** 2:17 | **individuals** 60:12 90:7 | **intersection** 89:4 | **issue**  15:13 25:2 65:6 |
| **incident**  11:4 | **indulge**  48:6 | **interview**  104:4 104:6 105:9,11 | **issued**  27:22,23 27:24 28:2,15 |
| 23:3 30:21,25 31:15 32:14 | **information** 30:10 44:22 | **interviewed** 103:13,17,19 | 32:4,11 36:21 40:12,17 41:4 |
| 35:6,8 37:6,8 37:21 40:9,20 | 45:5 73:8,11 103:8 109:17 | 103:23 104:1 105:4 108:12 | 44:7 51:16,20 52:2 113:4 |
| 43:1,5 46:12 56:19 60:5 | 116:7,9,16,19 | **introduce** 73:21 | **it'd**  63:19 |
| 61:15 62:19 | **informed**  119:9 | **investigated** | **items**  27:16 |
| 67:5 69:11 | **initial**  73:11 111:14 | 109:8 | **j** |
| 71:2,6 100:12 101:3 102:7 | **initially**  82:3 | **investigating** 17:15 60:19,19 | **j**  1:16 2:24 119:2,22 |
| 103:14,24 | **inject**  37:24 | **investigation** | **jackson**  30:6,7 |
| 106:19 107:1,5 107:17 111:24 | **injury**  94:19 95:6,20 | 15:10,19 16:2 16:8,10,20,23 | 45:21 100:17 101:6 104:2,8 |
| 112:6 114:7,20 115:7 | **inside**  18:3 39:8 43:15 | 17:13 25:14,16 25:24,25 26:8 | 105:5,6 107:25 108:13 109:9 |
| **incidents**  66:11 109:7 | 49:2 71:8 72:25 86:13 | 31:1,1 58:16 60:11 84:11 | **janis**  1:7 |
| **included** 120:14 121:3 | 90:23 | 88:16 96:11 102:23 107:24 | **january**  1:25 118:20 119:17 120:3,5 |
| | **instance**  38:3 109:21 115:4 | | |

Veritext Legal Solutions
866 299-5127

**[jefferson - learned]**

| jefferson | | kind | l |
|---|---|---|---|
| **jefferson** 67:20 67:20 75:18,20 77:6 79:2 80:7 | 93:8 94:25 95:11 96:16,18 99:14,23 100:7 | **kind** 17:8 45:18 65:3 68:9 | **l** 4:1 5:11 |
| **jensen** 2:4 3:5 5:5 6:1,5 15:16 16:1,9,19 17:14,21 18:24 20:18,25 21:15 21:22 22:13 23:14,25 24:14 25:7,17 26:1,9 31:3 33:2,9,16 33:24 34:10,16 34:24 35:22 36:12,16,19 42:16 43:16 44:10,13 46:23 49:15 50:14 51:4 54:11 55:1,12 56:4 57:14,16 58:2 58:20 59:12 60:4,25 61:10 61:19,25 62:22 63:4,6 64:5,13 65:10,14,18,23 66:9,17,23 67:4,24 69:2,9 70:14 73:24 74:12,20 75:5 75:9 76:7 78:3 78:9,17 79:22 80:8 82:6 85:4 85:7,21 87:7 88:18 89:20 | 103:5 105:3,17 109:16 110:2 111:2,10 112:3 113:23 114:5 114:13,24 115:9,13 118:18 120:1 **job** 6:21 24:25 44:23 45:15 104:21 120:5 122:2 **joined** 20:9,10 **joseph** 74:7,8 74:23 75:2,4 75:13 77:5 80:4,5 81:20 **judge** 1:6,7 **judgment** 32:22 95:4 **jurisdiction** 21:21,23 22:14 | **knew** 70:6 87:8 87:15 92:2 **know** 7:8,15,24 8:9,11 9:14 14:2,2 17:8 24:22 29:8,13 30:10 36:1,4 38:19 39:5,5 49:13 59:1,4 59:11,17,20 66:21 68:21,21 69:7 70:4,7,18 71:1,2,3 76:15 78:25 82:23 83:15 84:23 86:1 87:16 88:24 92:22 94:24 95:9,10 95:23,24,25,25 96:1,6,7,8,10 97:1 104:5,7 107:6,8,14,15 108:15,16 109:21,24,25 111:8 112:13 116:16 **knowledge** 83:13 **known** 33:10 70:12 | **lafourche** 24:16,16 **lake** 74:15 **lane** 6:3 **lapse** 19:15 20:6,8 **lapsed** 19:16,18 20:8,10 **law** 1:20 14:21 15:1,7 20:12 20:20 21:10,23 22:23 23:20 32:22 33:4 38:3 56:5 58:3 65:2 86:2 92:25 95:3,13 95:21 99:19,25 110:8 115:1 **laws** 21:3,3,4 **lawsuit** 11:2 12:6 13:20 **lawyer** 55:17 **lawyers** 12:12 14:15 78:11 **lean** 71:15 **leaning** 71:15 71:22 80:16 **learn** 73:8 100:14 108:14 113:7 **learned** 69:10 100:11 |
| | **k** | | |
| | **katrina** 15:24 15:25 16:14,15 16:21,24 **keep** 9:12 50:6 66:21 112:11 **kevin** 1:7 2:17 32:14 120:4 122:1 **kid** 92:1 | | |

Veritext Legal Solutions
866 299-5127

**[learning - map]**

**learning** 100:18

**leave** 17:2,3 49:9 50:5 94:2 94:8 95:3,19 96:19

**leaving** 15:25

**led** 66:11

**left** 17:15 20:9 27:8 28:7,8,11 28:12 36:2 74:15 83:3,18 88:8,9 90:22 96:20 97:6,8

**legal** 120:7

**legrand** 1:21 2:19

**letters** 18:12

**levee** 2:17 14:11 52:22

**level** 27:16

**license** 3:14 5:18 115:15,21 116:2,5,7,10,13 116:15

**life** 9:2 56:19 58:14 94:10,13

**lights** 43:14,17 43:18,21,25 44:3,7 53:25 58:22,23,25 59:1,6,11,14,16 83:22 87:16

**likely** 77:11 78:19 79:4,7

79:16

**limit** 57:8,13

**line** 120:15 121:4 122:4,7 122:10,13,16 122:19

**lines** 87:19 102:19

**list** 3:9

**listen** 11:6

**lit** 84:6

**litigation** 14:12

**little** 14:17 39:17 55:9

**live** 22:8,9 59:4 106:14,15,21 106:25 107:4 108:5,6,7,17 109:11,13

**lived** 81:24

**lives** 81:19

**llc** 1:21 2:12,19

**llp** 2:4

**lobbied** 107:19

**local** 21:4

**located** 71:15 73:14,15 77:20

**location** 49:18 76:12 93:20,21

**locked** 120:12 121:1

**log** 66:21

**long** 10:6 33:10 93:18,22,25 96:22,23 104:3

112:11

**longer** 19:19,19

**look** 27:3 39:4 72:8 85:23 102:14

**looked** 89:16 93:14

**looking** 71:6,17 81:1,11 82:2 88:1 90:1,3,6 90:21,22 93:17 97:5

**looks** 27:20

**lost** 81:11,12

**loud** 110:14

**louisiana** 1:2 1:17,23 2:14 2:20,25 3:14 6:4 24:13 38:10 48:20,22 107:12 119:2 119:12,17

**loyola** 74:8,23 75:1,2,4,13,18

**lying** 104:21

---

**m**

**m** 2:7 5:8,11

**ma'am** 29:9 38:11 40:1,11 40:13,16,18 42:6 44:15 46:9 49:25 50:5 51:3 70:11 79:17 90:3,19 91:1,3

91:5 102:4 105:10

**made** 8:25 97:2 111:13

**magazine** 27:24,25 77:6 79:1 80:5,6

**magazines** 28:1

**magistrate** 1:7

**majority** 70:12

**make** 5:22 8:5 8:13 9:1 11:19 17:4 36:3 38:2 42:25 43:21 56:20,21 63:14 68:7 78:6,13 106:17,21 110:9 111:11 118:14 120:14 121:3

**makes** 86:7

**making** 95:14 117:24 119:10

**male** 91:12

**mall** 2:5

**man** 89:18 90:10

**manage** 57:18

**map** 3:12 10:19 10:19 73:21,25 74:3,11,13 75:7,14,21,24 75:25 78:5 79:20 82:11

**[mark - never]**

| mark 2:19 74:3 75:10,14 77:8 77:14,24 78:16 79:11 | means 103:3 | missing 39:6 | named 6:19,23 7:2 |
|---|---|---|---|

mark 2:19 74:3
 75:10,14 77:8
 77:14,24 78:16
 79:11
marked 49:16
 49:17 51:9
 52:9,19,20
 53:4,8,14,16,17
 54:4,7,9,13
 58:17 73:18,23
 74:5 75:25
 76:9 82:11,24
 83:1 115:17
marking 79:12
 79:13 86:21,21
markings 43:6
 43:13,13
marrero 6:4
matched
 116:14,15
matter 5:14
 119:15
mblb.com 2:21
mean 7:18 13:6
 13:11 21:1,7
 22:2,7 23:12
 27:19 45:12
 46:1 48:16
 55:9 67:16
 68:8 99:1,4
 105:25,25
 106:5 109:20
 112:20 115:3
meaning 97:3

means 103:3
media 106:4,6
 106:11 108:10
meerveld 1:7
meet 9:25 10:2
meetings 10:6
 112:4
megan 6:3
member 13:24
members 13:19
 13:23
mention 63:22
message 112:16
messed 17:8
met 33:17 77:7
method 119:6
mhanna 2:21
michael 1:14
 5:1,11 120:5
 122:2
middle 5:8,9
military 14:19
mind 96:1
 110:8
minds 110:5
 111:9
minute 76:4
 93:18,22 107:3
 115:11
minutes 54:23
 55:6 94:9
 108:23
miscommuni...
 17:5

missing 39:6
model 42:25
moment 50:15
 51:8,15 83:19
 94:6
moments 54:12
 61:11,14 79:4
month 14:22
months 30:25
 30:25 102:15
mouledoux
 1:21 2:19
move 54:24
 55:8,23 56:2
 57:23 62:18
 88:4,9
moved 19:20
movement 91:6
 91:9
movements
 56:17
moving 60:14
 60:16,20,21
municipality
 21:4
murder 7:7

**n**

n 2:1 3:1 4:1
 5:8 27:9
name 5:7,9 6:5
 14:1,2,2,3,4
 27:6 35:11,12
 35:14 41:10
 107:16,16

named 6:19,23
 7:2
nameplate
 41:10
names 5:16
 107:14,15
nashville 79:3
 80:7
nature 16:16
 37:7,15 57:6
 60:18 98:2,6
 98:15 100:22
 100:23 101:22
 112:13
near 37:17
 72:23 81:14
nearly 76:13
necessarily
 87:3
necessary
 120:14 121:3
need 8:8 9:13
 51:1 52:2,12
 53:8 58:15
 75:10 110:14
needed 31:20
neighborhood
 2:17 36:5,6
 39:25 68:23
 74:1
neighbors
 35:10
neither 119:13
never 7:23
 10:23 34:17

Veritext Legal Solutions
866 299-5127

**[never - officer]**

39:18,22 61:6
104:23 111:20
**new** 1:23 2:9,9
2:11,14,20
10:17 12:16,21
14:25 15:4
17:10,12,23,25
18:2,7,9,10,11
18:13,14,14,17
18:23 19:13
20:1 21:17
22:9,10,10,11
22:11,15 24:9
25:9 26:2,21
27:10 35:21
41:5 50:3
52:22 70:4,5,6
70:13,20
**night** 9:12
31:23 40:8,20
41:17 43:1,5
43:14 46:12,18
47:3 52:22
59:18 60:5
61:14 62:24
64:23,24 67:5
67:13,25 68:16
68:18 69:3,4
95:17 99:1,1
109:19 110:4
111:4,12
113:16 114:14
115:20 116:20
118:14

**nissan** 43:2
**nods** 9:9
**non** 14:15
**nonverbal** 9:9
**nopd** 15:9 20:9
31:21,25 37:8
66:16 97:16,17
98:7
**normally** 35:8
49:7 84:5
**notating**
120:15 121:4
**notes** 10:24
115:7
**notified** 97:16
116:6
**notify** 56:13
**notifying** 97:17
**number** 18:4
32:17 37:4
59:7 86:2
120:15 121:4
**numbered** 1:16

**o**

**o** 4:1 5:8 27:9
**oath** 6:10 44:14
**object** 15:11
18:19 20:15,22
21:11,19 22:4
22:4 23:22
24:5 25:1 26:4
30:22 32:23
33:6,23 34:7
34:18 35:17
42:11 46:19

50:9,24 54:2
54:18 57:1,17
58:6 59:2,24
60:22 61:3
63:2,16 64:8
65:4 66:3,5,13
67:1,17 68:25
70:9 74:10
75:23 78:4
87:4 88:14
93:3 94:20
95:7 99:11,20
100:6 104:25
105:13 108:25
109:23 111:5
111:25 113:17
114:1,11,21
**objecting** 64:8
**objection** 15:14
15:20 16:4,12
16:25 17:18
25:4,10,21
65:7,12,16,22
66:20 69:5
79:21
**objections** 4:9
8:25 57:16
**observe** 60:16
60:21 80:10,19
92:24 115:24
116:1
**observed** 69:19
88:22 89:6,21
95:2,18 106:4
106:5

**obtained** 116:2
**occupant** 91:22
92:8
**occupants** 68:1
69:11,19 71:7
71:8,10 72:3,6
72:25 80:20
82:25 85:13,23
86:5,10 88:17
88:25 90:20,23
92:24 94:17
95:5 96:12
104:10,15
105:19 109:18
110:4 111:4
113:16 118:15
**occur** 37:6
**occurred** 56:19
58:10 103:18
103:19
**occurs** 37:21
**octavia** 75:19
75:20,20,21,21
76:5 77:6 80:5
80:18 81:20,20
**office** 52:23
115:4 120:11
**officer** 5:13
18:7,17 19:9
19:20 20:19,21
21:2,10,24
22:24 24:3,12
26:14,17,24
27:7 28:23
31:6 33:4

Veritext Legal Solutions
866 299-5127

**[officer - part]**

| | | | |
|---|---|---|---|
| 35:19 37:14 38:10 43:7 46:25 47:21 48:14,17 56:6 56:8 58:4 60:7 65:2 68:15 69:15 82:8 83:13,14 86:3 86:4,16 87:3,9 87:12,18,22 89:1,7,10,13 90:2,5,10,18 95:14 98:13 101:12,14 104:14 105:4 107:16 111:19 115:20,21 116:2,9,18,23 116:24 117:23 117:25 118:2 119:3 **officers** 12:15 13:2,10,11 15:24 17:2,7 39:13 59:9 86:24 96:12 **offices** 1:20 **officially** 45:5 104:23 **oh** 15:17 64:5 76:4 103:1 110:16 **okay** 7:25 8:4 8:10 12:24 13:16 14:8 | 17:5 18:16,25 19:5 20:11 24:18 28:13,19 28:22 32:13 36:3,18 38:17 42:8 43:12,25 46:4,10 47:24 53:18 57:1 58:1 62:16 74:8,8,13,17,18 75:5,20 76:1,1 76:3,5 78:4 82:1 85:6 93:25 97:2 100:9 103:12 106:17 110:20 111:16,18 112:25 115:24 116:1,18 117:2 117:10 **old** 91:18 109:21 **once** 20:10 59:19 80:24 81:1,16,25 84:9,24,25 85:22 89:8,24 90:9 93:5,13 111:14,16 116:2 **ones** 50:13 **online** 44:1 **open** 80:20 **opinion** 32:22 | **opinions** 119:12 **opportunity** 8:7 **order** 23:8 53:9 **ordered** 86:11 **ordinance** 21:4 **orientation** 74:11,19,21 75:6 **original** 119:16 119:16 120:10 120:21 **orleans** 1:23 2:11,14,17,20 10:17 12:16,21 14:11,25 15:4 17:10,12,23,25 18:2,7,9,10,11 18:13,14,14,17 18:23 19:14 20:1 21:17 22:1,7,8,9,10 22:10,11,11,15 24:9 25:9 26:2 26:21 27:10 35:21 41:5 50:3 52:22 70:4,5,6,13,20 **outcome** 119:15 **outside** 13:11 19:1,3,6 33:19 33:22 34:1,22 71:16,20,22 | 80:16 112:4 115:11 |
| | | | **p** |
| | | | **p** 2:1,1 4:1 5:11 **p.m.** 1:25 118:19 **page** 3:2 74:17 119:16 120:15 121:4 122:4,7 122:10,13,16 122:19 **pages** 119:5 120:14,17,17 121:3,6,6 **paid** 19:6 21:9 29:3,6,11,19 35:13,19 37:14 39:13 47:14 48:2,8,10,18 50:7,12,15,17 50:21 51:5,8 51:13 66:18 99:16 **pants** 27:12,13 **paperwork** 64:22 99:2,3 **parents** 107:11 **parish** 21:25 22:3,7,8,8 **park** 49:2 **parked** 74:6 **part** 7:23,24 21:16 28:19 29:9 37:19,21 61:8 88:5,5 |

Veritext Legal Solutions
866 299-5127

**[participate - please]**

| | | | |
|---|---|---|---|
| **participate** 117:12 | 51:19 52:7,16 64:20 67:12 97:20 | **perjury** 120:17 121:6 | 68:21,21 73:3 73:5 98:22 |
| **particular** 31:23 35:20,25 37:3,4,7,9,10 44:2 49:14,18 52:21 58:10 68:17 71:21 108:7 111:14 111:22 | **patrolling** 50:22 51:7 67:14,15 | **permission** 17:3,16 31:20 46:17 | 99:7 112:15,17 112:19,20 113:2,2,3,4,5 114:18 |
| | **patrols** 50:16 | **person** 13:21 29:21 37:1 38:5,16 45:14 45:15,18,20 49:7 58:11 88:24 90:24 91:20 92:18,23 119:10 | **phones** 32:11 39:3,4 67:11 68:20 |
| | **pause** 9:14 | | **physical** 91:12 |
| | **pd** 27:9 | | **pick** 39:3 64:3 |
| | **pdf** 120:12 121:1 | | **pierre** 1:14 2:17 5:1,11,13 5:13 27:7 52:24 115:20 119:4 120:5 122:2 |
| **particularly** 31:18 69:8 70:4 | **peace** 19:9 20:19,24 21:2 24:12 | | |
| | **pen** 75:10 | **person's** 117:24 | |
| **parties** 4:4 119:13 | **pena** 1:16 2:24 119:2,22 | **personal** 41:3 42:24 46:13,18 46:22 51:19,25 52:17,17,18,25 53:1,17,21,23 55:13 56:7,25 58:5,12 73:19 113:2,3,4 | |
| **partner** 38:13 | **penalty** 120:16 121:5 | | **pierre's** 115:14 |
| **pass** 80:6 | | | **pigman** 2:12 |
| **passed** 94:8 | **people** 45:16 52:25 72:7 88:24 90:3 101:1 110:1 | | **place** 11:21 27:16 39:13 49:14 88:6 |
| **passenger** 71:12,14,18 80:13,13,14 91:23,24 | | | |
| | **performing** 48:24 | **personally** 44:5 72:14 89:21 93:9 97:17 102:21 | **placed** 43:15 |
| **passenger's** 80:15 | | | **plain** 40:5 53:11,11 |
| **past** 5:15 44:23 45:1,6,9,17 79:1 | **perilloux** 2:18 13:21,25 14:1 14:3,7 30:9 31:9 44:20 58:21 113:14 | **personnel** 23:10 31:22 | **plainclothes** 29:17 |
| | | **pertained** 16:11 | **plaintiff** 1:5,15 2:3 6:6 |
| **patients** 49:11 | **period** 120:18 121:7 | **pertaining** 37:3 | **plate** 69:24 70:15 |
| **patrol** 17:7 26:25 33:5 35:24 37:14 40:3,6 42:10 46:11,21,24 47:17 48:2 49:20 51:6,14 | | **pertains** 50:21 | |
| | **periodically** 112:10 | **phone** 32:10 35:25 68:10,11 | **please** 5:6,10 5:21 8:16 9:6 9:10 27:5 55:8 55:22 57:23 |

**[please - process]**

67:10,16 74:3
75:11,14 77:8
77:14,24 79:11
79:19 81:9
82:14 89:25
90:11 110:14
**plus** 57:8
**pockets** 27:14
27:14,15
**point** 9:13 20:6
33:25 40:25
41:17 44:19
45:4 48:6
54:19 60:16
69:10 72:19,19
74:22 75:7,8
75:11 76:9,19
76:20,20 77:18
80:19 83:21
85:11 87:9
88:4,19 91:4
93:1,7,7 94:6
94:10,13
100:11 101:2
101:12,14
103:13 105:11
111:19
**pointed** 104:10
104:15 108:22
109:4
**pointing** 100:3
100:8 101:12
109:3
**police** 2:17
12:16,21 14:11

14:24,25 15:2
15:4 17:10,13
17:23 18:2,7,9
18:10,11,15,17
18:23 19:2,14
19:19 23:5
24:3,10 25:9
26:2,10,14,17
26:24 27:10
28:23 29:19
35:19 38:10
40:12 41:15
42:20 43:7,18
43:18 44:1
46:24 47:2
48:2,8,13,17,17
49:24 52:2,9
52:20,22 53:5
53:8,18 56:8
56:14 59:20
83:13,14 86:16
86:23 87:18,21
87:22 117:23
117:25
**policy** 50:3
**political** 106:8
106:9 107:11
**polo** 27:6
**portion** 39:16
**pose** 84:8
111:18,21
**posed** 9:15
94:18 95:5,19
110:4 111:4,7

**position** 15:8
23:15,17,19,20
24:2 26:13,16
26:17,19 30:4
30:8,18,20
35:6 44:20
45:4,15 71:18
71:19 85:12,23
86:1 92:14
**positioned**
71:20,21 73:16
82:15
**positions** 26:16
44:23
**possible** 8:8 9:1
**post** 17:2,3,12
17:16 106:14
106:16 107:10
107:10,22
108:17 115:6
117:7,7 118:5
**posted** 108:10
109:14
**potential** 90:6
**potentially**
37:23
**pouch** 27:25
28:3
**power** 16:17
**poydras** 1:22
2:13,20
**prairieville**
119:17
**prefer** 5:12

**preparation**
102:17 103:8,9
**prepare** 9:22
10:13
**prepared** 119:6
119:8
**present** 10:9
104:6
**pretty** 10:17
11:16,17 12:7
31:24
**prior** 12:25
30:3 32:14
61:22 67:13
69:18 82:7
87:11,24,24,25
94:14 108:19
**private** 21:13
39:10,11,12,24
**probably** 68:5
76:25 77:1,5
**problem**
115:16
**procedure** 4:5
119:12 120:19
120:20
**proceed** 8:5
**proceeding**
107:1 118:19
**proceedings**
106:22
**process** 7:16
8:6 24:24
60:20

Page 19

**[professional - reasons]**

| | | | |
|---|---|---|---|
| **professional** 14:18 119:3 | 101:19,20 102:6,7 111:17 | 57:10 61:9,12 61:22,23 62:2 | **ramon** 1:14 5:1 5:8 52:24 |
| **professionally** 33:11 | **pulled** 56:14 62:23 73:20 | 62:4,4,8,9,12 62:13,17 63:2 | 115:14 119:3 120:5 122:2 |
| **profiling** 117:20 | 87:14,14 102:1 109:10 | 63:3,7,9 64:9 66:2,4,5,19 | **ran** 69:24 116:6 |
| **program** 117:14 | **pulling** 53:7,11 71:19 80:17 | 94:3,21 95:24 107:6 110:13 | **rate** 80:12 |
| **prohibition** 119:11 | 87:1 97:4 100:25 101:23 | 110:15,21,23 113:18 114:2 | **rather** 17:11 73:19 |
| **promotions** 26:22 | **pulls** 52:25 | **questions** 8:6,8 | **reaction** 100:18 |
| **properties** 70:12,13 | **purpose** 49:6 | 8:19,24 9:17 39:22 57:7,20 | **read** 61:21 101:21 102:2,4 |
| **property** 39:24 | **purposes** 58:18 84:5 | 105:2 118:8 | 102:19,20,21 102:22,22 |
| **protect** 21:2 | **pursuant** 4:5 | **quick** 44:10 | 103:9,11 106:3 |
| **protecting** 36:5 | **put** 40:22 41:17 | **quite** 48:15 | 106:9 107:15 |
| **protocol** 84:5 97:14 | 41:21,25 42:4 42:7 78:22 | 105:21 | 107:16,18,19 108:24 109:12 |
| **provide** 6:14 | 84:4,9,17 | **r** | 110:21,23 |
| 30:1 45:23 | 85:11 91:9 96:2,3 | **r** 2:1 5:8,11,11 | **reading** 4:6 120:23 121:9 |
| **provided** 24:8 120:19 121:8 | **putting** 41:25 | 27:7 122:3,3 | **really** 54:19 |
| **provides** 117:13 | **q** | **r&s** 121:1,9 | 61:5 62:19 63:23 64:5 |
| **providing** 35:20 | **qualified** 15:13 25:2 65:5 | **r.s.** 119:4 | 78:1 |
| **public** 70:11 | **question** 4:10 | **race** 72:2 99:19 99:25 117:24 | **reason** 6:13 14:4 34:1 35:3 |
| **pull** 21:17 38:5 | 8:15,17,18 9:6 9:10,15,16 | **rachel** 2:13 115:10 | 48:1 59:19 122:6,9,12,15 |
| 50:23 51:21,23 51:24,25 53:3 | 12:25 13:9 15:12 18:20,21 | **racial** 117:20 | 122:18,21 |
| 53:7,20,21 55:13 56:6,24 | 24:1 32:24 34:11,25 43:5 | **radio** 27:20,23 27:23 31:25 | **reasonable** 86:3,4,8 |
| 58:4,11 59:15 60:1,12,13 | 50:2 54:22,24 55:2,6,18,24 | 32:3 36:17,21 37:13 | **reasons** 58:9,10 58:19 73:19 |
| | 56:23 57:2,4,8 | **radios** 31:18 | 83:1 |
| | | **raise** 93:6 | |
| | | **raised** 119:16 | |

[recall - representatives]

**recall** 7:12 8:9 10:3,21 32:17 60:24 65:13,17 65:19,24 66:7 68:2,3,4 69:16 72:2,4,5 73:5 76:8,11,18,20 77:18,20 82:10 82:22 83:6,21 83:23 87:20,21 87:23 91:13 92:14,20 95:4 96:24 97:2,17 97:19 101:11 101:16,25 103:22,24 104:5,9,14 106:11 113:11
**receive** 19:12 19:23 30:20 36:7,14,24 46:17 117:7
**received** 19:13 19:25 20:7 37:2 73:11 74:4,24 115:2
**recertify** 24:12
**recess** 44:12 96:17 115:12
**recognize** 59:17 73:25 87:2
**recognizes** 59:5
**recollect** 23:4

**recollection** 11:2 77:10 91:11,21 101:3
**record** 5:7 9:14 27:5 57:5 63:13,19 77:15 78:7,8,10 79:24
**recorded** 60:10 108:7
**recordings** 11:6
**reference** 13:2 13:4,12 15:25 16:14 17:3,9 31:6,19 34:21 45:2,12 51:11 52:13 60:11 70:23 71:5 81:5,10 84:15 89:23 90:12,13 107:6 109:3 111:13 113:22
**referenced** 120:6
**references** 45:11,13,16,24 46:1
**referencing** 109:11
**referring** 12:20 31:5
**reflects** 8:23
**refresh** 11:1

**regard** 57:6
**regarding** 115:1
**regardless** 53:24
**registered** 119:2
**registration** 116:14,15
**regrets** 113:15 113:22 114:6
**regular** 27:14 56:16,17 98:3 106:21
**reinstate** 23:7
**related** 11:2 34:22 65:20 104:21 119:14
**relating** 6:20
**relation** 83:10
**relationship** 32:21
**relationships** 119:11
**released** 120:21
**relevant** 15:13 25:2 65:5
**relieved** 49:3
**remember** 23:4 24:22 30:14 66:7 67:7 71:25 76:14 78:21 83:4 91:14,15,18 92:1,2,11,12

97:10 102:3 104:7 109:5
**renew** 24:2
**repeat** 8:16 62:4,8,10,14 94:3
**repetitive** 54:21 55:23 57:2,6,20 64:10
**repetitively** 55:7
**rephrase** 8:17 44:9 46:11 88:2 95:1 109:20
**report** 31:7,12 31:15,19 38:23 38:25 39:1 97:12 98:10
**reported** 1:15 1:20 2:23 97:13 119:5
**reporter** 1:17 5:22 8:20 9:2,5 9:8 33:14 89:11 110:23 119:2,3
**reporter's** 119:1
**reporting** 119:6
**representatives** 13:18 14:10

**[represented - seal]**

| | | | |
|---|---|---|---|
| **represented** 9:20 113:7,12 | **resign** 16:8 17:12 | 83:3,17 88:8,9 90:22 101:21 107:7 117:8,14 | **safety** 30:1 56:14,15,15 58:9,10,18,18 73:19 83:1 84:5 86:4,5 87:1 90:7,8,21 111:19 118:2 |
| **representing** 6:6 | **resigned** 25:13 25:15,23,25 26:8 | **rights** 57:5 | |
| **request** 31:18 105:23,25 | **resigning** 15:9 | **rings** 68:10 | |
| **requested** 121:1,9,10 | **respect** 16:20 | **river** 74:17 81:21,22 | **saints** 48:24 |
| **require** 48:11 | **respond** 9:10 | **rob** 53:12 | **san** 2:5 |
| **required** 23:7 24:2 28:20,25 29:5,10 38:5,6 46:5 62:1 119:9 | **response** 110:18 | **robbery** 7:7 | **satisfaction** 55:4 56:1 |
| | **responses** 55:20 | **role** 22:19 24:1 29:25 35:11,12 35:14 37:19 39:21 | **saw** 68:20,20 76:24,25 78:19 79:5,7,9,13,18 80:9,10 83:20 87:16 95:23 106:12 108:17 109:11 |
| | **responsibilities** 35:23,24 | | |
| **requirement** 29:14,15,18,20 37:25 44:24,25 | **responsiveness** 4:10 | **roman** 2:17 | |
| | **return** 59:8 120:17 121:6 | **room** 12:12 | |
| **requirements** 42:8,14 | **returned** 116:4 | **route** 74:3 75:10,15 76:8 76:19 | |
| **requires** 31:16 31:17 | **review** 10:13 10:22 11:4 102:17 105:18 105:23 120:8 120:10,13 121:2 | **rpr** 2:24 119:22 119:23 | **saying** 11:19 17:6,7 18:9,17 38:17 39:19 52:11 54:7 79:12,14,15 87:23 102:5 111:11 |
| **reserve** 57:5 | | **rule** 98:9 | |
| **reserved** 4:11 | | **rules** 4:5 8:4 9:18 49:20,23 98:14 119:9,12 121:8 | |
| **residence** 36:3 39:8,8,10,11,12 39:24 59:20 64:21 68:12,13 70:2,3 89:4 | | | |
| | **reviewed** 10:15 102:9 105:12 | **run** 70:15 | **says** 17:23,24 18:13,14 |
| | **revisit** 12:25 | **rwisdom** 2:15 | |
| | **ride** 38:17 | **ryan** 13:21,25 14:1,5 | **scene** 88:13,20 88:21,23 89:8 96:20 97:6,9 |
| **resident** 70:3 81:24 89:6 | **right** 6:5 7:15 7:19 14:17 23:2 27:8 28:5 28:17 52:17 57:9,11 74:14 75:3 76:1 81:8 | **s** | |
| **residential** 6:2 6:3 | | **s** 2:1 4:1 122:3 | **schedule** 38:14 120:10 |
| **residents** 30:2 35:10 36:1 37:24 67:12 | | **safe** 54:5 86:3 96:9,11,12,13 | **scopes** 48:13 |
| | | **safer** 54:6,6,8 | **seal** 119:16 |

Veritext Legal Solutions
866 299-5127

**[seat - speak]**

| | | | |
|---|---|---|---|
| **seat** 71:15,22 91:23,24 92:9 92:15,18 | **send** 44:22,25 | 98:25 | **silver** 43:2,3,4 |
| | **sense** 8:13 97:2 111:18 | **shifts** 39:14 42:18,21 51:15 51:18,21 52:11 52:14 | **simply** 11:11 |
| **seated** 92:14 | **sergeant** 30:5,6 30:7 45:21 100:15,16 101:6 104:2,8 105:6 107:25 108:13 | | **single** 8:21 |
| **second** 9:8 85:1 | | | **sir** 50:5 |
| **section** 70:12 70:13 | | **shine** 84:5 | **sirens** 52:1 56:13 |
| **secures** 28:2,3 | | **shirt** 17:22 18:1 27:6 | **sitting** 12:5 18:11 42:4 |
| **securing** 35:9 36:5 | **serious** 94:19 95:6,20 | **shocked** 100:20 100:21,24 | **situation** 95:13 |
| **security** 2:16 13:18 22:21,22 22:22,23 23:8 23:12,17,19 24:2,8 26:16 30:1 35:20 36:25 39:2,9 39:21 52:16 53:1 59:18 67:19 | **serve** 24:12 | **show** 86:11 93:11 111:15 | **skin** 92:3 |
| | **served** 14:19 | | **sleeves** 27:7 |
| | **serves** 39:12 | **showed** 84:7 96:4 111:15,16 | **slow** 71:13,13 80:12 |
| | **service** 36:7,14 36:24 37:12 59:5 | | **small** 41:10 |
| | | **shown** 10:15 | **social** 33:19 106:4,6,11 108:10 |
| | **services** 119:10 | **shrugs** 9:9 | |
| | **set** 98:13 119:4 | **side** 27:8,15 28:5,7,17 43:24 73:17,17 77:3,3,4 80:13 80:15 82:16,16 82:18,18,18,19 82:22,23,23 83:2,2,11,11,17 83:17,18,18 88:10 | **solutions** 120:7 |
| **see** 10:8 17:22 28:9 36:4 38:3 53:10,11,16,17 59:10,10 62:17 68:23 73:18 76:3 83:1 84:7 85:12 88:5 91:6 106:1 107:22 | **setting** 8:2 | | **somebody** 38:15,24 39:6 53:12 98:4,5 |
| | **several** 7:7 55:6 | | |
| | **sewn** 18:3 | | **sorry** 10:19 11:10,18 14:5 22:11 33:14 43:3 80:14 85:18,20 89:1 89:11 92:16 105:21 110:12 110:16 |
| | **shack** 39:17 | | |
| | **shake** 64:7 | | |
| | **she'll** 5:22 | | |
| | **shed** 39:23 | | |
| | **sheet** 64:18 | **sign** 120:16 121:5 | |
| | **sheriff's** 52:23 | **signature** 119:16,22 120:21,23,23 121:9 | **sort** 49:20 |
| **seeing** 18:11 76:20 77:18 | **shift** 21:8,9 31:10,13 38:20 48:19 51:13 52:6 53:1,4 59:23 61:2 63:10 64:14 67:6,8 68:6 | | **sound** 14:6 |
| | | | **sounds** 43:21 54:16 |
| **seems** 64:6 | | | |
| **seen** 10:23 72:14 92:4,6 98:5 | | **signed** 26:7 | **speak** 12:1 13:7 13:12,13 52:5 |
| | | **signing** 4:7 | |

Veritext Legal Solutions
866 299-5127

## [speaking - street]

| | | | |
|---|---|---|---|
| **speaking** 52:4 57:16 93:23,24 106:18,19 | 21:16 24:10,13 38:10 59:13 67:21,21 106:10,15,19 106:22,25 107:12,12 108:7,8,15,18 109:13 117:13 119:2 120:9,12 | **stay** 88:6 96:20 **stayed** 88:11 **stenotype** 119:6 **step** 81:3 84:13 89:15 90:11 93:13 96:5 115:10 | 83:9,20,25 84:1,3,17,24 87:15 88:4,24 89:4,6,8,24 90:16 91:6 93:2,10 94:1,5 94:7,11,15 97:12,21 98:10 115:20 116:22 118:14 |
| **specific** 16:22 19:24 41:21 51:2 52:3 113:10 | | | |
| **specifically** 11:24 50:13 101:19 | | **stepped** 81:3 84:13 86:22 | **stopped** 68:4,4 81:2 83:11 85:11,22 96:2 116:5 |
| **specifics** 52:5 67:16 | **stated** 29:15,21 29:22 55:12 68:17 73:18 82:23 84:12,15 93:12 105:18 107:7,8 108:16 109:2 | **steps** 78:5 **stipulated** 4:3 **stipulation** 3:3 120:20 **stone** 2:12 **stonepigman....** 2:15 | |
| **speculate** 8:12 | | | **stopping** 53:19 76:20 80:25 |
| **speed** 71:13 80:13 | | | |
| **spell** 5:6 | | | **stops** 37:20 38:1 50:8 52:18 60:1,2 61:5,6,8 63:13 63:25 64:1 68:7,8,12 99:6 99:10,16 117:18 |
| **spoke** 45:3 87:13 | **statement** 10:15,22,23 13:3,8 25:18 25:23 101:16 101:21 102:2,4 102:10,20,23 103:9 107:6,7 107:17,18,18 107:24 109:5 109:12,15 | **stop** 37:25 41:19,22,24 42:2,3 53:9,10 53:20 54:1,13 59:22 60:6,6,7 60:9,10 61:1 61:15,16,16,17 62:23,25 63:8 63:10,12,21,21 64:15,21,24 65:3,20 66:25 67:13,25 68:9 68:11,11,11,12 72:12 73:3,8 73:12 74:6 75:15 76:9 80:11,18,24 82:7,9,12,15 | |
| **spoken** 13:1,10 13:21 39:18 63:25 | | | |
| **spotted** 77:11 | | | **store** 44:1 |
| **square** 67:22 | | | **story** 53:15 81:4 84:14 89:17 |
| **staff** 17:6 | | | |
| **standing** 85:25 88:1 | | | |
| **start** 67:6 75:11 76:9 | **states** 1:1 18:4 18:5 27:9 | | **stream** 106:14 106:15,25 107:4 108:5,6 108:17 109:12 109:13 |
| **started** 20:7 76:2,3 90:15 93:17 | **statewide** 19:9 20:19 24:3 | | |
| **starting** 74:3 76:19 | **stating** 25:15 72:2,5 | | |
| **state** 1:17 2:25 5:6 18:22 21:4 | **status** 30:21 **statute** 119:9 | | **street** 1:22 2:13 2:20 67:21,22 |

Page 24

**[street - thing]**

74:8 76:15,15
77:6 78:21,22
79:1 80:4
81:14,19 82:3
82:4
**streets** 49:20
50:16,22 51:6
51:7,14,19
52:7 67:23
75:24
**stuff** 39:18
**subject** 15:14
25:4 62:12
65:7
**subpoenaed**
7:13
**substance**
103:6
**sued** 6:23
112:10 113:10
**suggest** 80:16
**suite** 1:22 2:13
2:20
**superdome**
48:23,23 49:1
50:17
**supervision**
119:7
**supervisor**
13:22
**supervisors**
11:11 13:3,7
13:11,12,19
114:23

**supposed** 97:21
98:10
**sure** 11:19
13:10 17:4
36:3 38:2
39:15 48:15
51:5 63:14
68:18,18,19
69:6,6,8,17
77:17 78:6,13
88:7 96:22
97:7,15,16,16
101:19 111:8
**suspicious**
37:22
**swear** 105:7,8
**switched** 23:5
**sworn** 5:2 7:21
104:23 119:4
**system** 32:3
36:17,21,25

**t**

**t** 4:1,1 122:3,3
**tab** 66:21
**table** 55:25
**take** 9:11,13
10:24 11:21
17:4 44:10
49:11 78:5
83:17,18 85:19
96:14,16
114:18 115:21
116:18
**taken** 1:15 4:4
44:12 96:17

115:12 119:3
**talk** 9:3 11:15
14:17 19:5
32:7 96:20
**talked** 30:9
45:21 93:12
**talking** 11:12
12:2 44:19
48:16 50:13
51:2 52:13
78:21 89:19
90:13 92:17
93:16 96:5
107:25 108:11
109:7
**tall** 92:12
**taser** 27:24
28:8,9,10,12
**tchoupitoulas**
67:21,21
**technically**
25:13
**teenager**
109:25
**tell** 8:10,16
13:23 47:22,23
47:23,24 50:3
55:17 75:17
76:13 81:4
83:5 84:14
86:2 89:17
90:1 101:7
104:23 105:7,8
113:10

**telling** 50:4
**terminated**
15:7 16:16,18
24:25 25:8,12
25:19 26:3,7
**terms** 32:21
84:21
**testified** 5:3
6:16,18 7:4,6
82:24
**testify** 6:10
11:23 119:4
**testimony** 6:9
6:14 7:21 9:22
119:3,5
**texas** 19:20
**text** 112:16,20
**texted** 34:3,5
34:17 35:1
**texture** 92:3
**thank** 12:4 13:5
13:15 18:25
27:12 28:4,13
35:5 77:17
80:9
**thanks** 110:22
**that'd** 47:12
49:22
**thigh** 27:16
**thing** 16:16
17:7,7 53:16
55:7,10 76:15
78:25 89:14,16
96:10 108:11
109:25

Veritext Legal Solutions
866 299-5127

**[things - trying]**

things 9:1 17:8
  54:17 99:6
  108:14 112:13
think 14:4
  19:24 30:25
  63:1,19,22,23
  68:5 88:11
  97:15,15 98:5
  101:18
thinking 94:24
  95:10,12 96:6
thought 60:20
threat 84:8
  90:5,6 93:7
  95:15,17 110:3
  110:9 111:3,8
  111:11,19,21
threatening
  93:1
three 30:25
  39:5 68:1 73:2
  88:17,25 90:3
  90:6,20,23
  94:4,6,9
time 6:22,23,25
  8:3,8 17:6
  19:17 22:21,22
  22:25 23:20
  24:4,8,15
  26:22 30:24
  32:8,13 35:6,8
  36:10 38:15,15
  38:16 40:25
  47:4 55:25
  56:8 66:11

67:7 68:16
69:10,16,17
73:1,2,4,6,7,7
80:10,10 83:20
84:8 88:16,23
90:25 93:25
94:4,6,7,8 95:2
95:3,18,18,22
95:22 96:2,5
96:11 102:9
103:16,22
107:1,4,25
108:1,7,11
110:6 111:14
111:22 120:10
120:18,24
121:7
times 10:2
  32:16,18 45:14
  55:19 59:7
  65:11,15 66:8
  99:6 116:22,24
tina 2:4 6:5
  120:1
titan 43:2
title 27:7 35:11
  35:12,14 39:21
tjensen 2:6
  120:2
today 5:19 6:10
  6:14 9:20,23
  10:14 11:25,25
  12:5,20 15:17
  17:22 27:4
  103:18

today's 8:5
together 32:18
  38:17
told 30:5,7
  45:22 47:19
  70:15,20 71:1
  71:3,5 77:1
  80:25 89:17
  93:15 109:9
  113:11
took 75:15 76:8
  76:19
top 43:23
topic 117:20
towards 72:9
  81:21,22
traffic 21:18
  37:20,24,25
  38:3 41:19
  48:25 49:10
  50:8,18 52:18
  53:9,19 54:1
  54:13 56:16,17
  58:12 59:22
  60:1,2,9,9,10
  61:1,5,6,8,17
  63:8,10,12,12
  63:21,25 74:5
  74:6 89:6
  99:10,15
trained 83:12
  83:13,14
training 86:9
  115:1 117:7,7
  117:10,13,16

117:22 118:2,6
transcribed
  119:6
transcript 1:13
  4:7 8:23 119:7
  119:8,8,16
  120:6,8,10,13
  120:13,21
  121:2,2
transcripts
  110:19
transpired
  84:16
trial 4:11 7:7
  7:14,24
trip 64:18
truck 43:2,6
  46:15 53:11,21
  56:7,12,25
  58:5 59:10,14
  73:19
true 119:7
truth 104:24
  105:7,8
truthful 6:14
  105:1
truthfully 6:11
try 9:10 55:25
  56:2 62:17
  63:24
trying 52:3,4
  53:12,13,13
  54:15 63:9,13
  64:3 107:21
  112:21

Veritext Legal Solutions
866 299-5127

**[turn - vehicle]**

**turn** 64:22
**turned** 83:22
  99:2,3,7
**turning** 67:5
**two** 10:7 26:15
  27:14,15,25,25
  29:21 30:25
  38:17 39:4
  43:19 54:16
  75:17,17 76:13
  83:5 91:14,15
  102:3,15
  108:13 109:7
**type** 27:6 58:16
**typed** 102:24
**typical** 68:6

**u**

**u** 4:1
**uh** 85:14,19,20
  85:20 106:2
  110:10,15
**ultimate**
  116:19
**under** 6:10
  15:9 16:2,8,16
  16:22 17:13
  18:5,6,6 20:19
  25:13,15,24,25
  26:8 44:14
  56:9,10 119:6
**understand** 6:7
  6:9 8:15 11:19
  12:20 20:20
  21:6 22:14
  26:15 32:4

34:25 38:2
44:14 46:1
47:25 48:7,15
49:21 53:5
54:15 62:3
72:21 76:10
83:16 91:17
101:22 104:20
107:21 108:19
117:22
**understanding**
  12:6 76:18
  87:11 94:5
  119:7
**understood**
  12:4 13:15
  20:11 78:23
  86:22,23 98:24
**unfair** 63:23
**unfamiliar**
  69:24,25 70:18
**uniform** 26:25
  28:19 29:9,10
  29:16,19 40:2
  40:10,12
**uniforms** 42:15
**unit** 37:4 48:11
  49:1,13 53:8
  53:14,17,18
  54:4,7 58:17
  73:18 86:21,21
  116:4
**united** 1:1
**unknown** 95:25

**unmarked** 52:1
  52:2 87:2
**uptown** 74:15
**use** 4:11 12:19
  39:16,17 46:22
  47:5,7,10,13,18
  47:20,24 48:1
  48:3,4,5,8,11
  48:12,13,14
  49:9,10,12,12
  49:17,24 50:3
  50:4 52:16
  78:5 99:19,24
  117:16
**used** 5:15 49:6
  49:16
**using** 47:16
  48:18 52:17
  107:11
**usually** 78:11
**utilizes** 59:5

**v**

**v** 1:6 77:25
**v1** 77:24 78:16
  78:18 79:11,12
  79:12,13
**valid** 119:15
**van** 1:7
**variation** 55:19
**vehicle** 41:18
  41:20,25 42:5
  42:7,17,23,24
  42:25 43:15,20
  43:23 46:13,18
  46:22 48:8,12

48:13,18,19
49:4,16,17,20
49:24 50:16,22
51:1,7,9,11,12
51:14,16,19,21
51:25,25 52:2
52:2,7,9,17,18
52:19,20,20,25
53:1,5,7,7,17
53:21,24 54:10
54:13 55:14
58:12,22 59:6
60:5,7 62:24
62:24 64:21
68:13 71:7,8
71:10,16,22
72:3,6,8 73:14
73:15,15,16,20
79:18 80:11,12
80:16,17,20,25
81:2 82:24,25
83:1,24 84:1,1
84:2,3,4,4,17
84:18,24 85:2
85:3 86:6,10
86:14,22 87:1
87:17 88:6,7,9
88:10,25 89:8
89:24 90:2,19
90:23 91:7
92:13,25 94:18
95:5 96:13
104:10,16
105:19 106:8
109:18 113:16

Veritext Legal Solutions
866 299-5127

[vehicle - witness]

116:16,23,23 117:18
**vehicles** 47:5,8 47:9,11,14 49:10,11 50:23 51:22,23,24 53:3 59:15 60:2 73:2 80:24 82:14 88:11 94:1,4,7
**verbally** 9:10 79:22 87:19,22
**verbatim** 97:2
**veritext** 120:7,9 120:11
**vest** 40:19,23 41:1,3,6,7,25 42:1,7 84:4,18
**video** 11:4 114:18
**videoconfere...** 2:8
**view** 64:10
**viewed** 107:9
**viewing** 106:12 108:4,6
**violating** 38:3
**violation** 21:18 56:16,17 58:12 60:14,15,17,21
**violations** 60:20
**virtually** 12:13
**vision** 116:25 116:25

**volatile** 37:16
**vs** 120:4 122:1

**w**

**w** 2:13
**w1** 77:14
**wait** 36:10,10 58:17 76:4 85:1,16,16,16 93:18,22 107:3 110:11,11,11 110:14,14
**waived** 4:8 120:23,23
**waiving** 120:20
**walking** 85:9 85:11,22 88:3
**walther** 2:12
**want** 5:8 8:11 14:22 22:18 24:19,19,20,21 26:18 29:24 32:7 36:2 44:16 48:3,4 55:4 59:1,13 63:14 78:15,22 82:24 98:1,20
**wanted** 30:11 59:14,16
**watch** 10:7 106:21
**watching** 106:25 107:4
**way** 9:22 50:4,4 55:4 62:9,13 71:20,21 74:7

74:16 76:11,14 86:17 93:19,23
**we've** 9:18 62:19
**weapon** 28:2 102:7
**wear** 26:25 28:20 29:10,16 29:18 40:2,5 40:25 42:15
**wearing** 17:22 27:18 40:8,19 114:14
**web** 117:10,13
**week** 103:24
**weeks** 108:3
**went** 24:10 68:20 76:14 89:18 99:2,8,8 114:7
**whatnot** 8:2 39:17 71:6 75:18
**whatsoever** 6:13
**wheeler** 1:7 2:17 10:10 31:6 32:14 33:25 61:15 68:15 69:15,18 69:21 73:12,16 73:17 74:4,24 76:21,24,25 77:12 79:7,9 80:23,25 81:4

82:8,16 83:9 83:12,21 84:9 84:12,14 86:23 87:12,16,21,25 88:8,13,17 89:1,1,7,10,13 89:14,16 90:2 90:5,10 93:14 96:20 97:6,13 98:13 101:12 101:14 104:15 110:4 111:4,23 114:6 115:21 116:2,9,18,23 116:24 120:4 122:1
**wheeler's** 10:22 10:23 60:7 62:24 90:18 107:16
**wisdom** 2:13 3:7 63:18 64:3 64:6 117:5 118:8
**witness** 4:7 5:24 15:22 16:6 43:8,10 43:12 54:20 57:3 58:1 61:18,21 63:20 74:18 75:4 77:9 85:18 89:12 103:1 110:12,16,20 113:20 120:13

Veritext Legal Solutions
866 299-5127

**[witness - zip]**

| | | |
|---|---|---|
| 120:16 121:2,5 122:24 | 66:11,25 68:15 | 100:25 109:25 110:1 |
| **wittman** 2:12 | **workplace** 49:9 | **z** |
| **word** 8:21 | **write** 64:20 101:2,7 | **zip** 70:1,2,5,17 70:19,20 |
| **work** 18:1,6,6 19:3 22:8 30:11 31:1,4 33:19,22 34:1 34:1,2,22,23 38:14 41:13 45:1,6,9 49:2,7 52:15 59:9 65:2 70:8,11 | **writing** 101:11 101:16 | |
| **worked** 15:1 32:13,18 33:13 33:15 35:9 38:12 45:17 | **wrong** 24:19,20 | |
| | **wrote** 79:20 101:18,25 102:3,5,10,21 102:22 106:1 106:10 | |
| | **x** | |
| | **x** 3:1 82:12 121:9 | |
| **worker** 45:18 | **y** | |
| **working** 14:21 21:8,9 22:17 22:19 23:16 26:10 28:20,23 29:2,5,11,16,22 29:23 30:16 31:7,23 32:8 32:21 33:4 35:7,13,19,21 36:13,20 37:19 38:4,19 44:17 48:10,20,22,24 49:13 50:7,12 52:15,21 53:2 53:3 56:6 59:18 60:2 61:6 64:14 | **y'all** 38:17,18 109:4 | |
| | **yards** 2:8 | |
| | **yeah** 7:3 16:7 24:21 43:11 75:1,1 76:6 | |
| | **year** 14:22 23:2 23:4,5 | |
| | **years** 5:15 24:9 75:17 76:13 83:5,13,15 91:15 102:3 | |
| | **yolanda** 1:16 2:24 119:2,22 | |
| | **york** 2:9,9 | |
| | **young** 72:7 89:18 90:10 91:20 92:1,23 | |

Page 29

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.